## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE THE HONORABLE CLAIRE R. KELLY

|  |  |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, AND NEXTEEL CO., LTD., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) |
| Defendant, | ) ) |
| and | ) ) |
| CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, AND MAVERICK TUBE CORPORATION, | ) ) ) ) ) |
| Defendant-Intervenors. | ) ) |

Consol. Court No. 18-00169

**PUBLIC DOCUMENT**

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment on the agency record, defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


_____

JUDGE

Dated: _____, 2019

New York, NY

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE THE HONORABLE CLAIRE R. KELLY

| | |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, AND NEXTEEL CO., LTD., | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Consol. Court No. 18-00169 |
| UNITED STATES, | ) ) **PUBLIC DOCUMENT** |
| Defendant, | ) ) |
| and | ) ) |
| CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, AND MAVERICK TUBE CORPORATION, | ) ) ) ) ) |
| Defendant-Intervenors. | ) |

## RESPONSE BRIEF OF DEFENDANT-INTERVENORS CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, AND WELSPUN TUBULAR LLC USA

Roger B. Schagrin
Elizabeth J. Drake
Christopher T. Cloutier
Luke A. Meisner
SCHAGRIN ASSOCIATES
900 7th Street NW, Suite 500
Washington, D.C. 20001
(202) 223-1700
*Counsel to California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA*

Dated:  July 29, 2019

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.    STATEMENT PURSUANT TO Rule 56.2 ...........................................................1

    A.    The Administrative Determination under Review ...................................1

    B.    Issues of Law Presented ..........................................................................2

III.    STATEMENT OF FACTS ....................................................................................2

IV.    SUMMARY OF ARGUMENT .............................................................................6

V.    STANDARD OF REVIEW ...................................................................................7

VI.    ARGUMENT .........................................................................................................9

    A.    Plaintiffs' Statutory Argument Was Not Exhausted Below and Is Without Merit ......................................................................................9

        1.    Plaintiffs Failed to Exhaust their Administrative Remedies .......................9

        2.    The Law Unambiguously Permits Commerce to Make a PMS Adjustment to Respondents' Cost of Production ......................................11

        3.    If the Law is Ambiguous, Commerce Reasonably Resolved the Ambiguity by Making a PMS Adjustment to Respondents' Cost of Production .................................................................................12

    B.    Commerce's Determination that a Particular Market Situation Exists in Korea that Distorts the Costs of Production of Welded Line Pipe is Supported by Substantial Evidence and is in Accordance with the Law ..............15

        1.    Commerce Properly Applied the Cost-Based PMS Provision of the Antidumping Statute to Address Distortive Input Costs ...........................15

        2.    The *NEXTEEL I* and *II* Decisions Do Not Preclude This Court from Applying the Requisite Standard of Review ....................................19

        3.    Commerce's PMS Finding Was Based on the Totality of the Circumstances; Arguments Linking Individual Elements of the PMS Analysis to Individual Companies Miss the Point ..........................20

        4.    Commerce Appropriately Considered the Subsidies Received By Korean Hot-Rolled Coil Producers ............................................................23

        5.    Commerce Was Correct to Find That Chinese Imports Distorted the Korean Market ...................................................................................26

6.      Commerce Was Correct To Find That Strategic Alliances Exist
        Between HRC Suppliers and WLP Producers in Korea ..........................28

7.      Commerce Was Correct To Find That Distortions in the Korean
        Electricity Market Contribute To the PMS ................................................30

C.   Commerce Correctly Made a Particular Market Situation Adjustment
     Based on the CVD Rates Applied in *Hot-Rolled Steel Flat Products From
     Korea* Investigation...............................................................................................32

1.      Hot-Rolled Steel Flat Products CVD Investigation Is the Best
        Source for Subsidy Rate............................................................................32

2.      Commerce's Use of an AFA Rate for the PMS Adjustment is
        Permissible................................................................................................34

VII.   CONCLUSION..........................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
66 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ............................................................ 10

*Albemarle Corp. & Subsidiaries v. United States*,
821 F.3d 1345 (Fed. Cir. 2016)................................................................................. 34, 35

*Bergerac v. United States*,
102 F. Supp 2d 497 (Ct. Int'l Trade 2000) ............................................................ 21

*Bloate v. United States*,
559 U.S. 196 (2010)...................................................................................................... 26

*Catfish Farmers of Am. v. United States*,
641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ........................................................ 8

*Cemex S.A. v. United States*,
133 F.3d 897 (Fed. Cir. 1998).................................................................................... 21

*Ceramica Regiomontana, S.A. v. United States*,
10 CIT 399, 636 F. Supp. 961 (1986),
aff'd, 810 F.2d 1137 (Fed. Cir. 1987)....................................................................... 9, 13

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*,
467 U.S. 837 (1984)...................................................................................................... 8, 13

*China Nat. Machinery Import & Export Corp. v. United States*,
264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) ........................................................ 24-25

*Cleo Inc. v. United States*,
501 F.3d 1291 (Fed. Cir. 2007) ................................................................................ 8

*Consol. Edison Co. v. NLRB*, 305
U.S. 197 (1938)............................................................................................................... 7

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)...................................................................................................... 8

*Corus Staal BV. v. United States*,
502 F.3d 1370 (Fed. Cir. 2007).................................................................................. 10

*Evonik Rexim (Nanning) Pharm. Co. v. United States*,
253 F.Supp.3d 1364 (Ct. Int'l Trade 2017) .......................................................... 21

*Fujitsu Gen. Ltd. v. United States*,
88 F.3d 1034 (Fed. Cir. 1996)................................................................................... 13

*Fuwei Films (Shandong) Co. v. United States*,
791 F. Supp. 2d 1381 (Ct. Int'l Trade 2011) ........................................................ 3

*Goldlink Indus. Co. v. United States*,
431 F.Supp.2d 1323 (Ct. Int'l Trade 2006) .......................................................... 8

*Husteel v. United States,*
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .......................................................... 29

*JBF RAK LLC v. United States,*
    790 F.3d 1358 (Fed. Cir. 2015)........................................................................... 13

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984)........................................................................... 7-8

*Maverick Tube Corp. v. United States,*
    273 F. Supp. 3d 1293 (Ct. Int'l Trade 2017),
    appeal docketed, No. 18-1351 (Fed. Cir. Dec. 28, 2017) ...................................... 31

*Murata Mfg. Co. v. United States,*
    820 F. Supp. 603 (Ct. Int'l Trade 1993) ............................................................. 21

*NEXTEEL Co., Ltd. v. United States,*
    Court No. 17-00091, Slip Op. 19-1 (Ct. Int'l Trade Jan. 2, 2019) ................. 3, 7, 20

*NEXTEEL Co., Ltd. v. United States,*
    Court No. 18-00083, Slip Op. 19-73 (Ct. Int'l Trade June 20, 2019)................... 3, 7

*Nucor Corp. v. United States,*
    Court No. 18-1787, Slip Op. (Fed. Cir. June 21, 2019)........................................ 31

*Pakfood Pub Co. v. United States,*
    724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) ...................................................... 10

*Pesquera Mares Australes Ltda. v. United States,*
    266 F.3d 1372 (Fed. Cir. 2001).......................................................................... 8

*POSCO v. United States,*
    Slip Op. 18-117 (Sept. 11, 2018) ...................................................................... 31

*RadLAX Gateway Hotel v. Amalgamated Bank,*
    566 U.S. 639 (2012)..................................................................................... 25-26

*SKF USA Inc. v. United States,*
    675 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .................................................. 34, 35

*Timken Co. v. United States,*
    699 F.Supp. 300 (Ct. Int'l Trade 1988) .............................................................. 8

*Timken Co. v. United States,*
    354 F.3d 1334 (Fed. Cir. 2004)................................................................... 8-9, 13

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009)................................................................................... 8, 13

*U.S. Magnesium LLC v. United States,*
    839 F.3d 1023 (Fed. Cir. 2016).......................................................................... 21

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013).......................................................................... 34

**STATUTES AND REGULATIONS**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................................ 7

19 U.S.C. § 1677(15) ........................................................................................................... 13

19 U.S.C. § 1677b ......................................................................................................... *passim*

19 C.F.R. § 351.102(b) ...................................................................................................... 14

**ADMINISTRATIVE DETERMINATIONS**

*Biodiesel from Argentina: Final Determination of Sales at Less Than Fair Value and*
*Final Affirmative Determination of Critical Circumstances, in Part,*
83 Fed. Reg. 8837 (Dep't Commerce Mar. 1, 2018), and accompanying Issues
and Decision Memorandum ................................................................................ 29

*Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair Value,*
83 Fed. Reg. 8835 (Dep't Commerce Mar. 1, 2018), and accompanying Issues
and Decision Memorandum ................................................................................ 16

*Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea:*
*Final Affirmative Countervailing Duty Determination and Final Negative Critical*
*Circumstances Determination,*
82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017) .......................................... 33

*Certain Corrosion-Resistant Carbon Steel Flat Products from Korea,*
62 Fed. Reg. 18,404 (Dep't Commerce Apr. 15, 1997) ........................................ 17

*Certain New Pneumatic Off-the-Road Tires,*
77 Fed. Reg. 52,683 (Dep't Commerce Aug. 30, 2012) ........................................ 25

*Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review; 2014-2015,*
82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017), and accompanying Issues
and Decision Memorandum ................................................................................ 18

*Certain Oil Country Tubular Goods From the Republic of Korea: Amended Final*
*Results of Antidumping Duty Administrative Review; 2014-2015,*
82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017) ......................................... 18

*Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review and Final Determination of No*
*Shipments; 2015-2016,* |
83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018), and accompanying Issues
and Decision Memorandum ................................................................................ 19

*Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review; 2016–2017,*
84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019), and accompanying Issues
and Decision Memorandum ................................................................................ 19

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review; 2015-2016,*

83 Fed. Reg. 27,541 (Dep't Commerce Jun. 13, 2018), accompanying Issues and Decision Memorandum......................................................................................... 36

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *as amended*, 81 Fed. Reg. 67,960 (Dept. Commerce Oct. 3, 2016) ............................................. 3

*Steel Concrete Reinforcing Bar from Taiwan: Final Determination of Sales at Less Than Fair Value*,
82 Fed. Reg. 34,925 (Dep't Commerce Jul. 27, 2017). ........................................................ 23

*Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019), and accompanying Issues and Decision Memorandum.......................................................................................19

## LEGISLATIVE MATERIALS

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 385, codified at 19 U.S.C. § 1677b(e) .......................................................... 6, 12, 13, 15

S. Rep. No. 114-45 (2015) ............................................................................ 16, 17, 26

## I.   INTRODUCTION

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Defendant-Intervenors California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA hereby submit this Response Brief addressing the February 1, 2019 briefs filed by Plaintiffs Husteel Co., Ltd. ("Husteel"), Hyundai Steel Company ("Hyundai"), SeAH Steel Corporation ("SeAH"), and NEXTEEL Co., Ltd. ("NEXTEEL"), respectively, in support of their Rule 56.2 motions for judgment on the agency record. Pl. Husteel's Br. Supp. Mot. J. Agency R. (Feb. 1, 2019) ("Husteel Br.") (ECF No. 42); Mem. Supp. Consol. Pl. Hyundai Steel Co.'s Rule 56.2 Mot. J. Agency R. (Feb. 1, 2019) ("Hyundai Br.") (ECF No. 40); Br. SeAH Steel Corp. Supp. Rule 56.2 Mot. J. Agency R. (Feb. 1, 2019) ("SeAH Br.") (ECF No. 38); Mem. Supp. Consol. Pl. NEXTEEL Co., Ltd.'s Rule 56.2 Mot. J. Agency R. ("NEXTEEL Br.") (ECF No. 41). This Response Brief is timely filed in accordance with the Court's order on June 24, 2019. *See* Amended Scheduling Order (June 24, 2019) (ECF No. 62). For the reasons set out in this brief, Plaintiffs' motions should be denied.

## II.   STATEMENT PURSUANT TO RULE 56.2

### A.   The Administrative Determination under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final results in the first administrative review of the antidumping duty order covering Welded Line Pipe from the Republic of Korea. *See Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 33,919 (Dep't Commerce Jul. 18, 2018) ("*Final Results*"), as amended, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018) (PR Docs. 329, 340).[1]  Commerce's findings and

---

[1] Citations to the administrative record indicate the public record document numbers ("PR

conclusions of fact and law are set out in Commerce's unpublished Issues and Decision Memorandum accompanying the Final Results. Issues and Decision Memorandum for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea, Jul. 11, 2018 ("Final IDM") (PR Doc. 322).

**B.    Issues of Law Presented**

Whether Commerce's determination that a particular market situation existed in Korea during the POR with regard to hot-rolled coil costs ("HRC"), based on record evidence demonstrating distorted welded line pipe production costs in Korea resulting from the collective impact of (1) the Korean government's subsidization of the production of HRC production (the primary input for WLP), (2) Chinese HRC overcapacity, (3) strategic alliances between certain Korean HRC suppliers and Korean WLP producers, and (4) the Korean government's involvement in the electricity market, is supported by substantial evidence on the record and otherwise in accordance with law.

Whether Plaintiffs exhausted their administrative remedies with regard to the argument that Commerce's adjustment to the cost of production ("COP") for the sales-below cost test to account for a particular market situation was in accordance with the law.

Whether Commerce's adjustment to respondents' cost of production to account for Commerce's particular market situation finding is supported by substantial evidence on the record and otherwise in accordance with law.

**III.    STATEMENT OF FACTS**

On February 13, 2017, Commerce initiated the first administrative review of the antidumping duty order on WLP from Korea for the period of May 22, 2015 through November 30, 2016, *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed.

Doc.").

Reg. 10,457, 10,459 (Dep't Commerce Feb. 13, 2017) (PR Doc. 21), and subsequently selected two mandatory respondents: Hyundai Steel Company and SeAH Steel Corporation. Memorandum from Joshua Tucker to Melissa G. Skinner, re: *2015-2016 Antidumping Duty Administrative Review of Welded Line Pipe from the Republic of Korea, Selection of Respondents for Individual Review* (March 7, 2017) at 6 (PR Doc. 22).

On September 25, 2017, Maverick Tube Corporation ("Maverick") alleged that a particular market situation ("PMS") exists in Korea such that the costs of production of line pipe in Korea were distorted during the period of review, did not reflect the cost of production in the ordinary course of trade, and therefore warrant corrective adjustments. Maverick Tube Corporation PMS Allegation, Sept. 25, 2017 ("Maverick PMS Allegation") (PR Docs. 154-221). The Maverick PMS Allegation included evidence showing that a particular market situation exists in Korea due to four elements: "subsidies on Korean hot-rolled coil ('HRC'), strategic alliances between HRC suppliers and downstream pipe producers, distortive pricing of Chinese HRC, and government subsidization of electricity." Maverick PMS Allegation at 7-8. In support of this allegation, Maverick submitted documentation underlying the first and second antidumping reviews in *Oil Country Tubular Goods from Korea* ("*OCTG from Korea*"),[2] *see* Maverick PMS Allegation at Exhibits 1-7, 14-29, as well as from the countervailing duty investigation in *Hot-Rolled Steel Flat Products from Korea*, *see Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), *as amended*, 81 Fed. Reg. 67,960 (Dept.

---

[2] These OCTG from Korea proceedings were appealed to this Court and are subject to remand orders. *See NEXTEEL Co., Ltd. v. United States*, Court No. 17-00091, Slip Op. 19-1 (Ct. Int'l Trade Jan. 2, 2019); *NEXTEEL Co., Ltd. v. United States*, Court No. 18-00083, Slip Op. 19-73 (Ct. Int'l Trade June 20, 2019). As explained below, however, neither of these cases is dispositive for purposes of the case now before this Court.

Commerce Oct. 3, 2016) ("*Hot-Rolled Steel from Korea*"), *see* Maverick PMS Allegation at Exhibits 8-10.

On November 9, 2017, Maverick filed additional factual information related to its PMS allegation. The November 9 submission included that "the distortive Korean market conditions on which the Department based its recent PMS determination in *OCTG from Korea* have worsened." Maverick Tube Corporation Submission of Factual Information Pertaining to Particular Market Situation, Nov. 9, 2017, at 3 (PR Docs. 240-241), including UN COMTRADE data.

On January 9, 2018, Commerce published its *Preliminary Results*, calculating a preliminary margin of 19.42% for Hyundai, 2.30% for SeAH, and 10.86% for non-examined companies. *Welded Line Pipe from Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 1,023, 1,024 (Dep't Commerce Jan. 9, 2018) (PR Doc. 267), accompanying Decision Memorandum ("*Preliminary Decision Memo*") (PR Doc. 259). In the accompanying *Preliminary Decision Memo*, Commerce preliminarily determined that a PMS exists in Korea, resulting from the "cumulative effect" and "collective impact" of "Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market." *Preliminary Decision Memo* at 12. Further, Commerce found that "the CVD rates from the investigation on Hot-Rolled Steel from Korea are an appropriate basis for making a PMS adjustment in this review." *Preliminary Decision Memo* at 13.

In its *Final Results*, Commerce reaffirmed its approach to the above issues, dismissing arguments now raised by Plaintiffs. As to the existence of a particular market situation, Commerce considered the evidence on the record concerning each of the four elements. First,

Commerce found that "{t}he record evidence demonstrates that the Korean government subsidized HRC and that the mandatory respondents purchased HRC from entities receiving these subsidies."  Final IDM at 13.  Second, Commerce found that, "as a result of significant overcapacity in Chinese steel production, which stems, in part, from the distortions and interventions prevalent in the Chinese economy, the Korean steel market has been flooded with imports of cheaper Chinese steel products, placing downward pressure on Korean domestic steel prices."  Final IDM at 13.  Third, Commerce found that "the record evidence supports that … strategic alliances {between certain Korean HRC suppliers and Korean WLP producers} exist in Korea," and have led to distortions in the prices of HRC.  Final IDM at 13.  Finally, Commerce found that "the Korean government's involvement in the electricity market in Korea is a contributing factor to the PMS in Korea impacting the COP for WLP."  Final IDM at 14.  "Considered collectively," Commerce determined that:

> the circumstances present during this review – that is, the PMS allegation itself and the record evidence concerning the allegation – remained largely unchanged from those which led to the finding of a PMS in Korea in the other reviews. Therefore, we find that, based on the collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market, a PMS exists in Korea which distorts the cost of production for WLP.

Final IDM at 13.

In selecting the most appropriate subsidy rate, Commerce considered and rejected the same sources Plaintiffs suggest in their brief to this Court (*i.e.*, the rate from *Cut-to-Length Plate from Korea*).  Final IDM at 14-15 ("Contrary to the respondents' arguments, and, as explained in the *Preliminary Results*, we continue to find that the subsidy rates from *Hot-Rolled Steel from Korea* are more appropriate than the subsidy rates from Commerce's CVD investigation of *Cut-to-Length Plate from Korea*, because the former rates are for hot-rolled steel, the primary input used to make WLP, whereas the latter are not").  Commerce also rejected the respondents'

arguments – again recycled here by Plaintiffs – that the AFA rate from *Hot-Rolled Steel from Korea* is inaccurate and cannot be applied to cooperating parties.  Final IDM at 15 ("Regarding the fact that POSCO's CVD rate was based on total or partial AFA, we disagree that this fact alone should discredit its use in making a PMS adjustment," and the rates "represent an accurate measure of the subsidies received by the producers of HRC").

## IV.   SUMMARY OF ARGUMENT

Plaintiffs did not present to Commerce below their new argument before the Court that the PMS provisions in the statute only permit Commerce to adjust constructed value ("CV") and not to adjust the cost of production ("COP") for the purposes of the sales-below-cost test. Plaintiffs thus failed to exhaust their administrative remedies regarding this issue before the agency, and they are precluded from bringing this claim before the Court. Even if this Court were to consider Plaintiffs' new claims on this issue, it should find that the statute does permit Commerce to adjust costs both for the sales-below-cost test and for constructed value to account for the PMS it found to exist.

Commerce properly found that a particular market situation exists in Korea which distorts the cost of production for WLP.  Commerce correctly applied the Trade Preferences Extension Act ("TPEA") amendment to the U.S. antidumping statute, Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362, 385, codified at 19 U.S.C. § 1677b(e), which grants Commerce great flexibility both in identifying a PMS with respect to a respondent's input costs, and in addressing the PMS through its costs of production adjustment.

There is substantial evidence on the record supporting Commerce's finding of four elements contributing to the particular market situation in Korea:  (1) the Korean government's subsidization of HRC production, which is the primary input for WLP; (2) the Chinese steel overcapacity crisis that floods the Korean steel market with imports of "cheaper Chinese steel

products, placing downward pressure on Korean domestic steel prices;" (3) strategic alliances between certain Korean HRC suppliers and Korean WLP producers; and (4) the Korean government's involvement in the electricity market.  Commerce's approach, to consider the cumulative effect of these four elements, is supported by well-established agency and judicial precedent.

Neither the Court's remand order in *NEXTEEL I, see NEXTEEL Co., Ltd. v. United States*, Court No. 17-00091, Slip Op. 19-1 (Ct. Int'l Trade Jan. 2, 2019), nor the Court's remand order in *NEXTEEL II*, *see NEXTEEL Co., Ltd. v. United States*, Court No. 18-00083, Slip Op. 19-73 (Ct. Int'l Trade June 20, 2019), are dispositive for purposes of the current case, as (1) these cases ultimately may be further appealed and or affirmed; and (2) the Court is obliged to consider this unique record and Commerce's determination in accordance with the standard of review.

Once Commerce established that a particular market situation existed in Korea, it was correct to use *Hot-Rolled Steel from Korea* for calculating a reasonable adjustment to HRC costs, as it was the current rate, and calculated for the primary input for WLP.  That the subsidy rates from *Hot-Rolled Steel from Korea* are tied to the application of AFA is of no importance, as the rate is still meant to represent an accurate measure of the subsidies received by the producers of HRC.  Accordingly, the Court should uphold Commerce's approach.

## V.    STANDARD OF REVIEW

Final Commerce determinations may be held unlawful only if "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  "The

possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1366 (Ct. Int'l Trade 2009) ("The administrative record for an {AD} administrative review may support two or more reasonable, though inconsistent, determinations on a given issue"). Accordingly, the Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). The substantial evidence standard of review also does not permit the Court to reweigh the evidence or substitute its judgment for Commerce's own. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006). *See also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988).

In determining whether Commerce's interpretation and application of the AD statute is in accordance with law, the Court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).   *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001)).   Under *Chevron*, the first step is for the Court to determine whether Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842 – 843. If so, the agency and the Court must comply with that clear Congressional intent. *Id*. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, Commerce's interpretation governs if it is not unreasonable, *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009), and "{a}ny reasonable construction of the state is a permissible construction." *Timken Co. v. United*

*States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).  The Court also evaluates whether the agency's interpretation is a "reasonable means of effectuating the statutory purpose." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

## VI.  ARGUMENT

### A.  Plaintiffs' Statutory Argument Was Not Exhausted Below and Is Without Merit

In their opening briefs, Plaintiffs Husteel and Hyundai argue that the PMS provisions of the statute only permit Commerce to make adjustments to a respondents' costs for the purpose of calculating constructed value ("CV") and not for the purpose of calculating the cost of production ("COP") for the sales-below-cost test. Husteel Br. at 17 – 19; Hyundai Br. At 18 – 19. As explained in more detail below, no Plaintiff raised this argument in their case briefs before the agency, and Plaintiffs have therefore failed to exhaust their administrative remedies with regard to this argument. The Court should therefore decline to hear these arguments in the first instance.

If the Court waives the exhaustion requirement, it should nonetheless find that the statute unambiguously permits the adjustment to COP that Commerce made. At a minimum, if the statute is ambiguous, Commerce's interpretation was reasonable and therefore warrants deference from this Court.

### 1.  Plaintiffs Failed to Exhaust their Administrative Remedies

Neither Husteel nor Hyundai argued in their case brief before the agency that the PMS provisions of the statute only permit Commerce to make adjustments to a respondents' costs for the purpose of calculating constructed value ("CV") and not for the purpose of calculating the cost of production ("COP") for the sales-below-cost test. *See* Husteel Case Brief. PR Doc. 282.

*See also* Hyundai Case Brief. PR Doc. 283. Commerce's regulations require parties to "present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination" in their case briefs. 19 C.F.R. § 351.309(c)(2). In addition, the statute directs the Court to require the exhaustion of administrative remedies where "appropriate," 28 U.S.C. § 2637(d), and the Court has generally found that it is "appropriate" to require the exhaustion of administrative remedies through the inclusion of specific issues in parties' case briefs before the agency in antidumping proceedings. *See, e.g., Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1350 (Ct. Int'l Trade 2010). The Federal Circuit has explained, "absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). Among the policy reasons favoring the exhaustion requirement are the prevention of deliberate flouting of agency rules, protection of "the autonomy and efficiency of agency decisionmaking within the agency's sphere of expertise," assisting judicial review, and promoting judicial economy. *Pakfood*, 724 F. Supp. 2d at 1350 n.44 (citations omitted).

The Court has also required that litigants exhaust their administrative remedies by including specific aspects of an argument in their case briefs, not just the issue in general: "Both the Federal Circuit and this court have held that failure to raise a specific argument in a case brief, even where the general issue is addressed, constitutes a failure to exhaust administrative remedies." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 66 F. Supp. 2d 1354, 1366 (Ct. Int'l Trade 2009) (citations omitted). This is because the failure to raise a specific argument deprives Commerce of the opportunity to consider the matter, make its ruling, and state the reasons for its decision. *Id*. Thus, the fact that Husteel and Hyundai generally addressed the issue of Commerce's PMS findings and PMS adjustment does not excuse their failure to address the

specific issue they now raise regarding Commerce's statutory authority to adjust COP for the purposes of the sales-below-cost test to account for the PMS that was found to exist.

Finally, the specific argument raised before the Court by Husteel and Hyundai does not qualify for the "pure question of law" exception to the doctrine of exhaustion. Though the Court has applied the exception to *Chevron* prong one issues that do not require further agency interpretation or explanation, that is not the case here. *See, e.g., Fuwei Films (Shandong) Co. v. United States*, 791 F. Supp. 2d 1381, 1384 (Ct. Int'l Trade 2011) (noting the doctrine "might apply for a clear statutory mandate that does not implicate Commerce's interpretation of the statute …." (citations omitted)). Here, the agency determined that the expanded definition of "ordinary course of trade" and the ability to apply "any other calculation methodology" in the new PMS provisions of TPEA permitted Commerce to apply a methodology that included a PMS adjustment to respondents' COP. Final IDM at 12. Whether the Court finds the language unambiguous or not, the agency's interpretation involved a recently-enacted statute vesting Commerce with broad new discretion, and Commerce should have had the opportunity to address plaintiffs' contentions regarding the proper reading of the statute in the first instance in the underlying proceeding. It would therefore be inappropriate to excuse Plaintiffs' failure to exhaust their administrative remedies under the "pure legal question" exceptions in this instance.

For all of these reasons, the Court should find that Plaintiffs failed to exhaust their administrative remedies regarding this particular argument.

## 2. The Law Unambiguously Permits Commerce to Make a PMS Adjustment to Respondents' Cost of Production

In the event the Court does not require exhaustion of this argument and proceeds to review Plaintiffs' claims on the merits, it should find that the statute unambiguously permitted Commerce to make a PMS adjustment to respondents' COP under *Chevron* prong one. TPEA

amended 19 U.S.C. § 1677b(e) to authorize Commerce to use another calculation methodology

under the statute "or <u>any other</u> calculation methodology" in the event that "a particular market

situation exists such that the cost of materials and fabrication or other processing of any kind

does not accurately reflect the cost of production in the ordinary course of trade." TPEA § 504(c)

(emphasis added). Thus, once a PMS was found to render costs outside the course of ordinary

trade, the statute unambiguously provides Commerce with the authority to use "any other"

calculation methodology. The fact that the authorization is contained in a section of the statute

concerning constructed value does not in itself limit the scope of the explicit authority to use

other calculation methodologies under the statute as well as "any other" calculation

methodology.

Commerce thus appropriately concluded that TPEA not only added the concept of

"particular market situation" and "ordinary course of trade" to the statute for the purposes of

constructed value, but also, "through these provisions for the purposes of the COP { cost of

production } under section 773(b)(3) of the Act." Final IDM at 12. Thus, Commerce permissibly

determined that it had the authority to adjust respondents' cost of production to account for the

PMS that was found to exist, as the adjustment to respondents' COP qualifies as "any other

calculation methodology." The Court should therefore find that the statute unambiguously

permitted the PMS adjustments to respondents' COP.

> **3.** **If the Law is Ambiguous, Commerce Reasonably Resolved the Ambiguity by Making a PMS Adjustment to Respondents' Cost of Production**

If this Court determines that the amended statute did not unambiguously authorize

Commerce to adjust respondents' COP, it should nonetheless find that Commerce's

interpretation of the ambiguous statute was reasonable. If the statute is silent or ambiguous with

respect to the specific issue, the court must defer to Commerce's interpretation as long as it is

reasonable. *Chevron*, 467 U.S. at 843. *See also Eurodif*, 555 U.S. at 316; *Timken*, 354 F.3d at 1342. As demonstrated below, Commerce's interpretation was a reasonable means of effectuating the statutory purpose, and it is therefore entitled to deference. *See Ceramica Regiomontana*, 636 F. Supp. at 966.

Indeed, the deference this Court affords to Commerce's statutory interpretations is at its highest when the interpretation involves Commerce's calculation methodologies. When a statute fails to make clear "any Congressionally mandated procedure or methodology for assessment of the statutory tests, Commerce may perform its duties in the way it believes most suitable." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (internal quotations and citation omitted). As a result, Commerce receives "tremendous deference" when it exercises its technical expertise to select and apply methodologies to implement the statute. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

In this case, as noted above, Congress amended the statute to permit Commerce to use "any other calculation methodology" if a cost-based PMS is found to exist such that the costs of materials or other items not longer reflect the cost of production in the ordinary course of trade. TPEA § 504(c). Congress also amended the definition of transactions that are outside of the "ordinary course of trade" to include "{s}ituations in which the administering authority determines that a particular market situation prevents a proper comparison with the export price or constructed export price." TPEA § 504(a). *See also* 19 U.S.C. § 1677(15).

The question of whether costs and prices are in the "ordinary course of trade," and therefore whether or no they can form the basis of a fair and proper comparison with export price (or constructed export price), is fundamental to the entire concept of normal value. *See* 19 U.S.C. § 1677b(a). First, when examining home market prices as a possible basis for normal value, the

statute instructs Commerce to rely, where possible, on home market prices that are for sales made "in the usual commercial quantities and in the ordinary course of trade …." 19 U.S.C. § 1677b(a)(1)(B)(i). Second, when certain sales are disregarded because they are found to be made at less than the cost of production, the statute directs Commerce to base normal value on "the remaining sales of the foreign like product in the ordinary course of trade." 19 U.S.C. § 1677b(b)(1). Third, when calculating the cost of production, the statute directs Commerce to use costs of materials and other items during a period that would "ordinarily permit the production of that like foreign product in the ordinary course of business." 19 U.S.C. § 1677b(b)(3)(A).

Thus, once Commerce found that a PMS distorted the cost of production such that those costs were no longer in the course of ordinary trade, it was reasonable for the agency to conclude that it could not use those distorted costs either for the calculation of constructed value or for the calculation of the cost of production. Indeed, it would be illogical to find that the very same costs that are outside the ordinary course of trade for the purposes of calculating constructed value must nonetheless be used to calculate the cost of production. Such a result would contradict the Congressional mandate that the costs of materials used to calculate the cost of production must not be outside the ordinary course of business. 19 U.S.C. § 1677b(b)(3)(A). It was thus reasonable for Commerce to conclude that costs which are outside the ordinary course of "trade" for the purposes of constructed value are also outside the ordinary course of "business" for the purposes of the sales-below-cost test.

Such a result is also consistent with the broader statutory mandate to calculate normal value so as to "achieve a fair comparison with the export price or constructed export price." 19 U.S.C. § 1677b(a). Congress specifically clarified that the existence of a particular market

situation is one such circumstance that may prevent a proper comparison with export price or constructed export price. TPEA § 504(a). If Commerce had reached the contrary result and determined it must use costs that are distorted by a particular market situation and outside the course of ordinary trade, the resulting normal value would, by definition, not be capable of achieving a "fair" and "proper" comparison with export price and constructed export price. This would defeat the entire purpose of the statute.

It was therefore reasonable, and consistent with the statutory scheme and statutory purpose, for Commerce to interpret its authority so as to permit it to adjust respondents' cost of production to account for the particular market situation that was found to exist. The Court should thus defer to Commerce's reasonable interpretation.

**B.**      **Commerce's Determination that a Particular Market Situation Exists in Korea that Distorts the Costs of Production of Welded Line Pipe is Supported by Substantial Evidence and is in Accordance with the Law**

Commerce's determination that, "based on the collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market, a PMS exists in Korea which distorts the cost of production for WLP," is supported by substantial evidence on the record and is in accordance with the law. Final IDM at 13.  The Court should therefore affirm the portions of Commerce's final results relating to the existence of a PMS challenged by Plaintiffs.

**1.**      **Commerce Properly Applied the Cost-Based PMS Provision of the Antidumping Statute to Address Distortive Input Costs**

Plaintiffs argue that affirmative cost-based PMS findings should be reserved for "extreme circumstances," and they seek to create statutory standards that do not exist.  See, *e.g.*, Hyundai Br. at 17-18 (ECF No. 40). Plaintiffs' arguments lack merit and are based on a basic misunderstanding of the purpose and import of the Trade Preferences Extension Act ("TPEA")

amendment to the U.S. antidumping statute. 19 U.S.C. § 1677b(e). Through the TPEA amendment, Commerce was given authority to address cost-based PMS concerns in situations where the market for a producer's input costs is distorted. 19 U.S.C. § 1677b(e)(1), (3). The antidumping statute continues to provide for a price-based PMS analysis, which addresses situations where a producer's home market sales prices cannot be compared to its U.S. sales prices due to some distortion. 19 U.S.C. § 1677b(a)(1)(B)(ii)(III). In both the price-based and cost-based context, the PMS analysis serves to identify where market conditions are unrepresentative for purposes of a fair comparison to U.S. price.

The TPEA expanded Commerce's PMS authority with the intention of granting Commerce "flexibility in calculating a duty that is not based on distorted pricing or costs," S. Rep. No. 114-45 (2015) at 37, and added the following provision:

> For purposes of paragraph (1) {concerning the "cost of materials and fabrication or other processing"}, if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

19 U.S.C. § 1677b(e).

The cost-based provisions of the statute date from 2015. Plaintiffs argue that Commerce "must interpret both sales and cost provisions together," based again on language from the URAA-SAA, which predates the 2015 TPEA. Hyundai Br. at 19-20 (citing *Biodiesel from Indonesia: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 8835 (Dep't Commerce Mar. 1, 2018), and accompanying Issues and Decision Memorandum at Comment 3 ("*Biodiesel from Indonesia*"). With this argument, and in attempting to establish that there is a "high bar" to find a cost-based PMS, *see* Hyundai Br. at 19, Plaintiffs mistakenly draw from sources related to price-based PMS, such as provisions of the Statement of Administrative

Action accompanying the 1994 Uruguay Round Agreements Act (URAA-SAA), which introduced the price-based PMS provision, and certain price-based PMS determinations.  *See* Hyundai Br. at 20-21 (citing, *e.g.*, *Certain Corrosion-Resistant Carbon Steel Flat Products from Korea*, 62 Fed. Reg. 18,404 (Dep't Commerce Apr. 15, 1997)).  These sources are not relevant to Commerce's analysis of market distortions related to a foreign producer's cost of production. The statute provides that where "the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade" Commerce has the authority to "use another calculation methodology under this subtitle or any other calculation methodology."  19 U.S.C. § 1677b(e).  The PMS provisions under the TPEA were explicitly designed to grant Commerce the broad authority and "flexibility" to address situations in a foreign market where inherent distortions in the market prevent a fair comparison.  S. Rep. No. 114-45 (2015) at 37.

The cost-based PMS provision affords Commerce broad discretion to resort to "another calculation methodology under this part *or any other calculation methodology*."  19 U.S.C. § 1677b(e)(3) (emphasis added).  As correctly implemented in the *Final Results*, the cost-based PMS affords Commerce greater flexibility both in identifying a PMS with respect to a respondent's input costs, and in addressing the PMS through its costs of production adjustment. Commerce's interpretation is reasonable, and under the standard of review set out in *Chevron*, is therefore in accordance with law.

Commerce grounded its cost-based PMS finding on substantial record evidence demonstrating the combined impact of a variety of distortions present in the Korean HRC market.  *See* Final IDM at 12-18.  Cost-based PMS allegations are "necessarily … specific to the allegation raised in the particular case and with respect to a particular market," and Commerce

17

must evaluate cost-based allegations on the basis of the record developed in each case. *See Biodiesel from Indonesia* at Comment 3.

In the *Final Results*, Commerce found that welded line pipe production costs in Korea are distorted as the result of the collective impact of four elements:  (1) the Korean government's subsidization of HRC production, which is the primary input for WLP; (2) the Chinese steel overcapacity crisis that floods the Korean steel market with imports of "cheaper Chinese steel products, placing downward pressure on Korean domestic steel prices;" (3) strategic alliances between certain Korean HRC suppliers and Korean WLP producers; and (4) the Korean government's involvement in the electricity market.  Final IDM at 13 (finding a PMS "based on the collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market").

All of these factors combine to distort the costs of HRC in Korea.  The market distortions caused by the cumulative impact of these interrelated factors has been established and, based on the evidence on the record, has not abated.  Commerce first recognized the existence of this particular market situation in Korea in the first administrative review of OCTG from Korea (2014-2015), and also applied it in the second and third administrative reviews of OCTG from Korea (2015-2016; 2016-2017), the 2015-2016 review of Circular Welded Pipe from Korea, and the second administrative review of WLP from Korea (2016-2017).  *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017), and accompanying Issues and Decision Memorandum; as amended in *Certain Oil Country Tubular Goods From the Republic of Korea: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 31,750 (Dep't Commerce July 10, 2017); *Certain Oil Country Tubular*

*Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 17,146 (Dep't Commerce Apr. 18, 2018), and accompanying Issues and Decision Memorandum; *Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019), and accompanying Issues and Decision Memorandum; *Welded Line Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 27,762 (Dep't Commerce June 14, 2019), and accompanying Issues and Decision Memorandum.

### 2.    The *NEXTEEL I* and *II* Decisions Do Not Preclude This Court from Applying the Requisite Standard of Review

Plaintiffs cite the Court's remand order in *NEXTEEL I*, concerning the final results of Commerce's first administrative review of the antidumping order on OCTG from Korea, to argue that the Court's decision precludes the Court from affirming Commerce's determination of the existence of a PMS in this administrative review.  *See, e.g.*, Hyundai Br. at 25-26 (citing *NEXTEEL I*); *see also* SeAH Br. at 20; Husteel Br. at 13.  Plaintiffs are wrong.  The remand orders in *NEXTEEL I* and *NEXTEEL II* are not dispositive for purposes of this Court's review of Commerce's PMS determination based on the factual record of the administrative review that is now before the Court.  Plaintiffs argue that the "facts are no different" in this case versus those underlying the *NEXTEEL I* decision.  Hyundai Br. at 26.  However, they also acknowledge in the same brief that there are "differences in the facts and records of the proceedings."  Hyundai Br. at 2.  Commerce's decision in the *Final Results* is based on the factual record developed in this particular review.  The Court is obliged to consider this unique record and Commerce's determination in accordance with the standard of review.

Although Commerce complied with the *NEXTEEL I* Court's specific instruction in the remand order to reverse the finding of a PMS, Commerce issued its redetermination on remand "under protest."  *See* Final Results of Redetermination Pursuant to Court Remand, Oil Country Tubular Goods from the Republic of Korea, *NEXTEEL Co., Ltd. v. United States*, Consol. Ct. No. 17-00091, at 6 (Apr. 2, 2019) ("Although we agree with the Court that our particular market situation approach was reasonable, we respectfully disagree with the remainder of the Court's decision on this issue.  Even so, we have complied with the Court's Remand Order and, under protest, recalculated the margins of the mandatory respondents, SeAH and NEXTEEL, and the non-examined companies without the application of a PMS adjustment, as ordered by the Court" (citations omitted)).  It is therefore possible that Commerce may appeal the Court's ruling on Commerce's final remand determination in *NEXTEEL I* to the Court of Appeals for the Federal Circuit.  It is also possible that the Court may affirm Commerce's redetermination on remand in *NEXTEEL II*.  There is no basis for the Court to depart from its normal standard of review in assessing Commerce's PMS determination in this administrative review.

**3.    Commerce's PMS Finding Was Based on the Totality of the Circumstances; Arguments Linking Individual Elements of the PMS Analysis to Individual Companies Miss the Point**

Plaintiffs challenge each individual element of Commerce's PMS analysis.  *See, e.g.,* Hyundai Br. at 33-39; SeAH Br. at 23-26.  Plaintiffs have failed to effectively address that Commerce based its PMS determination on the "totality of circumstances in the market."  Final IDM at 18.  Commerce has used, and the courts have upheld, a totality of the circumstances approach that assesses factors together on a cumulative basis on a range of issues.  The CAFC has confirmed that such an approach is lawful, where "Commerce has not confined the inquiry to

particular defined factors, but instead has employed a 'totality of circumstances' test." *U.S. Magnesium LLC v. United States,* 839 F.d 1023, 1028 (Fed. Cir. 2016).

Likewise, this Court confirmed that, "the agency's methodology for deciding when sales are outside the 'ordinary course of trade' has been to examine the *totality of the circumstances* surrounding the sale or transaction in question to determine whether the sale or transaction is extraordinary," and that "Commerce's regulation specifically states, 'sales or transactions {may be considered} outside the ordinary course of trade if . . . , based on an evaluation of all of the circumstances particular to the sales in question, such sales or transactions have characteristics that are extraordinary for the market in question.'" *Bergerac v. United States*, 102 F. Supp 2d 497, 507 (Ct. Int'l Trade 2000) citing 19 C.F.R. § 351.102(b) (emphasis added); *see also Cemex S.A. v. United States*, 133 F.3d 897, 900 (Fed. Cir. 1998) ("Determining whether home market sales are in the ordinary course of trade is a question of fact. Commerce must evaluate not just 'one factor taken in isolation but rather . . . all the circumstances particular to the sales in question'), *Murata Mfg. Co. v. United States*, 820 F. Supp. 603, 607 (Ct. Int'l Trade 1993).  This Court has also upheld the agency's use of such an approach "when Commerce conducts a bona fide sales analysis, it weighs several factors and makes a final determination based on the '*totality of the circumstances*.' … Considering all factors in totality, the court finds that Commerce's deliberation of the record evidence was reasonable." *Evonik Rexim (Nanning) Pharm. Co. v. United States*, 253 F.Supp.3d 1364, 1372-73 (Ct. Int'l Trade 2017) (emphasis added).  The precedent is clear that Commerce's decision to make a PMS determination using a totality of circumstances approach is in accordance with law.

The cost-based PMS provisions give Commerce the authority to determine whether "a particular market situation exists such that the costs of production" are outside the ordinary

course of trade.  19 U.S.C. § 1677b(e).  By using the singular "particular market situation," the provision suggests that the market be considered as a whole, rather than as multiple, compartmentalized individual allegations.  It follows, then, that in determining whether a single PMS exists, Commerce will make a holistic determination based on component considerations within the market, instead of finding multiple "particular market situations."

Under a totality of the circumstances approach it is entirely possible that no single element will amount to a PMS in and of itself, yet the combined effect of the factors will lead to an affirmative PMS determination.  That is the case in the instant review.  Commerce's PMS finding did not rely on any one element, nor did it consider each element in a vacuum.  Final IDM at 13 ("we considered the four aspects underlying the PMS allegation *as a whole*, based on their *cumulative effect* on the cost of production for Korean WLP") (emphasis added).  Plaintiffs nevertheless structure their arguments by focusing on Commerce's findings with regard to each element individually.  *See* Hyundai Br. at 33-39; SeAH Br. at 23-26.  While each individual element is important – and as discussed below, supported by ample evidence on the record – Commerce's conclusions must be considered on a collective basis.  Viewing the elements of Commerce's analysis in that manner is in line with the statute and precedent.

For this reason, the arguments advanced by certain Plaintiffs that every one of the individual elements do not apply to their specific circumstances miss the point entirely.  *See, e.g.*, Hyundai Br. at 34-35; SeAH Br. at 23-25.  Even if all four elements do not apply to each of the individual Plaintiffs, or the respective impact of a particular element is not quantifiable for a given producer, that has no bearing on the existence of a PMS because the focus in on the *market* situation, not a particular *company* situation.  *See* Final IDM at 16 ("We disagree with the notion that such company-specific analysis is necessary and appropriate in a situation where, as here,

there is sufficient evidence demonstrating that the market as a whole is distorted and a PMS exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade. Companies do not operate in a vacuum, but, rather, purchase their inputs in a market. If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs"). Plaintiffs cite to administrative reviews where Commerce employ "data driven analyses focusing on the respondent's specific costs." Hyundai Br. at 21-22 (citing *Steel Concrete Reinforcing Bar from Taiwan: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 34,925 (Dep't Commerce Jul. 27, 2017). However, a granular approach focusing on specific company costs is neither required nor the best approach to assessing *market-wide* distortions. The statute does not require a company-specific analysis of input costs to determine whether the prices paid by a particular company for inputs "accurately reflect the cost of production in the ordinary course of trade" and Commerce's interpretation and application of the law is reasonable, in line with the statutory mandate, and consistent with an examination that considers the market as a whole.

### 4.    Commerce Appropriately Considered the Subsidies Received By Korean Hot-Rolled Coil Producers

With respect to Korean government subsidies on hot-rolled steel, Commerce found that:

> The record evidence demonstrates that the Korean government subsidized HRC and that the mandatory respondents purchased HRC from entities receiving these subsidies, including POSCO. The record evidence also shows that the subsidies received by certain Korean HRC steel producers totaled almost 60 percent of the cost of hot-rolled steel, the primary input into WLP production.

Final IDM at 13.

Plaintiffs contend that Commerce failed to show that their cost of materials did not accurately reflect the COP in the ordinary course of trade. *See, e.g.,* Hyundai Br. at 23; SeAH

Br. at 22.  The statute permits Commerce to focus its analysis on the market generally and to conclude that production costs are distorted irrespective of the particular transactions or circumstances of an individual respondent.   A company-specific cost analysis is neither necessary nor warranted where, as here, there is sufficient evidence demonstrating that the market as a whole is distorted and a PMS exists such that the cost of materials and fabrication or other processing does not accurately reflect the COP in the ordinary course of trade.  Commerce has repeatedly found that this PMS permeates the entire market for WLP's most significant input, HRC, and as such specifically affects producers including the Plaintiffs.  *See, e.g.,* Final Results of WLP from Korea AR 1; OCTG from Korea AR 1 and 2; Final Results of CWP AR 1.

There is ample evidence on the record that heavy subsidization by Korean authorities, along with the downward pressure from Chinese steel made cheap by the subsidization of Chinese authorities, "distorts the Korean market prices of HRC."  Final IDM at 13.  In this review, Commerce found that "record evidence demonstrates that the Korean government subsidized HRC and that the mandatory respondents purchased HRC from entities receiving these subsidies, including POSCO," and that the subsidies received by Korean HRC producers "totaled almost 60 percent of the cost of hot-rolled steel."  Final IDM at 13.

Plaintiffs claim that there is no evidence that the subsidy benefits "passed through" in the form of lower prices.  Hyundai Br. at 33 ("Commerce's analysis in this case simply assumes (without any record support or analysis) that 100 percent of the alleged subsidies that accrue to hot-rolled steel producers are passed along the pipe producers").  However, this Court has recognized that input subsidies affect the price of downstream goods.  *See, e.g., China Nat. Machinery Import & Export Corp. v. United States*, 264 F. Supp. 2d 1229, 1237 (Ct. Int'l Trade 2003) ("If the prices CMC paid to its supplier for the steel input were artificially low, however,

due to subsidies it was receiving from the government, then the calculated NV for the end product, TRBs, would be artificially low, suppressing the dumping margins of CMC."); *Certain New Pneumatic Off-the-Road Tires*, 77 Fed. Reg. 52,683 (Dep't Commerce Aug. 30, 2012), and accompanying Issues and Decision Memorandum at 20.   Commerce need not show for the purpose of its PMS analysis that subsidies affected the specific prices of specific inputs of any single respondent's specific costs.   It is enough to find that, taken alongside other elements, the subsidy benefits affected the overall market conditions for HRC.   As Commerce clearly states in this review:

> We disagree with the notion that such company-specific analysis is necessary and appropriate in a situation where, as here, there is sufficient evidence demonstrating that the market as a whole is distorted and a PMS exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade. Companies do not operate in a vacuum, but, rather, purchase their inputs in a market. If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs.

Final IDM at 16.

Plaintiffs further argue that any subsidization of HRC inputs should instead be addressed under the upstream subsidy analysis applicable to countervailing duty (CVD) proceedings.   *See Hyundai Br.* at 31-33.   This argument is flawed in that it attempts to deprive Commerce of the authority purposefully granted to it under the TPEA.   Prior to the statute's amendment in 2015, the statute did not address situations where market distortions affect production inputs.   19 U.S.C. § 1677b(a)(1)(C)(iii).   In that context, distortion-causing government subsidies could reasonably have been analyzed under the CVD law.   However, since the TPEA was enacted, Commerce has explicitly been empowered to remedy distortions in input costs through the antidumping laws.   Plaintiffs rely on certain cases to argue that only the CVD law can address the issue of upstream subsidy allegations.   Hyundai Br. at 32 (citing *RadLAX Gateway Hotel v.*

*Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted); *Bloate v. United States*, 559 U.S. 196, 207 (2010) (citation omitted)).  Focusing solely on the use of CVD law in the context of upstream subsidy allegations fundamentally misses the point of the PMS cost provisions of the TPEA.  To require that Commerce instead use only the CVD law would deprive the agency, in contravention of Congress's express intent, of a purposefully granted tool to address the *totality* of circumstances leading to a PMS.  S. Rep. No. 114-45 (2015).  Indeed, precisely because Congress has enacted "specific scheme and has deliberately targeted specific problems with specific solutions," *see RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. at 645, Commerce properly relied on the cost-based PMS provisions in considering the *totality* of circumstances leading to a PMS.  Commerce's determination is not limited to a finding that HRC production is subsidized, but that a PMS exists because of several elements – one of which is government subsidization.  These factors must be considered together under the auspices of the cost-based PMS provisions.

### 5.    Commerce Was Correct to Find That Chinese Imports Distorted the Korean Market

Commerce found that, "as a result of significant overcapacity in Chinese steel production, which stems, in part, from the distortions and interventions prevalent in the Chinese economy, the Korean steel market has been flooded with imports of cheaper Chinese steel products, placing downward pressure on Korean domestic steel prices," a situation that, along with subsidized Korean steel production, "distorts the Korean market prices of HRC, the main input in Korean WLP production."  Final IDM at 13.

Plaintiffs argue that the impact of HRC imports from China cannot be directly quantified in Plaintiffs' costs, and that there is no evidence that Chinese overcapacity is directed to the Korean market.  *See* Hyundai Br. at 36; Husteel Br. at 15-16.  First, in its analysis Commerce

examines the market as a whole.   Imports of HRC from China, a country experiencing substantial and well-documented overcapacity in HRC production, can indeed have a distortive effect on the price of HRC in the Korean market.   Based on evidence on the record, Commerce found this to be the case – that "distortions and interventions prevalent in the Chinese economy" resulted in "the Korean steel market has been flooded with imports of cheaper Chinese steel products, placing downward pressure on Korean domestic steel prices."  Final IDM at 13.

Second, record evidence shows that the extent of Chinese overcapacity in HRC production is such that it need not be solely, or even intentionally, directed at the Korean market in order to have a significant impact.   Numerous sources demonstrate that Chinese HRC has contributed to the PMS in Korea, and that subsidized Chinese HRC has driven down Korean prices for HRC in Korea, and negatively affected Korean pipe producers.   *See* Maverick PMS Allegation at Exhibit 30.   Whether or not Chinese HRC production also affects other countries is of no import for the analysis of the PMS in Korea.   Chinese overcapacity certainly does impact other markets.   Commerce need not find, however, that each element supporting a PMS finding be unique to the market in question, and Plaintiffs cite no authority imposing such a requirement. Final IDM at 17 ("we find that the fact that overcapacity affects other markets is irrelevant; certainly one aspect of a PMS could be a contributing factor to a PMS in more than one country").

SeAH compares the Korean and Chinese HRC prices to those of Japanese suppliers. SeAH Br. at 25.   Hyundai Steel also refers to HRC "benchmark data" submitted in the underlying investigation as a purportedly objective indicator of global prices, in an attempt to show that "its hot-rolled coil input costs were within the narrow band of the market prices shown in the record, and therefore were within the ordinary course of trade."  Hyundai Br. at 5-6 (citing

Hyundai PMS Comments (PR Docs. 237-239); Hyundai Rebuttal PMS Comments (PR Docs. 247-248)).  SeAH and Hyundai miss the point, as global or third country reference points neither negate a finding of a PMS in Korea nor serve as useful tool for adjusting respondents' costs of production.

Markets do not operate in a vacuum, and distortions may impact import prices as well, so it says very little that Japanese HRC prices fluctuate according to the pressures of the distorted Korean market.  Therefore, this comparison is not helpful.  As for Hyundai's benchmark data, nowhere does the statute require reference benchmarks.  Additionally, benchmarking may not be a reliable method for comparing Korean and world steel markets.  The fact that the Korean market for HRC may fluctuate with global steel prices certainly does not prove or disprove the existence of a PMS in Korea.  Lastly, Hyundai claims that, because "Hyundai Steel itself produced a significant portion of the hot-rolled steel it consumed," Chinese imports could have no significant effect on its costs.  Hyundai Br. at 34-35.  As discussed above, this company- and factor-specific approach is at odds with Commerce's established approach of considering the "totality of circumstances in the market," and should be disregarded.

**6.   Commerce Was Correct To Find That Strategic Alliances Exist Between HRC Suppliers and WLP Producers in Korea**

In the *Final Results*, Commerce found that, "{w}ith respect to Maverick's contention that certain Korean HRC suppliers and Korean WLP producers attempt to compete by engaging in strategic alliances, we agree that the record evidence supports that such strategic alliances exist in Korea."  Final IDM at 13.  Commerce correctly found that the strategic alliances are relevant as an element of the PMS analysis, stating that, "{b}ecause strategic alliances have led to distortions in the prices of HRC, as evidenced by the record information, we find that such

strategic alliances are a contributing factor to the PMS in Korea impacting the COP for WLP."
Final IDM at 13.

Plaintiffs argue that the strategic alliances allegation is not supported by evidence, and
that Commerce failed to articulate how such alliances, if present, affected the market for HRC.
*See* Hyundai Br. at 36-38; SeAH Br. at 23-24.  Commerce is not required to prove causation in
identifying a PMS.  *See, e.g.*, *Biodiesel from Argentina: Final Determination of Sales at Less
Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 83
Fed. Reg. 8837 (Dep't Commerce Mar. 1, 2018), and accompanying Issues and Decision
Memorandum at Comment 3.  For the purposes of the PMS analysis, it is sufficient for
Commerce to consider the collective impact of such strategic alliances alongside other relevant
elements.

Contrary to Plaintiffs' arguments, credible evidence pertaining to the existence of
strategic alliances between certain Korean HRC suppliers and Korean WLP producers is on the
record in the instant case, and is applicable to the period of review.  PMS Allegation at 30,
Exhibit 3.  Similarly, Commerce has found that strategic alliances between HRC suppliers and
OCTG producers distorted HRC pricing in multiple segments.  OCTG Korea AR 1 Final IDM at
41; OCTG Korea AR 2 Final IDM at 17.

Plaintiffs claim that the Court has already considered and rejected the strategic alliances
element.  Hyundai Br. at 37.  Specifically, Hyundai refers to the Court's decision in *Husteel v.
United States*.  Hyundai Br. at 37 (citing *Husteel v. United States*, 98 F. Supp. 3d 1315, 1359 (Ct.
Int'l Trade 2015)).  There, however, the Court looked at a different question in the context of
circumstances that predate the TPEA.  Here, Defendants have alleged that strategic alliances
between HRC suppliers and downstream pipe producers have caused a PMS in Korea that

renders reported costs of WLP production outside the ordinary course of trade.  This allegation could not have been considered by the Court in *Husteel* because that case was decided before the TPEA came into effect.  As such, the Court's decision in *Husteel* is not instructive for this Court's assessment of the record before it.

### 7. Commerce Was Correct To Find That Distortions in the Korean Electricity Market Contribute To the PMS

In its *Final Results*, Commerce found that (1) "a PMS may exist where there is government control over prices to such an extent that home market prices cannot be considered to be competitively set"; (2) "electricity in Korea functions as a tool of the government's industrial policy"; and (3) "the largest electricity supplier, KEPCO, is a government controlled entity."  Final IDM at 13-14.  Therefore, while any distortion of the electricity market may not, on its own, indicate the existence of a PMS, Commerce correctly considered it as a contributing factor in its affirmative PMS determination.  Final IDM at 18 ("the fact that we were not able to quantify the amount of the distortion does not undermine the fact that the government's policies have an effect on electricity prices … As stated previously, above, we evaluate the existence of a PMS based on the totality of circumstances in the market. Based on the record, we find that government involvement in the Korean electricity market distorts the cost of producing WLP").

Plaintiffs argue that the fact that Commerce has never found that there are measurable countervailable subsidies with regard to electricity in Korea means that electricity support cannot be a basis for a particular market situation.  Hyundai Br. 38-39.  A determination regarding whether government support of electricity supply constitutes a countervailable subsidy, however, is different from a determination of whether government support of electricity supply distorts the market and is a contributing factor to a PMS.  In the investigation in this case, for example, Commerce found that the respondents did not receive electricity rates from KEPCO that were

lower than other customers, and therefore found no countervailable subsidies. *See Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1306 (Ct. Int'l Trade 2017), appeal docketed, No. 18-1351 (Fed. Cir. Dec. 28, 2017).[3]   That is a different analysis than the one Commerce undertook in the context of a PMS, based on considerations that government control over prices means home market prices cannot be considered to be competitively set, electricity functions as a tool of the Korean government's industrial policy, and KEPCO is a government-controlled entity.  Final IDM at 13-14.

Finally, contrary to Plaintiffs' argument, precedent supports a finding that the PMS provisions may be employed to consider government subsidies, regardless of the results of the parallel CVD review.   Plaintiffs cite to examples where Commerce found, and the Court confirmed, that the government's provision of electricity was not for less than adequate remuneration.  Hyundai Br. at 38 (citing, *e.g.*, *POSCO v. United States*, Slip Op. 18-117 (Sept. 11, 2018)); SeAH Br. at 24; Husteel Br. at 16.   However, as discussed above, it would contravene Congress's express intent and the enactment of the TPEA to require Commerce to abandon legislative tools provided by Congress simply because other remedies under the CVD statute may be available.   It is well established that the PMS provisions are applicable to government subsidies, such as for electricity, and Commerce was correct in its legal and procedural approach in this review.

---

[3] In a different case regarding Korean electricity subsidies to producers of a related steel product, corrosion-resistant steel, the Federal Circuit recently rejected the legal position advanced by Commerce that the lack of price differences was sufficient to establish that no subsidies are conferred through the provision of electricity in Korea. *See Nucor Corp. v. United States*, Court No. 18-1787, Slip-Op (Fed. Cir. June 21, 2019).

**C.     Commerce Correctly Made a Particular Market Situation Adjustment Based on the CVD Rates Applied in *Hot-Rolled Steel Flat Products From Korea* Investigation**

**1.     Hot-Rolled Steel Flat Products CVD Investigation Is the Best Source for Subsidy Rate**

The cost-based PMS provision affords Commerce broad discretion to resort to "another calculation methodology under this part *or any other calculation methodology*."  19 U.S.C. § 1677b(e)(3) (emphasis added).  As correctly implemented in the *Final Results*, the cost-based PMS statutory provision affords Commerce greater flexibility both in identifying a PMS with respect to a respondent's input costs, and in addressing the PMS through its costs of production adjustment.  Commerce's interpretation is reasonable, and under the standard of review set out in *Chevron*, is therefore in accordance with law.

Commerce determined to adjust the respondents' reported HRC costs based on the subsidy rates from *Hot-Rolled Steel from Korea*.  Final IDM at 14.  In doing so, Commerce:

> disagree{d} disagree with the respondents' argument that the CVD rates applied in Hot-Rolled Steel from Korea are not an appropriate basis for the adjustment. The respondents argue that it would not be appropriate to make a PMS adjustment based on the CVD rate applied to POSCO in Hot-Rolled Steel from Korea, because that rate was based on total AFA and is for a period that does not overlap with this review.

Final IDM at 15.

*Hot-Rolled Steel from Korea* remains the best source for calculating a reasonable adjustment to HRC costs to account for the PMS, as it is the current rate, and calculated for the primary input for WLP.  Commerce has been consistent in its reasoning as to the applicability of the subsidy rate from *Hot-Rolled Steel from Korea.*  For example, in its recent Final Results in *OCTG from Korea AR 3*, Commerce again found that using the rate from *Hot-Rolled Steel from Korea* was the most appropriate approach, as it pertains to the primary input for OCTG (as well as for WLP), and "the record … does not contain appropriate data with which to make further

adjustments."  OCTG from Korea AR 3 Final IDM at 41-43.  This follows the logic laid out by Commerce in the instant review, that the subsidy rate from *Hot-Rolled Steel from Korea* "represent{s} an accurate measure of the subsidies received by the producers of HRC, and are a reasonable basis for Commerce's adjustment to reflect the Government of Korea's (GOK's) subsidization of HRC products in Korea."  Final IDM 15.  Plaintiffs point out that the Court's review of *Hot-Rolled Steel from Korea* and subsequent remand resulted in a downward adjustment of the subsidy rate in that case (from 58.68 percent to 41.57 percent), *see* Hyundai Br. at 28; SeAH Br. at 28-29.  However, this decision has been appealed to the Court of Appeals for the Federal Circuit and may be reversed.  Even if the adjusted rate remains at 41.57 percent, this is further confirmation that Commerce's overall approach in *Hot-Rolled Steel from Korea*, still leading to a high subsidy rate, is appropriate, and does nothing to contradict its application in the current case.

Plaintiffs alternatively argue for the use of the most recent rate from *Cut-to-Length Plate from Korea.  See* SeAH Br. at 28 ("The findings in the *Plate* investigation covered a period more contemporaneous with the review period in the Line Pipe review") (citing *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 82 Fed. Reg. 16,341 (Dep't Commerce Apr. 4, 2017), accompanying Issues and Decision Memorandum ("*Cut-to-Length Plate from Korea*"); *see also* Husteel Br. at 14.  Commerce has repeatedly explained that this rate is inappropriate in WLP and OCTG proceedings because cut-to-length plate is not used in the production of the subject product.  WLP from Korea AR 1 Final IDM at 14 ("we continue to find that the subsidy rates from *Hot-Rolled Steel from Korea* are more appropriate than the subsidy rates from Commerce's CVD investigation of *Cut-to-Length Plate*

*from Korea*, because the former rates are for hot-rolled steel, the primary input used to make

WLP, whereas the latter are not.   In our view, the difference in the PORs of these two

determinations does not outweigh our consideration that it is preferable to rely on CVD rates

which apply to the relevant input, versus CVD rates which apply to other products other than the

respondents' primary input"); OCTG from Korea AR 2 Final IDM at 19 ("In our view, a one-

year difference in the PORs of these two determinations does not outweigh our consideration that

one subsidization determination covered the input used in the production of OCTG, while the

other one did not").  In its *Final Results*, Commerce found that,

> {c}ontrary to the respondents' arguments, and, as explained in the *Preliminary Results*,
> we continue to find that the subsidy rates from *Hot-Rolled Steel from Korea* are more
> appropriate than the subsidy rates from Commerce's CVD investigation of *Cut-to-Length
> Plate from Korea*, because the former rates are for hot-rolled steel, the primary input used
> to make WLP, whereas the latter are not. In our view, the difference in the PORs of these
> two determinations does not outweigh our consideration that it is preferable to rely on
> CVD rates which apply to the relevant input, versus CVD rates which apply to other
> products other than the respondents' primary input.

Final IDM at 14.

### 2.       Commerce's Use of an AFA Rate for the PMS Adjustment is Permissible

Plaintiffs' arguments that the subsidy rates from *Hot-Rolled Steel from Korea* are tied to

the application of AFA and thus cannot be applied to "cooperative" parties, have been

considered and rejected by Commerce in prior reviews, and are not persuasive.  *See* Hyundai Br.

at 39 ("The courts have found that applying an AFA to a cooperating respondent is

impermissible and punitive," citing *Albemarle Corp. & Subsidiaries v. United States,* 821 F.3d

1345, 1358 (Fed. Cir. 2016)); Husteel Br. at 10 (citing, *e.g.*, *Yangzhou Bestpak Gifts & Crafts

Co., Ltd. v. United States*, 716 F.3d 1370, 1380 (Fed. Cir. 2013)); SeAH Br. at 26-27 (citing, *e.g.*,

*SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264, 1276 (Ct. Int'l Trade 2009)).

Plaintiffs' reliance on *Albemarle* is misplaced.  *See* Hyundai Br. at 39.  The court in *Albemarle* recognized that a cooperating party should have the opportunity to submit information to update a dumping margin calculated in a prior review.  *Albemarle Corp. v. United States*, 821 F.3d at 1359.  This is different from the current context where Commerce referred to a subsidy rate from a previous case because it was reasonably deemed to be the best source – and not because Commerce was ignoring new information.  Plaintiffs' argument that "Commerce may not penalize a cooperative party for non-cooperation by an unaffiliated entity" similarly misses the mark.  SeAH Br. at 27 (citing *SKF USA Inc. v. United States*, 675 F. Supp. 2d at 1276.  Commerce is not "penalizing" the parties by using the subsidy rates from *Hot-Rolled Steel from Korea*; rather, Commerce is relying on the rate that is most accurate for purposes of the PMS Adjustment.  In any case, Plaintiffs' arguments fail to acknowledge that AFA rate calculations largely account for distortions concealed by respondents and, as such, represent the subsidy rate that would apply if respondents had cooperated.  As Commerce explains in the *Final Results*:

> The fact that {the respondent failed to cooperate to the best of its ability} suggests that its full cooperation may have resulted in a higher CVD rate than the one based on total or partial AFA. Regardless of the motives, however, nothing on the record of this proceeding demonstrates that the CVD rates assigned to the producers in *Hot-Rolled Steel from Korea* are inaccurate or unlawful.

Final IDM at 15.

Commerce elaborated further in the final results of *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea,* which also employed the *Hot-Rolled Steel from Korea* AFA rate, saying, "{r}egardless of the producers' motives, however, nothing on the record of this proceeding demonstrates that the CVD rates assigned to the producers in HRS from Korea are inaccurate or unlawful.  Indeed, to date, the producers' rates remain the rates applied to relevant subject merchandise entering the United States."  *Circular Welded Non-Alloy Steel Pipe from the*

*Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 27,541 (Dep't Commerce Jun. 13, 2018), accompanying Issues and Decision Memorandum at 14.  As such, Commerce used the best rate available regarding the subsidization of HRC production to make the PMS adjustment.

## VII.   CONCLUSION

California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA respectfully request that the Court deny the motions for judgment on the agency record submitted by Hyundai, SeAH, Husteel, and NEXTEEL, and affirm the portions of Commerce's final results challenged by these parties in their entirety.

Respectfully Submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Christopher T. Cloutier
Luke A. Meisner
SCHAGRIN ASSOCIATES
*Counsel to California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA*

### CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word count limitation of the U.S. Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 11,275 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I relied on the word count function of the word processing software used to produce this brief.

/s/ Elizabeth J. Drake