UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, and NEXTEEL CO., LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Consol. Ct. No. 18-00169 ) |
| Defendant, | ) ) |
| and | ) ) |
| CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, and MAVERICK TUBE CORPORATION, | ) ) ) ) |
| Defendant-Intervenors. | ) ) |

## __ORDER__

Upon consideration of plaintiffs' motions for judgment on the agency record, defendant's and defendant-intervenors' responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____, 2019      _____
     New York, NY                                      JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, and NEXTEEL CO., LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | Consol. Ct. No. 18-00169 |
| Defendant, | ) ) ) | |
| and | ) ) | |
| CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, and MAVERICK TUBE CORPORATION, | ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

JOSEPH H. HUNT
Assistant Attorney General

JEANNE E. DAVIDSON
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
REZA KARAMLOO
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

JOSHUA E, KURLAND
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0477
Email: Joshua.E.Kurland@usdoj.gov

July 29, 2019

*Attorneys for Defendant United States*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

STATEMENT PURSUANT TO RULE 56.2 ..................................................... 2

   I.    Administrative Determination Under Review ......................................... 2

   II.   Issues Presented For Review ..................................................................... 2

STATEMENT OF FACTS ................................................................................. 2

   I.    Particular Market Situation ........................................................................ 3

   II.   Selection Of A Comparison Market ......................................................... 6

ARGUMENT ..................................................................................................... 7

   I.    Standard Of Review .................................................................................. 7

   II.   Commerce's Particular Market Situation Determination Is Reasonable And
        Lawful ........................................................................................................ 9

        A.   Legal Framework ......................................................................... 9

        B.   Commerce's Determination That A Particular Market Situation
             Exists In The Korean Hot-Rolled Steel Coil Market Is Supported By
             Substantial Evidence And In Accordance With Law ..................... 11

            1.   Commerce Reasonably Construed The Statute........................ 12

            2.   Commerce Reasonably Determined That A Particular Market
                Situation Exists In The Korean Hot-Rolled Steel Coil Market................. 23

            3.   Plaintiffs' Challenges To Commerce's Fact-Finding Lack Merit ........... 29

   III.  Commerce's Calculation Of The Weighted-Average Dumping Margin
        Assigned To The Non-Selected Respondents Is Lawful ............................ 39

        A.   Legal Framework ......................................................................... 39

        B.   The Weighted-Average Dumping Margin Commerce Assigned To The
             Non-Selected Respondents Is Consistent With The Statute And Agency
             Practice........................................................................................ 40

   IV.  Commerce Properly Relied On A Constructed Value As Normal Value
        For SeAH .................................................................................................... 42

A.     Commerce's Determination That SeAH's Canadian Sales Are Not Representative Of Normal Value Is Lawful ...................................................... 43

B.     Commerce's Determination That SeAH's Canadian Sales Are Not Representative Of Normal Value Is Consistent With Agency Practice........................................................................................................ 45

V.     SeAH's Differential Pricing Claim Is Not Properly Before The Court ...................... 46

CONCLUSION.................................................................................................................... 47

# TABLE OF AUTHORITIES

## CASES

*Albemarle Corp. & Subsidiaries v. United States*,
  821 F. 3d 1345 (Fed. Cir. 2016) .......................................................................... 40

*Alloy Piping Products, Inc. v. United States*,
  201 F. Supp. 2d 1267 (Ct. Int'l Trade 2002) ..................................................... 43, 44

*Apex Frozen Foods Pvt. Ltd. v. United States*,
  144 F. Supp. 3d 1308 (2016), *aff'd* 862 F.3d 1337 (Fed. Cir. 2017) ........................................ 46

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ............................................................................ 8

*Bloate v. United States*,
  559 U.S. 196 (2010) ............................................................................................ 20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ........................................................................................ 8, 15

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ............................................................................ 8

*Consol. Edison Co. of N.Y. v. NLRB*,
  305 U.S. 197 (1938) ............................................................................................ 7

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ............................................................................................ 7

*Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*,
  357 F.3d 1294 (Fed. Cir. 2004) .......................................................................... 34

*Downhole Pipe & Equip., L.P. v. United States*,
  776 F.3d 1369 (Fed. Cir. 2015) .......................................................................... 23

*Dunn v. Commodity Futures Trading Comm'n*,
  519 U.S. 465 (1997) .......................................................................................... 13

*Fujitsu Gen. Ltd. v. United States*,
  88 F.3d 1034 (Fed. Cir. 1996) .................................................................... 7, 9, 17

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
  335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ................................................. 32, 38

*Husteel Co. v. United States,*
  98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .................................................. 30, 38

*Hyundai Steel Co. v. United States,*
  319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ........................................... 29, 30, 35

*INS v. Elias-Zacarias,*
  502 U.S. 478 (1992) ........................................................................................... 7

*JBF RAK LLC v. United States,*
  790 F.3d 1358 (Fed. Cir. 2015) ....................................................................... 8, 21

*KYD, Inc. v. United States,*
  607 F.3d 760 (Fed. Cir. 2010) ....................................................................... 32, 35

*Lara-Aguilar v. Sessions,*
  889 F.3d 134 (4th Cir. 2018) ......................................................................... 20, 21

*Longkou Haimeng Mach. Co. v. United States,*
  581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) ...................................................... 39

*Melamine Chemicals Inc. v. United States,*
  732 F.2d 924 (Fed. Cir. 1984) ............................................................................ 33

*Nan Ya Plastics Corp. v. United States,*
  810 F.3d 1333 (Fed. Cir. 2016) ..................................................................... 35, 42

*Nation Ford Chem. Co. v. United States,*
  166 F.3d 1373 (Fed. Cir. 1999) .......................................................................... 35

*NEXTEEL Co. v. United States,*
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ............................................... *passim*

*NEXTEEL Co. v. United States,*
  No. 18-00083, 2019 WL 2565365 (Ct. Int'l Trade June 17, 2019) ...................... 29

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................................ 8

*Novosteel SA v. United States,*
  284 F.3d 1261 (Fed. Cir. 2002) .......................................................................... 46

*NTN Bearing Corp. v. United States,*
  74 F.3d 1204 (Fed. Cir. 1995) ............................................................................ 30

*POSCO v. United States,*
  337 F. Supp. 3d 1265 (Ct. Int'l Trade 2018) ...................................................... 33

*POSCO v. United States*,
    353 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) ......................................................... 32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ......................................................................................... 20

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
    203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ................................................. 7, 23

*Timken Co. v. United States*,
    354 F.3d 1334 (Fed. Cir. 2004) ..................................................................... 8, 15

*Tri Union Frozen Prods., Inc., v. United States*,
    163 F. Supp. 3d 1255 (Ct. Int'l Trade 2016), *aff'd* 741 F. App'x 801 (Fed. Cir. 2018) .......... 46

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ....................................................................................... 8, 12

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ......................................................................................... 33

## STATUTES & REGULATIONS

19 U.S.C. § 1673d .............................................................................................. 39, 40

19 U.S.C. § 1675 ....................................................................................................... 9

19 U.S.C. § 1677 .............................................................................................. 11, 22

19 U.S.C. § 1677b ............................................................................................ *passim*

19 U.S.C. § 1677e ................................................................................................... 40

19 U.S.C. § 1677f-1 ................................................................................................ 39

28 U.S.C. § 2637 .................................................................................................... 21

Pub. L. No. 114-27 § 504, 129 Stat. 362 (2015) .................................................... 10

19 C.F.R. § 351.401 ............................................................................................... 43

## ADMINISTRATITVE DETERMINATIONS

*Biodiesel from Indonesia*,
    83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) ........................ 14, 15, 18, 19

*Biodiesel from the Republic of Argentina,*
  83 Fed. Reg. 8,837 (Dep't of Commerce Mar. 1, 2018) ......................................... 14, 15, 18, 19

*Cut-to-Length Plate from Korea,*
  82 Fed. Reg. 16,341 (Dep't of Commerce Apr. 4, 2017) ....................................................... 34

*Hot-Rolled Steel Flat Products from Korea,*
  81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) ................................................ *passim*

*Hot-Rolled Steel Flat Products from Korea,*
  81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) .......................................................... 4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
  82 Fed. Reg. 10,457(Dep't of Commerce Feb. 13, 2017) ......................................................... 8

*Oil Country Tubular Goods From The Republic of Korea,*
  82 Fed. Reg. 18,105 (Dep't of Commerece Apr. 17, 2017) ......................................... 28, 45, 46

*Rebar from Taiwan,*
  82 Fed. Reg. 34,925 (Dep't of Commerce Jul. 27, 2017) ....................................................... 19

*Welded Line Pipe from the Republic of Korea,*
  80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) ...................................................... 28

*Welded Line Pipe from the Republic of Korea,*
  80 Fed. Reg. 75,056 (Dep't of  Commerce Dec. 1, 2015)......................................................... 2

*Welded Line Pipe From Korea,*
  83 Fed. Reg. 1,023 (Dep't of Commerce Jan. 9, 2018)............................................................. 3

*Welded Line Pipe From the Republic of Korea,*
  83 Fed. Reg. 33,919 (Dep't of Commerce Jul. 18, 2018) ......................................................... 2

*Welded Line Pipe From the Republic of Korea,*
  83 Fed. Reg. 39,682 (Dep't of Commerce Aug. 10, 2018) .............................................. 2, 3, 41

## LEGISLATIVE MATERIALS

S. Rep. No. 114-45 (2015) ................................................................................................... 16, 22

161 Cong. Rec. S2899-05 (May 14, 2015) ......................................................................... 16, 17

161 Cong. Rec. H4666-01(June 25, 2015) .............................................................................. 16

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
  H.R. Doc. 103-316, (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ....................... 10,13, 14, 28

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, and NEXTEEL CO., LTD., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) Consol. Ct. No. 18-00169 |
| Defendant, | ) ) |
| and | ) ) |
| CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, and MAVERICK TUBE CORPORATION, | ) ) ) ) |
| Defendant-Intervenors. | ) ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motions for judgment upon the agency record filed by plaintiffs Husteel Co., Ltd. (Husteel), Hyundai Steel Co. (Hyundai), SeAH Steel Corporation (SeAH), and NEXTEEL Co., Ltd. (NEXTEEL). Plaintiffs challenge the Department of Commerce's (Commerce's) determination in the first administrative review of its antidumping duty order on welded line pipe (WLP) from the Republic of Korea.  Plaintiffs' motions should be denied because Commerce's determination is supported by substantial evidence and otherwise lawful.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

The administrative determination under review is *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't of Commerce Jul. 18, 2018) (final admin. review) (P.R. 329), and the accompanying Issues and Decision Memorandum (IDM) (P.R. 322) (Final Results), *as amended by Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 39,682 (Dep't of Commerce Aug. 10, 2018) (amended final admin. review) (P.D. 340) (Amended Final Results). The period of review covers May 22, 2015, through November 30, 2016.

### II.    Issues Presented For Review

1.     Whether Commerce employed a permissible construction of the antidumping statute in determining that a particular market situation exists in the Korean hot-rolled steel coil market that distorts the cost of producing WLP.

2.     Whether Commerce's determination that a particular market situation exists in the Korean hot-rolled steel coil market that distorts the cost of production of WLP is supported by substantial evidence.

3.     Whether Commerce's calculation of the weighted-average dumping margin assigned to the non-selected respondents is proper.

4.     Whether Commerce properly relied on a constructed value in calculating normal value for SeAH.

## STATEMENT OF FACTS

This case arises out of Commerce's antidumping duty order covering WLP from Korea. *See generally Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 75,056 (Dep't of Commerce Dec. 1, 2015).  In February 2017, Commerce initiated an administrative review to

determine assessment rates for sales of subject merchandise from May 22, 2015, to November 30, 2016. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 10,457 (Dep't of Commerce Feb. 13, 2017) (P.R. 21).  Commerce selected Hyundai and SeAH as the mandatory respondents.  Respondent Selection Memorandum at 3-4 (Mar. 7, 2017) (P.R. 22; C.R. 5).  Commerce published the preliminary results of its review in January 2018, calculating weighted-average dumping margins of 19.42 percent, 2.30 percent, and 10.86 percent for Hyundai, SeAH, and non-selected respondents. *Welded Line Pipe From Korea*, 83 Fed. Reg. 1,023 (Dep't of Commerce Jan. 9, 2018) (prelim. admin. review) (P.R. 267), and accompanying Preliminary Decision Memorandum (P.R. 259) (PDM) (Preliminary Results).  Based on changes to margin calculations for the mandatory respondents in the final results, Commerce recalculated the weighted-average dumping margins.  Final Results, 83 Fed. Reg. at 33,920.  These rates were subsequently revised to correct for a ministerial error; the final weighted-average dumping margins for Hyundai, SeAH, and the non-selected respondents are 18.77 percent, 14.39 percent, and 16.58 percent.  Amended Final Results, 83 Fed. Reg. at 39,682.

## I.    Particular Market Situation

In September 2017, Maverick Tube Corporation (Maverick) submitted a letter and factual information arguing that Commerce should find that a particular market situation distorting the cost of production of WLP exists in the Korean hot-rolled steel coil market.  Particular Market Situation Allegation (Sept. 22, 2017) (P.R. 154-213; C.R. 230-297).  Maverick predicated its allegation on the cumulative effect of four factors:  (1) Korean government subsidies to the hot-rolled steel coil industry; (2) Korean imports of low-priced hot-rolled steel coil from China; (3) strategic alliances between Korean hot-rolled steel coil suppliers and WLP producers; and (4) Korean government intervention in the electricity market. *Id.* at 7-10, 19-41.

In October 2017, Commerce issued a letter inviting interested parties to submit factual information and comments regarding Maverick's allegation.  Ltr. re: Deadline for Submission of Factual Information Relating to Particular Market Situation Allegation (Oct. 27, 2017) (P.R. 229).  In response, Commerce received factual information and comments from Hyundai, SeAH, and Maverick.  Hyundai Particular Market Situation Comments (Nov. 8, 2017) (P.R. 237-239; C.R. 302-306); SeAH Particular Market Situation Comments (Nov. 8, 2017) (P.R. 233); Maverick Factual Information Submission (Nov. 8, 2017) (P.R. 240-241; C.R. 307-308); Hyundai Particular Market Situation Rebuttal Comments (Nov. 16, 2017) (P.R. 247-248; C.R. 309-310); SeAH Particular Market Situation Rebuttal Comments (Nov. 16, 2017) (P.R. 245-246); Maverick Particular Market Situation Comments (Nov. 16, 2017) (P.R. 249; C.R. 311).

In the preliminary results, Commerce determined, based on the collective impact of the four factors and supporting evidence Maverick identified, that a particular market situation exists in Korea and distorts the cost of production of WLP there.  PDM at 11-15.  Commerce explained that it had "considered the four {particular market situation} allegations as a whole, based on their cumulative effect," and found that they "represent facets of a single {particular market situation}" affecting the cost of producing WLP in Korea.  *Id.* at 12.

In addition, Commerce determined that sufficient record evidence existed to quantify the particular market situation's impact and to administer an alternative calculation methodology addressing distortion in the respondents' production costs.  *Id.* at 14.  Specifically, Commerce relied on subsidy rates determined for hot-rolled steel coil producers in the countervailing duty investigation of hot-rolled steel flat products from Korea.  *Id.* (citing *Hot-Rolled Steel Flat Products from Korea*, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) (final determ.), *as amended by* 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) (*Hot-Rolled Steel from*

4

*Korea*)).  To adjust the distorted price of the hot-rolled steel coil input, Commerce applied to the price of that input the subsidization rates applicable to the relevant hot-rolled steel producers. Commerce explained that the subsidy rates "appropriately quantif{ied} the impact of the {government of Korea's} assistance in the production of hot rolled steel products, which is integral to the {particular market situation} that Commerce has preliminarily found to exist."  *Id.*

After further analyzing the record evidence and the parties' case briefs, Commerce maintained its determination in its final results.  IDM at 12-18.  Regarding its affirmative particular market situation finding, Commerce explained that the existence and collective impact of the four factors led it to find a single particular market situation impacting the cost of producing WLP.  *Id.* at 12-13.  Specifically, although referencing other determinations, Commerce explained that the record supported the following findings:

(1) the Korean government significantly subsidizes producers of hot-rolled steel coil, the primary input in WLP, thereby distorting Korean market prices for hot-rolled steel coil and the resulting cost of producing WLP;

(2) the Korean steel market has been flooded with imports of low-priced Chinese steel products as a result of significant overcapacity in Chinese steel production, further placing distortive downward pressure on Korean steel prices;

(3) a set of strategic alliances exists between certain Korean hot-rolled steel coil suppliers and WLP producers that contribute to the particular market situation; and

(4) the Korean government's involvement in the electricity market—in particular, the government's use of the electricity market as a tool of industrial policy and its control of the largest electricity supplier, the Korean Electric Power Corporation (KEPCO)—contributed to the particular market situation.

*Id.* at 12-14.  Commerce determined that the collective impact of these "intertwined market conditions" indicated that the costs of producing WLP in Korea are distorted and are not in the ordinary course of trade.  *Id.* at 14.  Thus, Commerce continued to find that a particular market situation existed in the Korean market for the period at issue.  *Id.*

Commerce also continued to find that it was appropriate, as an alternative methodology, to quantify the needed adjustment to the hot-rolled steel coil input using the individual subsidy rates applicable to hot-rolled steel coil producers from the countervailing duty investigation of hot-rolled steel flat products from Korea. *Id.* at 14-15.  In doing so, Commerce explained that it used the rates from *Hot-Rolled Steel from Korea* in effect for the relevant hot-rolled steel coil producers at the time of its final results. *Id.* at 14, 15.  Commerce also explained why the fact that the rates it used were based on total or partial adverse facts available did not discredit their use in making a particular market situation adjustment. *Id.* at 15.  At the same time, although disagreeing with the respondents' claims that it was required to perform a company-specific empirical analysis of each individual respondent to find a particular market situation, Commerce also explained why the data Hyundai had offered as alleged benchmarks for comparison to its purchases did not constitute appropriate benchmark data for the hot-rolled steel that Hyundai and SeAH used in producing WLP. *Id.* at 16-17.

Apart from making the adjustment to hot-rolled steel coil input prices based on the rates from *Hot-Rolled Steel from Korea*, Commerce declined Maverick's requests that it make further adjustments stemming from the other factors leading to Commerce's particular market situation finding. *Id.* at 23-24.  As Commerce explained, the information on the record did not permit it to quantify such adjustments. *Id.*  Commerce also addressed and rejected Hyundai's allegations of improper political influence. *Id.* at 25-26.

## II.     <u>Selection Of A Comparison Market</u>

In its preliminary results, Commerce relied on Canada as SeAH's comparison market because it determined that SeAH's home market sales were insufficient to permit a proper comparison with United States sales pursuant to 19 U.S.C. § 1677b(a)(l)(C)(ii).  PDM at 15-16.

Subsequently, Commerce placed on the record the final determination of the Canadian Trade

Tribunal (CITT) in its antidumping inquiry on carbon and alloy steel line pipe.  Memorandum

Regarding Canadian Antidumping Duty Final Determination on Welded Line Pipe (Jun. 25,

2018) (P.R. 303) (CITT Final Determination).  Because the CITT found "that SeAH's Canadian

sales of steel line pipe were dumped," Canadian prices were no longer representative of the

company's home market sales.  IDM at 46.  Accordingly, Commerce in the final results

calculated SeAH's margin using a constructed value as normal value.  *Id.*

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion found by Commerce unless

it is unsupported by substantial evidence on the record, or otherwise unlawful.  *See Fujitsu Gen.*

*Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229

(1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility

of drawing inconsistent conclusions from the record does not render Commerce's findings

unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

When Congress entrusts an agency to administer a statute that demands inherently fact-

intensive inquiries, such as in this case, the agency's conclusions may be set aside only if the

record is "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v.*

*Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United*

*States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting tremendous deference to

Commerce's factual findings).  Likewise, it is improper to overturn an agency determination

"simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007). Thus, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations if they are reasonable and supported by the record as a whole, even if evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

When the Court examines Commerce's interpretations of the statute it administers, the Court employs the two-pronged test established in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, the Court examines "whether Congress has directly spoken to the precise question at issue," and if it has, the agency and Court must comply with the clear intent of Congress. *Id*. at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (citation omitted). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.*

Finally, this Court affords Commerce an especially great deal of deference "when a statute fails to make clear any Congressionally mandated procedure or methodology for assessment of the statutory tests." *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed.

Cir. 2015) (citation and quotation marks omitted).  In such cases, "Commerce may perform its

duties in the way it believes most suitable."  *Id.*  Consequently, Commerce receives "tremendous

deference" that is "both greater than and distinct from that accorded the agency in interpreting

the statutes it administers" when it exercises its technical expertise to select and to apply

methodologies to implement the dictates of the trade statute.  *Fujitsu*, 88 F.3d at 1039.

II.   **Commerce's Particular Market Situation Determination Is Reasonable And Lawful**

A.   **Legal Framework**

In an antidumping proceeding, the statute directs Commerce to determine whether subject

merchandise is being, or is likely to be, sold at less than fair value in the United States by

comparing the export price (or constructed export price) and the normal value of merchandise.

19 U.S.C. § 1675(a)(2)(A).  In doing so, the statute further directs that "a fair comparison shall

be made between the export price or constructed export price and normal value."  19 U.S.C.

§ 1677b(a).  Generally, export price is defined as the price at which subject merchandise is first

sold in the United States, and the normal value represents the price at which the merchandise is

sold in the exporting country.  *See id.* §§ 1677a(a), 1677b(b)(i).  Within this framework, normal

value generally is determined by reference to sales of merchandise in the home market, sales of

merchandise in a third country, or a constructed value of the merchandise consisting of the cost

of manufacturing (*i.e.*, the costs of materials and fabrication), selling, general, and administrative

expenses, profit, and packing expenses.  *See* 19 U.S.C. §§ 1677b(a)(1), (a)(4), (e).

When the record includes home market sales, several considerations affect whether

Commerce will rely on them in calculating normal value.  In particular, under 19 U.S.C.

§ 1677b(a)(1)(C), Commerce may consider home market sales unusable when "the *particular*

*market situation* in the exporting {home market} country *does not permit a proper comparison*

with the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(C)(iii) (emphasis

added).  Likewise, section 1677b(a)(1)(B)(ii) provides that Commerce may use sales to a third-

country market, but only if Commerce *does not* determine that a *particular market situation*

*prevents a proper comparison* with United States price.  19 U.S.C. § 1677b(a)(1)(B)(ii)(III).

Commerce thus has statutory authority to disregard reported prices in either the home

market or third-country markets when a "particular market situation" exists in the exporting

country or the third country, thereby preventing Commerce from making a proper comparison.

*See* 19 U.S.C. §§ 1677b(a)(1)(C)(iii), (B)(ii)(III).  Although the statute does not define

"particular market situation," the Statement of Administrative Action provides a non-exhaustive

list of examples of what might be considered a particular market situation.  *See* Statement of

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316,

at 822 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4162 (SAA).  For instance, a particular

market situation might exist when the home market consists of a single sale, when there is

government control over pricing to such an extent that home market prices cannot be considered

to be competitively set, or when the demand patterns in the foreign market are different from

those in the United States (*e.g.*, when substantial price changes are closely correlated with

holidays occurring at different times of the year in the two markets).  *See id.*

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) amended the Tariff

Act of 1930 to provide Commerce with additional discretion by applying the "particular market

situation" concept when using a constructed value to determine normal value.  *See* Pub. L. No.

114-27 § 504, 129 Stat. 362 (2015).  The amendments, in particular, provide Commerce with

methodological discretion in calculating the costs and other items that comprise a constructed

value.  Specifically, Congress in section 504 added the particular market situation concept to 19

U.S.C. § 1677(15)'s definition of sales and transactions that Commerce will consider outside the "ordinary course of trade," and thus not usable in its antidumping calculations.  Under section 1677(15), Commerce *shall find* "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the *particular market situation* prevents a proper comparison with the export price or constructed export price."  *Id.* (emphasis added).

Further, Congress in section 504 amended the statute's constructed value provision, 19 U.S.C. § 1677b(e), permitting Commerce to use alternative cost calculation methodologies based on particular market situation findings.  Under section 1677b(e), when Commerce in calculating a constructed value finds that a "*particular market situation* exists such that the *cost of materials and fabrication or other processing of any kind* does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use *another calculation methodology* under this subtitle or *any other calculation methodology*."  *Id.* (emphasis added).[1]

Accordingly, the statute provides Commerce with broad discretion in selecting the method for addressing situations in which "the cost of material and fabrication or other processing of any kind" is distorted as a result of a particular market situation.

B.    **Commerce's Determination That A Particular Market Situation Exists In The Korean Hot-Rolled Steel Coil Market Is Supported By Substantial Evidence And In Accordance With Law**

Plaintiffs argue that Commerce's determination improperly construes the statute, is unsupported by substantial evidence, and duplicates a determination that this Court previously reversed in *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019).  These arguments, however, ignore the deference provided to Commerce in

---

[1] Previously, when Commerce found a particular market situation affecting home market *sale prices*, the remedy was to disregard all sales in the market.  *See* 19 U.S.C. § 1677b(a)(1)(C)(iii). In contrast, the TPEA amendments permit Commerce to address distortions in reported *costs* through various calculation methodologies, including cost adjustments.  *See id.* § 1677b(e).

its interpretation of the statute and deviate from the standard of review that governs

whether Commerce's determinations are supported by substantial evidence.  Commerce

grounded its fact-laden determination in the record evidence.  Because Commerce

reasonably construed the statute and reached a reasonable conclusion in its evaluation of

the evidence, Commerce's determination should be sustained.

### 1.    Commerce Reasonably Construed The Statute

Commerce's determination reasonably construes the term "particular market situation"

and the controlling statutory provisions.  Husteel maintains that the statute does not authorize

Commerce to make a particular market situation adjustment.  Husteel Br.  17-19.  Hyundai

argues that the statute and Commerce's prior determinations establish that Commerce may only

make a particular market situation adjustment in "extreme circumstances" and that the term

"particular market situation" must be construed to require Commerce to perform what Hyundai

characterizes as a "data- and respondent-specific analysis . . . {that} relate{s} to the

circumstances of the individual conditions and situation of the respondent at issue."  Hyundai Br.

18, 22; *see generally id.* at 18-22.  In other words, Hyundai (joined by SeAH) claims that, as a

matter of law, the statute requires Commerce to solicit each respondent's individual cost data and

to compare these data to what Commerce determines to be the cost of production in the ordinary

course of trade.  *See id.* at 21-24; *see also* SeAH Br. 21-23.  This position reads requirements

into the statute that do not exist.  Because Commerce's determination reasonably construes a

broad statutory provision, the construction is permissible and should be sustained.  *See Eurodif*,

555 U.S. at 316; *NEXTEEL*, 355 F. Supp. 3d at 1347, 1349 (rejecting similar arguments).

As an initial matter, plaintiffs' arguments are contrary to the terms of the statute.

Although the statute does not define "particular market situation," and hence gives Commerce

12

considerable discretion in both identifying and acting upon such a situation, it plainly *does not* include the requirements Hyundai and SeAH assert.  The statute's plain terms authorize Commerce to make an adjustment if Commerce finds the existence of a "particular *market situation . . . such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade*{.}"  19 U.S.C. § 1677b(e) (emphasis added); *see also* 19 U.S.C. § 1677(15) (requiring Commerce to consider sales and transactions outside ordinary course of trade when "the particular *market* situation *prevents a proper comparison with the export price or constructed export price*" (emphasis added)).  That is *all* that the statute states—it does not prescribe a methodology by which Commerce is to determine whether a particular market situation exists that renders manufacturing costs outside the ordinary course of trade.

More specifically, Congress did not include a requirement that the circumstances be "extreme" or "so distortive," but merely that production costs not accurately reflect the ordinary cost of production in a manner preventing a proper dumping comparison (as Commerce found here).  *See Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470 (1997) ("{A}bsent any indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it." (citation and quotation marks omitted)).  Nor did Congress include a requirement that Commerce make its determination on a respondent-specific basis.  *See id.*  The statute does nothing to limit Commerce's discretion in this respect, and plaintiffs' efforts to do so here improperly read into the statute a requirement that does not exist.  Likewise, the SAA, as we established above, merely includes several examples of situations that may constitute a particular market situation, while explicitly highlighting that the term is undefined.  *See* SAA at 822; Hyundai Br. 20 (acknowledging that

SAA examples are not exclusive).  The SAA, like the statute, also does not discuss a required methodology by which Commerce will identify a particular market situation.  *See* SAA at 822.

Consistent with the statute and SAA, and contrary to plaintiffs' claims (Hyundai Br. 19-20), Commerce did not suggest otherwise in its recent post-TPEA particular market situation determination in *Biodiesel from Indonesia*, 83 Fed. Reg. 8,835 (Dep't of Commerce Mar. 1, 2018) (final determ.).  Rather, Commerce explicitly stated that "{a particular market situation} analysis will *necessarily be specific to the allegation raised in the particular case* and with respect to a particular market." *Id.* at IDM cmt. 3 (emphasis added).  Commerce in *Biodiesel from Indonesia* also focused its analysis on the statutory inquiry, which "simply requires that a {particular market situation} decision be based on a finding that the cost of materials . . . {does} not accurately reflect the cost of production in the ordinary course of trade." *Id.* (citation and quotation marks omitted); *Biodiesel from the Republic of Argentina*, 83 Fed. Reg. 8,837 (Dep't of Commerce Mar. 1, 2018) (final determ.) (*Biodiesel from Argentina*), at IDM cmt. 3 (same). Thus, contrary to Hyundai's claims, Commerce has not created additional non-statutory requirements.  As for Hyundai's claim that Commerce previously referenced a "high threshold" for disregarding a company's home market sales entirely based on a particular market situation finding, (Hyundai Br. 20 (citations omitted)), historical instances in which Commerce declined to find a particular market situation affecting a respondent's home market sales by applying the pre-TPEA statutory provisions to specific facts, do not control Commerce's determination here.

Hyundai and SeAH nonetheless argue that Commerce's determination improperly construes the statute because Commerce did not analyze with granularity whether each respondent's costs accurately reflected the cost of production in the ordinary course of trade.  *See* Hyundai Br. 21-24; SeAH Br. 21-23.  In doing so, they assert, incorrectly, that the statute

requires Commerce to conduct a *company*-specific analysis to determine whether a particular *market* situation exists.  This argument is flawed because it runs counter to the statutory term "particular market situation" and disregards *Chevron* deference.

The statute's plain language uses the term "particular market situation"—which indicates that the "situation" at issue exists in a *market*.  Thus, by definition, a particular market situation analysis concerns distortions in the overall market rather than distortions on particular sales or transactions by a particular company.  *Biodiesel from Argentina*, 83 Fed. Reg. 8,837, at IDM cmt. 3; *Biodiesel from Indonesia*, 83 Fed. Reg. 8,835, at IDM cmt. 3 (stating same).  The statute does not mandate that Commerce conduct a granular, company-specific cost evaluation of each respondent that purchases an input within a market.  *See id.*  Had Congress wished to take that approach, it would have been easy to define "particular market situation" in terms requiring company-specific analyses, or otherwise to have added additional direction in the statute.  Congress instead left the term "particular market situation" undefined, leaving the matter to Commerce's discretion.  Thus, plaintiffs' attempts to engraft additional requirements onto the statute are unsupported.

Even if plaintiffs' asserted requirements were not contrary to the statute's plain terms, because Congress has not otherwise spoken to the precise question at hand, the issue before the Court is whether Commerce's determination implicates any reasonable interpretation of the term "particular market situation" in the statute, when "any reasonable construction of the statute is a permissible construction."  *Timken*, 354 F.3d at 1342; *see Chevron*, 467 U.S. at 843 n.11 ("The court need not conclude that the agency{'s} construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.").

15

In this regard, as we established above, TPEA section 504 expanded the applicability of the particular market situation concept to cover distortions in input costs *within the markets for those inputs*.  The provision's legislative history states that the amendments ultimately enacted in the TPEA "provide that where a particular market situation exists that *distorts pricing or cost in a foreign producer's home market*, {Commerce} has *flexibility* in calculating a duty that is not based on distorted pricing or costs."  S. Rep. No. 114–45, at 37 (2015) (emphasis added); *see also NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same).  This contradicts plaintiffs' contentions that the amendments require Commerce to conduct respondent-specific analyses and to restrict particular market situation findings to "extreme" circumstances.

Indeed, the TPEA's legislative history further indicates that, during the floor debates, members of Congress were concerned with cost distortions in inputs, including cost distortions that resulted from unfair subsidization or dumping.  During consideration before the House of Representatives, for example, Representative Meehan highlighted that the legislation would empower Commerce "to disregard prices or costs of inputs that foreign producers purchase if {Commerce} has reason to believe or suspect *that the inputs in question have been subsidized or dumped*."  161 Cong. Rec. H4666-01, H4690 (daily ed. June 25, 2015) (statement of Rep. Meehan) (emphasis added); *NEXTEEL*, 355 F. Supp. 3d at 1349 (quoting same).

Likewise, during Senate debate on the bipartisan legislation, Senator Brown called the legislation "one of the most important bills to come in front of the Senate," because it would "guarantee that Americans can find a more level playing field as we compete in the world economy. . . ."  161 Cong. Rec. S2899-05, S2900 (May 14, 2015).  Senator Brown specifically identified the *Korean steel industry* as an industry exhibiting unfair trade practices:

> These {United States steel} producers increasingly lose business to
> foreign competitors that are not playing by the rules.  Imports for

> {Oil Country Tubular Goods} have doubled since 2008.  By some measures imports account for somewhat more than 50 percent of the pipes being used by companies drilling for oil and gas in the United States.
>
> Korea has one of the world's largest steel industries, but get this, not one of these pipes that Korea now dumps in the United States —*illegally subsidized*—is ever used in Korea for drilling because Korea has no domestic oil or gas production.  In other words, *Korea has created this industry only for exports and has been successful because they are not playing fair*.  So their producers are exporting large volumes to the United States, the most open and attractive market in the world, at below-market prices.  This is clear evidence that our workers and manufacturers are being cheated, and it should be unacceptable to the Members of this body.  It hurts our workers, our communities, and our country.  It is time to stop it.

*Id.* (emphasis added).

Reviewing the TPEA's legislative history, this Court has recognized that the statute reflects Congress's "desire to give Commerce the ability to choose the appropriate methodology when a particular market situation exists."  *NEXTEEL*, 355 F. Supp. 3d at 1349.  In other words, the TPEA amendments and their legislative history make clear Congress's intent to expand Commerce's discretion in administering the statute's constructed value provision when costs in a foreign producer's home market are distorted by the particular conditions in that market.  Thus, Commerce "has the ability to choose the appropriate methodology so long as it comports with its statutory mandate and provides a reasoned explanation."  *Id.* (citing, *inter alia*, *Fujitsu*, 88 F.3d at 1039 (discussing tremendous methodological deference afforded Commerce)).

In this case, Commerce explained that it examined the totality of the evidence on the record, focusing on the "collective impact" and "cumulative effect" of the four factors identified in Maverick's allegation:  (1) the Korean government's significant subsidization of hot-rolled steel coil; (2) Korean imports of hot-rolled steel coil from China; (3) strategic alliances within the Korean market; and (4) distortions in the Korean electricity market.  IDM at 12-13.  This

totality of the conditions approach is consistent with the plain meaning of the term "particular

*market* situation" and what Congress indicated it intended in enacting the TPEA:  to empower

Commerce to disregard input costs if it determines that they are distorted by a particular market

situation.[2]  *See* IDM at 14 (finding that intertwined market conditions "signify that the

production costs of WLP are distorted" and that distortions "impact the costs of production for

WLP from Korea").  As this Court held in *NEXTEEL*, "{t}he statute's language and legislative

history permit Commerce's chosen methodology in this investigation, which was to consider

allegations of a particular market situation based on the cumulative effect and the totality of the

conditions in the foreign market."  355 F. Supp. 3d at 1349; *cf. Biodiesel from Indonesia*, 83 Fed.

Reg. 8,835, at IDM cmt. 3 (employing "totality of the circumstances" approach while explaining

that "in certain contexts, an ordinary course of trade analysis may involve a comparison of

specific sales and transactions to the general market," but that "we do not believe such a

comparison is always appropriate within the context of a {particular market situation}

analysis."); *Biodiesel from Argentina*, 83 Fed. Reg. 8,837, at IDM cmt. 3 (same).  Commerce's

construction of the statute is thus reasonable and should be sustained.

    Moreover, Commerce addressed why plaintiffs' reading of the statute as requiring a

*company*-specific analysis to identify a particular *market* situation is not reasonable.  As

Commerce explained:

> We disagree with the notion that such company-specific analysis is
> necessary and appropriate in a situation where, as here, there is
> sufficient evidence demonstrating that the market as a whole is
> distorted and a {particular market situation} exists such that the
> cost of materials and fabrication or other processing of any kind
> does not accurately reflect the {cost of production} in the ordinary
> course of trade.  Companies do not operate in a vacuum, but,

---

[2] Correspondingly, Commerce explained that section 504 of the TPEA does not specify whether to consider particular market situation allegations individually or collectively.  IDM at 12.

> rather, purchase their inputs in a market.  If a particular market is distorted as a whole, it would be illogical to conclude that one company operating in that particular market is insulated from the market distortions with respect to costs.

IDM at 16.  In other words, notwithstanding plaintiffs' claims about individual costs, it is not appropriate to analyze company-specific transactions for possible distortion in circumstances such as these when the overall market is distorted.  Hyundai claims, inaccurately, that Commerce "ignored" data regarding its company-specific input prices.  Hyundai Br. 23.  But Hyundai fails to acknowledge that it pressed the data in furtherance of a non-statutory requirement that Commerce explained went beyond what was necessary and appropriate in this case.  Commerce did not "ignore" the evidence, but disagreed with plaintiffs regarding the evidence's relevance and explained why.  *See* IDM at 4-18 (documenting consideration of issue and respondents' arguments); *id.* at 17 (discussing flaws in data Hyundai claimed were appropriate benchmarks for company-specific analysis).  Consequently, Hyundai's claim that Commerce's determination should be overturned based on that "fact alone" is meritless.  *See* Hyundai Br. 23.

Still further, Commerce also addressed and explained its disagreement with the respondents' arguments regarding the need for a "quantitative analysis" of their individual data based on *Rebar from Taiwan*, 82 Fed. Reg. 34,925 (Dep't of Commerce Jul. 27, 2017), at IDM cmt. 1, and Commerce's determinations in the biodiesel investigations.  *See* IDM at 16.  Indeed, Commerce explained both that it similarly employed a "totality of the circumstances" approach in those investigations, and that its determination here employed numerical analysis in examining the market-wide factors supporting its finding.  *See id.* at 16; *see also Biodiesel from Indonesia*, 83 Fed. Reg. 8,835, at IDM cmt. 3 (employing "totality of the circumstances" approach); *Biodiesel from Argentina*, 83 Fed. Reg. 8,837, at IDM cmt. 3 (same).

In addition, Hyundai distorts the issue before the Court by claiming that Commerce's prior determinations demonstrate that "any finding that a particular market situation exists . . . must rely on *strong, substantial evidence* that the particular respondents' actual costs . . . are unusually and extensively distorted . . . ."  Hyundai Br. 23(emphasis added); *see also id.* at 24 ("Commerce did not rely on such *strong, substantial evidence* in this case . . . .").  This assertion improperly conflates the statutory construction issue with the language of the Court's standard of review pertaining to Commerce's factual findings.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record . . . .").  Whether Commerce has lawfully construed the statute is a separate issue from whether, in applying that provision to the record evidence, Commerce supported its determination with substantial evidence.

Hyundai (and SeAH in passing) also argues that Commerce's decision is improper because a more specific statutory provision, namely, the provision of the countervailing duty statute governing treatment of subsidies bestowed on upstream providers, addresses the question at hand.  Hyundai Br. 31-33 (citing *Bloate v. United States*, 559 U.S. 196 (2010), and *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012), for proposition that agency must adhere to more specific provision of statute over more general provision when both apply); SeAH Br. 26.  This argument lacks merit.  As an initial matter, Hyundai overstates the case law. The Supreme Court has explained that "{o}f course the general/specific canon is not an absolute rule, but is merely a strong indication of statutory meaning that can be overcome by textual indications that point in the other direction."  *RadLAX*, 566 U.S. at 646-47; *see Lara-Aguilar v. Sessions*, 889 F.3d 134, 142 (4th Cir. 2018) (explaining that canon "is applied '{t}o eliminate the contradiction' between general and specific statutory provisions" (quoting *RadLAX*, 566 U.S. at

645)).  Further, the canon only comes into play when provisions cannot be harmonized and genuinely conflict.  *See Lara-Aguilar*, 889 F.3d at 141-42 (citations omitted).  Thus, other tools of statutory construction may, and here do, weigh in favor of a different reading.

Specifically, in determining that a particular market situation exists in the Korea hot-rolled steel coil market that distorts the cost of producing WLP in Korea for respondents in *an antidumping duty proceeding*, Commerce is not remedying upstream subsidization under the countervailing duty law.  Rather, it is administering an alternative calculation methodology authorized separately under the *antidumping law* to prevent cost distortions from corrupting Commerce's dumping calculations.  Although Commerce relied on the subsidy rates determined for producers of hot-rolled steel coil in the countervailing duty investigation of hot-rolled steel flat products from Korea as data *to quantify* the particular market situation adjustment necessary in this proceeding, that is not the same as determining a duty to countervail an upstream subsidy. The two determinations serve different purposes and depend on different factual predicates. Hence, it is both lawful and reasonable for Commerce to look to various measures to determine how to adjust a respondent's costs.  Hyundai's reliance on the countervailing duty upstream subsidies provision is therefore misplaced.

Finally, Husteel's statutory argument positing that Commerce is prohibited altogether from applying a particular market situation analysis outside the context of a constructed value is equally meritless.  *See* Husteel Br. 18-19.  First, Husteel did not raise this argument in its case brief before Commerce and thus deprived Commerce of the opportunity to address it in the first instance by failing to exhaust its administrative remedies.  *See* Husteel Case Br. (P.R. 282); 28 U.S.C. § 2637(d); *JBF RAK*, 790 F.3d at 1366 (noting "strict view" of exhaustion).  Nor, despite making it a stand-alone section of its brief, did Husteel raise the issue in its complaint (and it is

therefore waived).  Regardless, the TPEA in addition to authorizing Commerce under section 1677b(e) to use "any other calculation methodology" to remedy a particular market situation affecting costs *also* expanded the *general* definition of "ordinary course of trade" to cover any situation in which Commerce finds that a particular market situation prevents proper comparison between markets.  19 U.S.C. § 1677(15) (Commerce "shall consider" such transactions outside ordinary course of trade).  Correspondingly, the statute in its basic definition of normal value (not just constructed value) requires that normal value reflect a price that is in the "ordinary course of trade."  *Id.* § 1677b(a)(1)(B)(i).  This carries through to the subsection (b) normal value provisions concerning sales below cost (subsection (b)(3) uses the similar term "ordinary cost of business").  *Id.* §§ 1677b(b)(1), (3).  It is also consistent with the TPEA's legislative history stating that the amendments ultimately enacted in the TPEA "provide that where a particular market situation exists that *distorts pricing or cost in a foreign producer's home market*, {Commerce} has *flexibility* in calculating a duty that is not based on distorted pricing or costs." S. Rep. No. 114–45, at 37 (emphasis added).

The foregoing contradicts Husteel's argument that because Congress did not modify the specific statutory provision governing the sales-below-cost analysis, Commerce lacks authority to adjust costs of production for a particular market situation when not using constructed value to calculate normal value.  The plain language of the statute and the legislative history of the TPEA amendments support the notion that Commerce has broad discretion in determining which calculation methodology to use in accounting for a particular market situation.  Although one of the TPEA provisions was added to the section of the statute discussing constructed value, it provides Commerce with broad authority to use "any other calculation methodology" if costs are distorted by a particular market situation and is reflected in general provisions concerning

normal value.  Moreover, it would be illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a particular market situation for constructed value, but still to rely on those same distorted costs for purposes of cost of production and the sales-below-cost test.  For this reason, Commerce has consistently found that Section 504 of the TPEA added the concept of particular market situation to the definition of the term "ordinary course of trade" for purposes of constructed value, "and through these provisions for purposes of the {cost of production} under {19 U.S.C. § 1677b(b)(3)}."  IDM at 12.  This is a reasonable interpretation.

### 2.    Commerce Reasonably Determined That A Particular Market Situation Exists In The Korean Hot-Rolled Steel Coil Market

Commerce reasonably determined based on the record evidence that a particular market situation exists in the Korean hot-rolled steel coil market, distorting the cost of production of WLP in Korea.  Plaintiffs challenge various aspects of Commerce's analysis and argue that the Court should reverse Commerce's determination based on the Court's prior decision in *NEXTEEL*.  Their arguments, however, disregard the standard of review and improperly request that the Court reweigh the record evidence.  Because Commerce reasonably evaluated the record before it in determining a particular market situation exists in the Korean hot-rolled steel coil market, the Court should sustain Commerce's determination.  *See Shandong Rongxin*, 203 F. Supp. 3d at 1338 (noting "tremendous amount of deference" afforded Commerce factual findings); *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015) (Court's role is not to "reweigh the evidence . . . or to reconsider questions of fact anew.").

As we have explained, in examining the particular market situation allegation before it, Commerce examined the totality of the evidence on the record.  Commerce's analysis focused on the cumulative effect of the four factors Maverick identified in its allegation:  (1) the Korean government's subsidization of hot-rolled steel coil; (2) the Korean market being flooded with

imports of low-priced hot-rolled steel coil from China; (3) the existence of strategic alliances within the Korean market; and (4) distortions in the Korean electricity market.  IDM at 12-13. Commerce's decision memorandum shows that it reasonably considered the distortive effects of these conditions in assessing the existence of a particular market situation and arrived at a determination that is supported by substantial evidence.  *See id.* ("For this review, after analyzing Maverick's allegation, as well as the factual information and case briefs subsequently submitted by interested parties, we determine that the circumstances present during this review – that is, the {particular market situation} allegation itself and the record evidence concerning the allegation – remained largely unchanged from those which led to the finding of a {particular market situation} in Korea in the other reviews.").

First, record evidence shows significant subsidization of hot-rolled steel coil by the Korean government and purchases of hot-rolled steel coil from subsidized Korean companies by the mandatory respondents in the review.  *See* IDM at 13; *Hot-Rolled Steel from Korea*, 81 Fed. Reg. at 53,439 and accompanying IDM *available at* Particular Market Situation Allegation at Ex. 8 (P.R. 202-206; C.R. 278-282);[3] *see also* Hyundai Supp. Sections A-D Response at Ex. SD-9 (Jul. 14, 2017) (P.R. 121-130; C.R. 148-160); SeAH Supp Sections D-E Response at Ex. SD-9-C (Aug. 16, 2017) (P.R. 148-150; C.R. 221-228) (demonstrating respondent purchases of hot-rolled steel from subsidized Korean companies).  Commerce, for example, explained based on its

---

[3] The particular document Commerce cited in the IDM as "Attachment 13, Exhibit 12," a case brief from an oil country tubular goods proceeding that, in turn, cites Commerce's *Hot-Rolled Steel from Korea* determination, appears to be listed but missing among the exhibits to the Particular Market Situation Allegation submission.  *See* Particular Market Situation Allegation at Ex. 3, pg. 5 (P.R. 155; C.R. 231) (listing Exhibit 12, but missing physical document).  However, in addition to the fact that the evidence primarily stems from Commerce's public determination in *Hot-Rolled Steel from Korea*, the same information appears in multiple places in the record. *See*, *e.g.*, Particular Market Situation Allegation at 7-8, 19-28 (P.R. 154; C.R. 230); *id.* at Ex. 8 (P.R. 202-206; C.R. 278-282) (copy of *Hot-Rolled Steel from Korea* IDM).

determination in *Hot-Rolled Steel from Korea* that the subsidies received by Korean hot-rolled

steel producers were up to nearly 60 percent of the cost of hot-rolled steel coil, the primary input

for WLP production.[4]  IDM at 13; *Hot-Rolled Steel from Korea*, 81 Fed. Reg. at 53,439 (source

of information cited in IDM); *see also* Particular Market Situation Allegation at Ex. 9 (P.R. 206-

207; C.R. 282-283) (amended final calc. memo for POSCO in *Hot-Rolled Steel from Korea*)).

Commerce additionally found that hot-rolled steel coil, as the primary input in WLP, constitutes

a substantial proportion of the cost of WLP production.  IDM at 13; *see also* Hyundai Sections

B-D Response at Exs. D-10-A and D-10-B (May 8, 2017) (P.R. 68-75; C.R. 91-101) (reflecting

percentage of hot-rolled coil to total cost of manufacturing); SeAH Section D Response at 9

(May 5, 2017) (P.R. 65; C.R. 84) (providing approximate percentage of cost of manufacturing).

Given these facts, as Commerce explained, distortions in the hot-rolled steel coil market due to

subsidization have a significant impact on the cost of producing WLP.  IDM at 13 (citation

omitted).  Substantial record evidence thus supports Commerce's determination that distortion

stemming from subsidization of hot-rolled steel contributed to a particular market situation.

Commerce similarly relied on substantial record evidence in determining that pervasive

low-priced imports from China in the Korean market contributed to a particular market situation

in Korea.  In particular, Commerce explained that the record contained additional evidence of

distortions in the Korean hot-rolled steel coil market arising from significant overcapacity in

Chinese steel production, which stems, in part, from distortions and interventions prevalent in the

Chinese economy, resulting in the Korean steel market being flooded with imports of cheaper

---

[4] Although Commerce reduced its subsidy calculation in *Hot-Rolled Steel from Korea* following
a Court remand, that does not affect the information in the record at the time Commerce made its
determination here.  *See* IDM at 15 (explaining that investigation results were reflected in "rates
currently being applied to HRC").  Moreover, even the revised rate continues to evidence
significant subsidization.  *See* Hyundai Br. 28; SeAH Br. 29 (noting 41.57 percent revised rate).

Chinese steel products.  IDM at 13 (discussing Particular Market Situation Allegation at Ex.3, Sub-Ex. 6, pp, 8-11 & Sub-Ex. 4 (P.R. 193; C.R. 269) (article entitled "POSCO Posts Smallest Ever Profit Amid Chinese Steel Deluge")).  As Commerce explained, this "plac{es} downward pressure on Korean domestic steel prices," and in combination with domestic steel production being heavily subsidized, "distorts Korean market prices of {hot-rolled steel coil}."  *Id.*

Commerce also indicated in relation to the Chinese imports factor that, although the mere presence of imports from another country would not automatically imply that a particular market situation exists, the record demonstrates that Chinese steel imports in Korea created conditions that go beyond normal trade with other countries.  *See*, *e.g.*, PDM at 15 ("Excess steel-production capacity causes serious market distortions and contributes to the downturn in global steel markets, including significant price suppression, displaced markets, unsustainable capacity utilization, negative financial performance, shutdowns, and lay-offs.").  Record evidence shows, moreover, that Chinese imports constitute a significant portion of the Korean hot-rolled steel coil market.  *See* IDM at 17 (discussing Particular Market Situation Allegation at Ex. 29, Sub-Ex. 10 (P.R. 218; C.R. 294) (COMTRADE Statistics for Korea 2016)).  Correspondingly, the record shows that POSCO, Korea's largest steel producer, has seen its profits negatively affected by "a deluge of Chinese exports" that "pushed global prices to their lowest in at least a decade."  IDM at 17 (quoting Particular Market Situation Allegation at Ex. 30, Sub-Ex. 4 (P.R. 218; C.R. 294) (additional copy of article "POSCO Posts Smallest Ever Profit Amid Chinese Steel Deluge")).

In addition, record evidence indicated that "China's production capacity will continue to grow until 2017," leading to "increased exports and price decline pressures."  *Id.* (quoting Particular Market Situation Allegation at Ex. 30, Sub-Ex. 2 (P.R. 218; C.R. 294) (article entitled "China's Steel Exports Reaching 100 Mt: What It Means to Asia and Beyond")).  Although

acknowledging that Chinese overcapacity is not a phenomenon *specific* to the Korean market, Commerce found that "the fact that overcapacity affects other markets is irrelevant; certainly, one aspect of a {particular market situation} could be a contributing factor to a {particular market situation} in more than one country." *Id.*; *see also* PDM at 15 (explaining that continued capacity expansions and declining demand "are likely to place further pressure on *country-specific* steel markets and create *incentives for government interventions* which will further distort the production costs and prices" (emphasis added)).

Commerce also reasonably determined that the third and fourth factors contributed to the existence of a particular market situation in Korea.  Regarding the third factor, Commerce found that the record supported Maverick's allegation of strategic alliances between Korean hot-rolled steel coil producers and Korean WLP producers that have distorted prices in the Korean hot-rolled steel coil market.  *See* IDM at 13, 17-18 (discussing Particular Market Situation Allegation at Ex. 3, Sub-Ex. 4, Att. 4 (P.R. 167) (redacted declaration; unredacted copy *available at id.* Ex. 31 (C.R. 296))); Particular Market Situation Allegation at 28-31 (P.R. 154; C.R. 230) (Maverick's strategic alliance allegations and evidence).  Moreover, Commerce explained that "{b}ecause strategic alliances have led to distortions in the prices of {hot-rolled steel coil}, as evidenced by the record information, we find that such strategic alliances are a contributing factor to the {particular market situation} in Korea impacting the {cost of production} for WLP." *Id.* at 13.  Commerce further explained that, because it evaluates the existence of a particular market situation based on the totality of circumstances in the market, it is unnecessary for every company operating in the market to be a member of a strategic alliance in order for such alliances to have a distortive effect on the market as a whole.  *See id.* at 17-18.

With respect to the fourth factor concerning distortion in Korea's electricity market, Commerce reasonably found that the Korean government's involvement in the electricity market contributes to the particular market situation in the Korean hot-rolled steel coil market.  *See* IDM at 13-14.  Commerce's determination is based on its findings that electricity in Korea "functions as a tool of the government's industrial policy" and that the largest Korean electricity supplier, KEPCO, is a government-controlled entity.  *Id.* at 14 (citing *Oil Country Tubular Goods From The Republic of Korea*, 82 Fed. Reg. 18,105 (Dep't of Commerce Apr. 17, 2017) (final admin. review) and IDM at 41; *Welded Line Pipe from the Republic of Korea*, 80 Fed. Reg. 61,365 (Dep't of Commerce Oct. 13, 2015) (final determ.) and IDM at 13-15).  These findings comport with the SAA's guidance that a particular market situation may exist when there is government control over prices such that prices cannot be considered competitively set.  *Id.* at 13 (citing SAA at 822).  Accordingly, Commerce reasonably found that the Korean government's involvement in the electricity market is a contributing factor to the particular market situation affecting the cost of production of WLP in Korea.  *Id.* at 13-14, 18.

Overall—consistent with the TPEA, SAA, and evidence of legislative intent—Commerce evaluated the allegation before it based upon the totality of the record evidence and reasonably determined that an affirmative finding was warranted.  It explained that "based on the collective impact of Korean {hot-rolled steel coil} subsidies, Korean imports of {hot-rolled steel coil} from China, strategic alliances, and government involvement in the Korean electricity market, a {particular market situation} exists in Korea which distorts the cost of production for WLP." IDM at 13.  It further explained that the four factors were "intertwined market conditions" that "signify that the production costs of WLP are distorted and are not in the ordinary course of trade."  IDM at 14; *see also* PDM at 12 (Commerce "considered the four particular market

situation allegations as a whole" and found they "represent facets of a single {particular market situation}."). Substantial evidence supports this determination, and it should be sustained.

### 3.   Plaintiffs' Challenges To Commerce's Fact-Finding Lack Merit

None of plaintiffs' arguments challenging Commerce's fact-finding demonstrate that Commerce's determination is unsupported by substantial evidence or otherwise unlawful. We address plaintiffs' arguments below.

First, Hyundai, SeAH, and Husteel argue that this case is essentially the same as the determination at issue in *NEXTEEL* and suggest that reversal is required because of that decision. *See* Hyundai Br. 2-3, 13-15, 24-26; SeAH Br. 19-21; Husteel Br. 11-13, 15-17. There are several flaws in this position. As an initial matter, each Commerce proceeding stands on its own and is a separate case before this Court. *See*, *e.g.*, *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018). That consideration is all the more relevant when, as here, in the prior case the Government did not argue the merits before the Court because it had requested voluntary remand following Commerce's change in position between the preliminary and final results. *See NEXTEEL*, 355 F. Supp. 3d at 1347-48.[5]

Moreover, *NEXTEEL* was determined, at least in part, by the Court's concerns as to factors that are not present in this case. Specifically, the Court reasoned as follows:

> The {C}ourt finds it unreasonable that Commerce reversed its {preliminary} position and subsequently found a particular market situation based on the same evidence. It does not stand to reason

---

[5] In a second *NEXTEEL* decision, issued subsequent to plaintiffs' briefs in this case, the Court remanded Commerce's particular market situation determination in an administrative review of the same order, stating that "{b}ecause Commerce's original finding of a particular market situation was not supported by substantial evidence, it is difficult for this court to find, based on substantially the same facts and record evidence, that Commerce's finding in the subsequent administrative review is supported by substantial evidence." *NEXTEEL Co. v. United States*, No. 18-00083, 2019 WL 2565365, at *6 (Ct. Int'l Trade June 17, 2019) (*NEXTEEL II*). The Court in that case did not analyze the record evidence in any detail. *See id.*

> that individually, the facts would not support a particular market
> situation, but when viewed as a whole, these same facts could
> support the opposite conclusion.  The {C}ourt concludes that
> Commerce's determination of the existence of one particular
> market situation in Korea is unsupported by substantial evidence.

*NEXTEEL*, 355 F. Supp. 3d at 1351.  Those circumstances are not at issue here.  Commerce

made an affirmative particular market situation determination in its preliminary results and

maintained that determination in the final results.  Hence, notwithstanding that Commerce

compared the record here to that underlying *NEXTEEL*, this is a fundamentally different case.

Relatedly, plaintiffs' reliance on a *preliminary* determination in the separate oil country

tubular goods review at issue in *NEXTEEL*, as if it was either the preliminary results of this

proceeding or the final results of the oil country tubular goods proceeding, is inappropriate on

several levels.  *See*, *e.g.*, Hyundai Br. 24-25; Husteel Br. 13, 15-16.  Aside from the fact that the

oil country tubular goods preliminary finding relates to a separate proceeding, and does not

supersede Commerce's affirmative findings in the preliminary results of *this* case, plaintiffs'

treatment of the matter ignores the nature of preliminary results.  It is well-established that

"preliminary determinations are 'preliminary' precisely because they are subject to change."

*NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *Hyundai Steel*, 319 F.

Supp. 3d at 1343 (same).  With the benefit of briefing and argument Commerce may change its

view in the final results.  *See Hyundai Steel*, 319 F. Supp. 3d at 1343 (citations omitted); *Husteel

Co. v. United States*, 98 F. Supp. 3d 1315, 1357 (Ct. Int'l Trade 2015) ("To the extent that U.S.

Steel contests Commerce's decision to reverse course on this issue in the Final Determination

without having received any new evidence following the Preliminary Determination, the court

rejects this contention.").  That makes it inappropriate to treat Commerce's statements in the

superseded oil country tubular goods preliminary finding as binding on these proceedings.

Second, plaintiffs argue that Commerce's determination is improper because it relies on subsidy rates for POSCO, a hot-rolled steel coil producer in the *Hot-Rolled Steel from Korea* investigation, that Commerce calculated based on adverse facts available. Hyundai Br. 26-28; SeAH Br. 26-29; Husteel Br. 14-15.[6] The argument is unfounded because Commerce did not assign adverse facts available to the respondents in *this* proceeding, but rather calculated each respondent's rate on the basis of its own information with adjustments where appropriate. *See* IDM at 15 (addressing issue). As Commerce explained, the subsidization finding relates to an input used in the production of WLP, *i.e.*, hot-rolled steel coil, and Commerce merely applied the subsidization rate as an adjustment to the cost of that input in its calculations. *See id.*

As Commerce further explained, the fact that the subsidy rates at issue were calculated based on adverse facts available, alone, should not prevent their use in making a particular market situation adjustment. *See id.* The rates were imposed because the respondents in *Hot-Rolled Steel from Korea* failed to cooperate to the best of their abilities. *Id.* POSCO and Hyundai, the respondents in *Hot-Rolled Steel from Korea*, are experienced respondents in trade remedy proceedings, and could have chosen to act to the best of their abilities in responding to Commerce's requests for information. That they did not suggests that their full cooperation may have resulted in a higher subsidization rate than the ones based on adverse facts available. *Id.* Regardless, as a countervailing duty rate applicable to hot-rolled steel coil produced in Korea at the time of Commerce's determination here—a clearly relevant consideration—Commerce reasonably determined that the data from *Hot-Rolled Steel from Korea* represented an accurate measure of the subsidies being received for production of hot-rolled steel coil, and thus a reasonable basis for its adjustment for that input. *Id.*

---

[6] Commerce did *not* apply POSCO's subsidy rate to all of Hyundai's hot-rolled coil purchases, but only to the portion Hyundai sourced from POSCO. *See* Hyundai Br. 13; IDM at 15.

For similar reasons, plaintiffs' argument that Commerce's adjustment improperly applies adverse facts available to a cooperative party lacks merit, because Commerce did not apply adverse facts available to any party.  *See* Hyundai Br. 39-40; SeAH Br. 26-27; Husteel Br. 21; *cf. POSCO v. United States*, 353 F. Supp. 3d 1357, 1381-82 (Ct. Int'l Trade 2018) (rejecting similar argument in analogous circumstances because Commerce had not applied AFA to plaintiff); *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018) (distinguishing *SKF* case cited by SeAH and discussing subsequent authority).

Further, Commerce addressed plaintiffs' assertion that it is contradictory for Commerce to find that it could not accurately calculate a subsidy rate for POSCO in *Hot-Rolled Steel from Korea*, yet use that same subsidy rate to quantify a particular market situation adjustment.  *See* IDM at 15; Hyundai Br. 27-28, 28-29; Husteel Br. 6-7, 10.  In determining to apply adverse facts available to POSCO in *Hot-Rolled Steel from Korea*, Commerce did not find the rate inaccurate, but that it could not calculate an accurate rate for POSCO in that proceeding due to POSCO's failure to submit complete, accurate, and reliable data.  *See* IDM at 15 (citation omitted).  As we explained above, experienced respondents like POSCO can choose to act to the best of their abilities in responding to Commerce's requests for information if they believe it will achieve a lower rate.  *Cf. KYD, Inc. v. United States*, 607 F.3d 760, 766 (Fed. Cir. 2010) (approving "common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the {responding party} knowing of the rule, would have produced *current* information showing the margin to be less" (citation omitted)).  As Commerce also explained, the rate it used for the adjustment was the actual rate applicable to the hot-rolled steel coil input at issue at the time of this determination.  Therefore, there is no basis for

plaintiffs' claim that POSCO's adverse rate from *Hot-Rolled Steel from Korea* cannot be used to

quantify an adjustment here.[7]

      Plaintiffs also argue that the data from *Hot-Rolled Steel from Korea* cannot be relied upon

because Commerce has adjusted POSCO's countervailing duty rate on remand.  Hyundai Br. 15,

28; SeAH Br. 28-29.  Although the countervailing duty rate for POSCO's hot-rolled steel coil is

subject to litigation and Commerce reduced it somewhat on remand, the new rate is not final and

unappealable (an appeal is pending).  *See POSCO v. United States*, 337 F. Supp. 3d 1265, 1278-

79 (Ct. Int'l Trade 2018), *after remand* 378 F. Supp. 3d 1348 (Ct. Int'l Trade 2019) (sustaining

Commerce's remand determination), *appeal pending* Fed. Cir. No. 2019-2095.  It would be

inappropriate for Commerce to adopt the new rate as an adjustment when there is no final and

unappealable court decision sustaining that rate.  Otherwise, Commerce's determinations would

be subject to a potential "yo-yo" effect, where the agency would be forced to constantly modify

its determinations with each twist of ongoing litigation in other proceedings.  *Cf. Melamine*

*Chemicals Inc. v. United States*, 732 F.2d 924, 934 (Fed. Cir. 1984) (disfavoring "yo-yo" effect

in context of liquidation and expressing view that liquidations should be suspended and then

retroactively governed by *final* court decision).  Moreover, as noted above, the rates Commerce

used were those applicable when it issued its final results.  *See Vt. Yankee Nuclear Power Corp.*

*v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-55 (1978) (If "litigants might demand

rehearings as a matter of law because some new circumstance has arisen, some new trend has

---

[7] Hyundai also confusingly points to the cost verification report for POSCO in the *antidumping* investigation of hot-rolled steel from Korea as alleged evidence that POSCO did not receive subsidies.  *See* Hyundai Br. 29-30.  There is no indication one would expect information about subsidies to be in an antidumping verification report when there was a separate countervailing duty investigation of the product focusing on subsidization.  Hyundai also confuses *POSCO's costs in the hot-rolled steel* investigation with Commerce's determination regarding the effect of Korea's subsidization of hot-rolled steel has on *respondents' costs of producing WLP*.  *See id.*

been observed, or some new fact discovered, there would be little hope that the administrative

process could ever be consummated in an order that would not be subject to reopening."); *Co-*

*Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) (same).

In short, plaintiffs have not articulated a legitimate basis for precluding Commerce's

reliance, as data, on countervailing duty rates that involved facts otherwise available with an

adverse inference, and as we have previously explained, the statute is silent as to what action

Commerce is to take in using an alternative calculation methodology to address a particular

market situation.  Thus, plaintiffs' arguments are misplaced.

Third, plaintiffs contend that Commerce should have relied on the countervailing duty

rate found in *Cut-to-Length Plate from Korea*, 82 Fed. Reg. 16,341 (Dep't of Commerce Apr. 4,

2017) (final determ.), to make the adjustment to the cost of hot-rolled steel coil.  Hyundai Br. 30-

31; SeAH Br. 27-28; Husteel 14-15 (arguing that *Hot-Rolled Steel from Korea* rates are "stale"

and "superseded" by *Cut-to-Length Plate from Korea*).  Commerce directly addressed this issue

in its decision memo.  IDM at 14.  As Commerce explained, hot-rolled steel coil, *not cut-to-*

*length plate*, is the primary input to WLP.  *Id.*  Moreover, contrary to plaintiffs' contemporaneity

claims, Commerce explained that the rates for the *Hot-Rolled Steel from Korea* investigation

were the ones currently in effect for that proceeding (no administrative review of that CVD order

had been completed).  Commerce further determined that "the difference in the {periods of

review} of these two determinations does not outweigh our consideration that it is preferable to

rely on CVD rates which apply to the relevant input, versus CVD rates which apply to other

products{.}"  *Id.*  Thus, Commerce reasonably continued to base its adjustment to the cost of

hot-rolled steel coil on the subsidy rate applicable to that specific product as the primary input in

producing WLP.[8]  *Cf. Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999) (discussing Commerce's "wide discretion" in valuing factors of production).

Hyundai argues that this reasoning misses the point—that in arguing that Commerce should have relied on *Cut-to-Length Plate from Korea*, Hyundai is not arguing that Commerce should adopt that rate, but rather that Commerce should treat it as evidence that POSCO's countervailing duty rate from *Hot-Rolled Steel from Korea* is inaccurate.  Hyundai Br. 30-31. This argument lacks merit because Commerce explained why it was reasonable to rely on an adverse rate applied to a respondent that chose not to cooperate to the best of its ability.  *See* IDM at 15; *KYD*, 607 F.3d at 766 (approving "common sense inference" regarding probativity of margins).  Moreover, Hyundai's reasoning is flawed because *Cut-to-Length Plate from Korea* involved a separate product, whereas the data Commerce used in its adjustment accurately reflected the subsidization rate then applicable to the very product at issue.  *See Hyundai Steel*, 319 F. Supp. 3d at 1342 n.13 ("What Commerce may have concluded in a parallel investigation of a different product with a separate record is of little moment." (citations omitted)).  Hyundai's appeal to "accuracy" as a means of undermining the substantial methodological discretion the statute accords Commerce contradicts current case law clarifying that the concept of "accuracy" in antidumping case law connotes mathematical accuracy rather than a broader concept.  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341-45 (Fed. Cir. 2016).

Fourth, SeAH argues that Commerce's particular market situation finding is unsupported because two of the four factors Commerce analyzed in the final results, namely, strategic

---

[8] Commerce observed that although Hyundai and SeAH use cut-to-length plate in addition to hot-rolled steel coil, the latter remains the primary input to WLP.  Commerce further explained that because the subsidy rates used in making the adjustment were calculated for hot-rolled steel coil, it limited its adjustments only to that input.  *See* IDM at 15.

alliances between Korean firms and manipulation of Korean electricity prices, do not apply directly to SeAH.  SeAH Br. 23-25.  Hyundai similarly argues that Commerce's analysis should not apply because it self-produced a portion of its hot-rolled steel coil input and because it and POSCO are competitors.  Hyundai Br. 35-37.  These arguments misunderstand the nature of the "particular market situation" inquiry.  As explained, the relevant statutory provision refers to a particular *market* situation—not a particular *company* situation.  19 U.S.C. § 1677b(e).  Absent unusual circumstances (*e.g.*, a single sale situation), a "particular *market* situation" finding is based on considering distortions in the market as a whole.  *See* IDM at 16, 17-18 (addressing these arguments).  Accordingly, in addressing the issue of the existence of a "particular *market* situation," *i.e.*, distortions in the overall market, Commerce properly considered whether the four factors exist in Korea and cause distortion in pricing.  *See* IDM at 12-18.  SeAH's and Hyundai's claims are thus inapt.  Commerce explained that record evidence establishes that subsidization and strategic alliances exist, affecting the Korean WLP market, which is relevant to the totality of circumstances in the market.  *See* IDM at 17-18.  Importantly, moreover, Commerce in making its adjustments applied subsidization rates from *Hot-Rolled Steel from Korea* consistent with the source of Hyundai hot-rolled steel input.  *See* Hyundai Br. 13; IDM at 15.  Commerce did *not* apply the POSCO rate to the portion of Hyundai's input that it self-produced.  *See id.*

Fifth, Hyundai (and SeAH briefly) argue that Commerce's reliance on the impact of Korean imports of hot-rolled steel coil from China is unsupported by the record because it sourced little of its hot-rolled steel coil from China and, in any event, Commerce cites to no evidence quantifying this impact.  Hyundai Br. 33-36; SeAH Br. 25.  Both arguments are misplaced.  As to Hyundai's sourcing an allegedly small portion of its hot-rolled steel coil from

China,[9] this argument suffers from the same flaw as the preceding argument:  the relevant

statutory provision refers to a particular *market* situation.  Thus, whether Hyundai and SeAH

sourced any or all of their hot-rolled steel coil from China, or what they paid compared to other

sources, is of no moment.  *See* 19 U.S.C. § 1677b(e).  As to Hyundai's claim that Commerce did

not quantify the impact of Korean imports of hot-rolled steel coil from China, that is inaccurate.

Commerce explained that imports from China account for approximately twenty percent of hot-

rolled steel imports into Korea and that "China's production capacity will continue to grow until

2017," leading to "increased exports and price decline pressures."  IDM at 17 (quoting Particular

Market Situation Allegation at Ex. 30, Sub-Ex. 2 (P.R. 218; C.R. 294) (article entitled "China's

Steel Exports Reaching 100 Mt: What It Means to Asia and Beyond")).

Commerce also tied the effect of Chinese imports to distortion in the Korean market.

*E.g.*, PDM at 15 ("Excess steel-production capacity causes serious market distortions and

contributes to the downturn in global steel markets, including significant price suppression,

displaced markets, unsustainable capacity utilization, negative financial performance, shutdowns,

and lay-offs.").  Indeed, it explained that POSCO, Korea's largest steel producer, has seen its

profits negatively affected by "a deluge of Chinese exports" that "pushed global prices to their

lowest in at least a decade."  IDM at 17 (quoting Particular Market Situation Allegation at Ex.

30, Sub-Ex. 4 (P.R. 218; C.R. 294)).  Thus, although Chinese overcapacity is a broader issue,

Commerce explained that "one aspect of a {particular market situation} could be a contributing

factor to a {particular market situation} in more than one country."  *Id.*  Finally, contrary to the

---

[9] The confidential numbers Hyundai provides indicate that it sourced more and self-produced less steel in relation to China than its rhetoric suggests.  *See* Hyundai Br. 34-35.  The numbers Hyundai provides support Commerce's determination that the combined effects of subsidies for Korean producers and significant imports of Chinese steel—both of which are sources on which Hyundai relied in addition to its own production—distort prices in Korea.

argument that it relied on speculation about combined effects of factors it found unquantifiable, Commerce explained that the lack of appropriate record data to quantify an adjustment does not constitute evidence that the underlying condition does not exist. *Id.* at 18.  Hyundai's claims that Commerce's analysis was insufficiently quantitative and overly speculative thus lack merit.

Sixth, Hyundai and SeAH argue that the relevance of the "strategic alliances" factor is unclear and fails to demonstrate that companies operating under an alliance would sacrifice their own interests for the alliance.  Hyundai Br. 36-38; SeAH Br. 23.  This merely disagrees with Commerce's determination that strategic alliances exist and are *an element* of Commerce's overall particular market situation analysis that *may* have a distortive effect on the market.  *See* IDM at 17-18; *see also Haixing Jingmei*, 335 F. Supp. 3d at 1346 ("mere disagreement with Commerce's weighing of the evidence" is insufficient basis for legal challenge).  Hyundai's reliance on this Court's decision in *Husteel* is inapposite because the Court in that case was reviewing, merely for rationality, Commerce's decision not to rely on evidence of strategic alliances for a different purpose, and the decision was prior to the TPEA providing Commerce flexibility to identify a particular market situation with respect to production costs.  *See* 98 F. Supp. 3d at 1358-59; *see also* IDM at 26 (stating that Commerce has been "actively engaged" in examining new particular market situation provisions and their implications).  Accordingly, Hyundai's and SeAH's claims as to this factor misconstrue Commerce's analysis and lack merit.

Seventh, and finally, Hyundai (and Husteel in passing) argue that Commerce's reliance on distortions in the Korean electricity market as the fourth factor in its particular market situation analysis is unreasonable because Commerce in other proceedings found that there are no countervailable subsidies in the Korean steel market pertaining to the provision of electricity. Hyundai Br. 38-39; Husteel Br. 16.  As Commerce explained, however, the fact that it has not

previously found *countervailable subsidies* in Korea relating to provision of electricity (in a separate proceeding with a different record) does not demonstrate that the Korean government's interventions the electricity market cannot *contribute to* a *particular market situation finding* under the *antidumping* statute. *See* IDM at 18. The Korean government's intervention in the electricity market is one of several factors jointly contributing to a particular market situation in Commerce's analysis. Moreover, as Commerce explained, because Commerce was unable to quantify the effect of distortion in the Korean electricity market, Commerce did not adjust for electricity in its particular market situation adjustment. *See id*. Instead, Commerce only found that the attendant distortive effect was a contributing factor to the *existence of* a particular market situation. This determination is reasonable and should be sustained.

### III.   Commerce's Calculation Of The Weighted-Average Dumping Margin Assigned To The Non-Selected Respondents Is Lawful

#### A.   Legal Framework

Commerce, generally, determines an individual weighted-average dumping margin for each known exporter or producer. 19 U.S.C. § 1677f-l(c)(l). However, when "it is not practicable" to do so due to the large number of such exporters or producers, Commerce may examine a reasonable number of respondents. *Id.* § 1677f-l(c)(2). The statute "is silent as to the method for establishing the rate for non-selected respondents." *Longkou Haimeng Mach. Co. v. United States*, 581 F. Supp. 2d 1344, 1359 (Ct. Int'l Trade 2008). Thus, Commerce possesses broad discretion to select any reasonable methodology.

When calculating the rate for non-selected respondents, Commerce generally relies upon 19 U.S.C. § 1673d(c)(5), which provides the methodology for calculating the "all-others" rate in market economy antidumping investigations. *See Longkou*, 581 F. Supp. 2d at 1354. This provision directs Commerce to calculate the all-others rate by averaging the margins calculated

for exporters and producers individually investigated, "excluding any zero and *de minimis* margins" and any margins based entirely upon facts available.  19 U.S.C. § 1673d(c)(5)(A).  The statute further provides that if the weighted-average dumping margins for the individually investigated companies "are zero or *de minimis* margins, or are determined entirely" upon facts available, then Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated . . . ."  *Id.* § 1673d(c)(5)(B).

**B.      The Weighted-Average Dumping Margin Commerce Assigned To The Non-Selected Respondents Is Consistent With The Statute And Agency Practice**

Husteel argues that the rate Commerce assigned to the non-selected respondents in this proceeding is unlawful and unsupported by substantial evidence because it flows from Hyundai's calculated margin in the proceeding, which in turn was calculated, in part, using total and partial adverse facts available rates from the *Hot-Rolled Steel from Korea* proceeding.  Husteel Br. 19-23.  Husteel also contends that Commerce is required to calculate rates that are a reasonable reflection of the non-examined, yet cooperative, respondent's commercial reality.  Husteel Br. 20-22 (citing 19 U.S.C. § 1673d(c)(5); *Albemarle Corp. & Subsidiaries v. United States*, 821 F. 3d 1345 (Fed. Cir. 2016)).  Contrary to Husteel's claims, Commerce's calculation of the non-selected respondents' rate was consistent with the statute and agency practice.

As an initial matter, Husteel reads requirements into the statute that do not exist.  The statute directs Commerce to average the "dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined *entirely* under {19 U.S.C. § 1677e}."  19 U.S.C. § 1673d(c)(5)(A) (emphasis added).  Husteel's claims are unfounded because, in this proceeding, Commerce calculated each respondent's rate based on its own information, with adjustments where appropriate.  *See* PDM at 14.  The total and partial adverse facts available rates in *Hot-Rolled*

*Steel from Korea*, on which Husteel's arguments rest, relate to the hot-rolled steel coil input used in producing WLP, and Commerce merely applied an *adjustment* to the cost of that input in its calculations.  *See id*.; IDM at 15.  Husteel and other non-selected respondents received a rate that averaged the calculated rates for Hyundai and SeAH.  Commerce did not (as Husteel claims) apply a total adverse facts available rate to Husteel.  *See* Husteel Br. 19-20.

Furthermore, Commerce calculated the non-selected respondents' rate consistent with agency practice.  Commerce in this case limited its examination of responding producers and exporters to Hyundai and SeAH.  Because Commerce preliminarily found that Hyundai and SeAH each sold WLP at less than fair value during the period of review, it preliminarily assigned the non-selected respondents a rate based on the simple average margin using the publicly-ranged data calculated for these companies.  *See* Preliminary Results, 83 Fed. Reg. at 1,024.  In keeping with past decisions, Commerce explained that "due to requests to protect business proprietary information," the resulting rate is "the best proxy of the actual weighted-average margin determined for the mandatory respondents."  *See id.* at 1024 & n.3 (citing *Ball Bearings and Parts Thereof from France*, 75 Fed. Reg. 53,661, 53,663 (Dep't of Commerce Sept. 1, 2010) (final admin. review)); *see also* Preliminary Results Calc. Memo (Jan. 2, 2018) (P.R. 264; C.R. 320).  Commerce did not depart from this standard methodology in calculating final weighted-average dumping margins for Hyundai, SeAH, and the non-selected respondents.  *See* Final Results, 83 Fed. Reg. at 33,920; Final Calc. Memo (July 11, 2018) (P.R. 323; C.R. 336); *see also* Amended Final Results, 83 Fed. Reg. at 39,682-83 & nn.12-13.

Finally, Commerce's responses to arguments made during the administrative proceeding refute Husteel's arguments about the rate assigned to the non-selected respondents.  In particular, contrary to Husteel's contention that Commerce deemed POSCO's subsidy rate inaccurate in the

*Hot-Rolled Steel from Korea* proceeding but still used it in this one (Husteel Br. 22), Commerce

explained that it *did not* find the rate inaccurate, but, rather, that it could not calculate an accurate

rate for POSCO in that case due to POSCO's failure to submit complete, accurate, and reliable

data.  *See* IDM at 15 (citation omitted).  Commerce further explained that "{a}s the CVD rates

currently being applied to HRC reflect the results of Commerce's investigation into the subsidies

the Korean producers received in *Hot-Rolled Steel from Korea*, we determine that the CVD rates

from *Hot-Rolled Steel from Korea* represent an *accurate measure* of the subsidies received by

the producers of HRC, and are a reasonable basis for Commerce's adjustment to reflect the

Government of Korea's (GOK's) subsidization of HRC products in Korea."  *Id.* (emphasis

added).  This refutes Husteel's contentions that Commerce's calculation of the rate assigned to

non-selected respondents is inconsistent with notions of accuracy and commercial reality.  *E.g.*,

Husteel Br. 22; *see also Nan Ya*, 810 F.3d at 1344 ("Our case law and the statute thus teach that

a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter,

thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent

with the method provided in the statute, thus in accordance with law.").

## IV.  Commerce Properly Relied On A Constructed Value As Normal Value For SeAH

Commerce reasonably determined to calculate SeAH's margin using a constructed value

as the basis for normal value.  IDM at 46.  SeAH contends that Commerce's decision is

inconsistent with the statutory scheme and agency practice.  SeAH Br. 9-19.  Commerce,

however, reasonably determined, based on the CITT's formal finding of dumping, that SeAH's

Canadian sales are not representative of viable home market sales.  IDM at 45-46.

### A.     Commerce's Determination That SeAH's Canadian Sales Are Not Representative Of Normal Value Is Lawful

To determine whether subject merchandise is being, or likely to be, sold at less than fair value, Commerce compares the export price or constructed export price with normal value. 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.401(a). Normal value is defined as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(l)(B)(i).

When Commerce determines that the home market is not viable, however, the statute directs the agency to use third country sales as the basis for normal value. *Id.* § 1677b(a)(1)(C). The statute imposes a similar viability requirement on third country sales. *See Alloy Piping Products, Inc. v. United States*, 201 F. Supp. 2d 1267, 1274 (Ct. Int'l Trade 2002). Specifically, the statute requires that (1) the price is representative; (2) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold is five percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States; and (3) the administering authority does not determine that a particular market situation in the third country prevents proper comparison with the export price or constructed export price. 19 U.S.C. § 1677b(a)(1)(B)(ii). Although neither the statute nor legislative history define the term "representative," because comparison market sales can reasonably be interpreted in these circumstances as a proxy for home market sales, they must accurately reflect, or be representative of, home market sales. *See Alloy Piping*, 201 F. Supp. 2d at 1277 ("{T}he Court agrees that the goal of accuracy cannot be achieved if Commerce relies upon dumped third country prices to calculate {normal value}.").

Further, the statute directs Commerce to use a constructed value as normal value if it determines that neither the home market nor third country is viable.  19 U.S.C. § 1677b(a)(4). Here, consistent with that mandate, Commerce explained that "because there are neither viable home nor comparison market sales on the record of this review, we calculated SeAH's margin using {constructed value} as the basis for {normal value}."  IDM at 46.  Regarding SeAH's third country sales, Commerce elaborated that because "SeAH's Canadian sales are dumped, and thus, inaccurate by their nature, for purposes of representing normal value . . . they cannot be representative of viable home market sales."  *Id.*

SeAH argues that Commerce's reliance on the CITT's final determination of dumping was unlawful because:  (1) the agency cannot outsource its investigative duties; (2) Canadian dumping methodologies allegedly are inconsistent with United States law; and (3) reliance on a third country finding could result in fundamental inconsistencies with United States law.  SeAH Br. 11-19.  These arguments are mistaken because Commerce's decision that SeAH's Canadian sales are not representative of viable home market sales based on the CITT's formal finding is reasonable under the statute.  IDM at 45-46.  This Court has indicated that Commerce may rely on a formal finding of dumping with respect to third country sales, rather than attempting to evaluate for itself whether the sales are dumped and, therefore, are unsuitable for use as normal value.  *See Alloy Piping*, 201 F. Supp. 2d at 1277 (holding that, absent formal finding, claim that Commerce should evaluate dumping for itself was "without merit").  The Court correspondingly recognized that "the goal of accuracy cannot be achieved if Commerce relies upon dumped third country prices to calculate {normal value}."  *Id*.  Although *Alloy Piping* formed the basis of Commerce's decision on this issue, *see* IDM at 46 & nn.242-243, SeAH does not address it. Commerce's determination should be sustained on this basis alone.

44

**B.     Commerce's Determination That SeAH's Canadian Sales Are Not Representative Of Normal Value Is Consistent With Agency Practice**

Commerce's decision that SeAH's Canadian sales are not representative of viable home market sales based on the CITT's formal finding of dumping is consistent with agency practice. SeAH claims that Commerce's decision here is inconsistent with its decision in the first review of the antidumping duty order on oil country tubular goods.  SeAH Br. 9-10.  In that case, despite the fact that SeAH was subject to an antidumping proceeding for the same product in Canada, Commerce relied on the company's third country market for purposes of normal value and also used the profit earned by SeAH on those sales as the basis for determining constructed value profit for the other mandatory respondent.  *Id.*  However, SeAH's attempt to conflate the facts in that case with those underlying this case is inappropriate.

At the time of Commerce's oil country tubular goods determination, there was no formal CITT decision regarding dumping.  As Commerce explained in that case, "SeAH is *subject* to an antidumping *proceeding* for {oil country tubular goods} in Canada."  *Oil Country Tubular Goods from Korea*, 82 Fed. Reg. 18,105 at IDM at 13, *available at* Particular Market Situation Allegation at Ex. 7 (P.R. 198-202; C.R. 274-278) (emphasis added).  By January 2018, however, there was a *final formal determination* by the CITT of dumping.  Hence, prior to the final results in this case, Commerce placed the CITT's final determination on the record and allowed parties to comment.  *See* CITT Final Determination (P.R. 303).

Regarding SeAH's argument concerning Commerce's reliance on the profit earned by SeAH on its Canadian sales as the basis for determining constructed value profit for the other mandatory respondent in segments of the oil country tubular goods proceeding, Commerce in oil country tubular goods approached the issue with caution, stating:

> We recognize NEXTEEL's concerns that SeAH's Canadian sales
> are allegedly dumped.  However, in light of the evidence available
> on the record, on balance, SeAH's sales of {oil country tubular
> goods} in a third country market are the best information available
> to determine what the price of {oil country tubular goods} would
> have been, if produced and sold in Korea.  These sales are specific
> to {oil country tubular goods} produced by a Korean producer in
> Korea and sold in a third-country market.  Further, we subjected
> SeAH's Canadian market sales to the cost test, and only those sales
> that were above the cost of production (*i.e.,* made in the ordinary
> course of trade) were used in constructing the aggregate
> {constructed value} profit and selling expenses.  Hence, the
> Canadian market sales are being used as {normal value} in
> calculating SeAH's antidumping duty margin in this review.
> Therefore, it is reasonable to use the same set of sales to calculate
> {constructed value} profit and selling expenses for NEXTEEL.

*Oil Country Tubular Goods from Korea*, 82 Fed. Reg. 18,105 at IDM at 13.  Although

Commerce determined in subsequent reviews that SeAH did not have a viable third-country

market to serve as a basis for normal value, it continued to rely on the profit earned by SeAH on

its Canadian sales as the basis for determining constructed value profit for similar reasons.

Consequently, there are no inconsistencies between this case and those cited by SeAH.

**V.      SeAH's Differential Pricing Claim Is Not Properly Before The Court**

SeAH concedes that the issue concerning Commerce's differential pricing analysis

identified in count in paragraph 8 of its complaint "is moot."  SeAH Br. 29-30.  Accordingly,

that claim, which SeAH does not otherwise develop in its brief, is not properly before the Court.

*Cf. Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (party waives arguments

based on contents of brief).  Regardless, this Court and the Federal Circuit repeatedly have

upheld Commerce's use of its differential pricing methodology.  *See, e.g.*, *Apex Frozen Foods*

*Pvt. Ltd. v. United States*, 144 F. Supp. 3d 1308, 1313–35 (2016), *aff'd* 862 F.3d 1337 (Fed. Cir.

2017); *Tri Union Frozen Prods., Inc., v. United States*, 163 F. Supp. 3d 1255, 1303 (Ct. Int'l

Trade 2016), *aff'd* 741 F. App'x 801 (Fed. Cir. 2018); *NEXTEEL*, 355 F. Supp. 3d at 1355-57.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions for

judgment and sustain Commerce's final results.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td></td><td>JOSEPH H. HUNT<br>Assistant Attorney General</td></tr>
<tr><td></td><td>JEANNE E. DAVIDSON<br>Director</td></tr>
<tr><td></td><td>/s/ L. Misha Preheim<br>L. MISHA PREHEIM<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL:<br>REZA KARAMLOO<br>Senior Attorney<br>Office of the Chief Counsel<br>for Trade Enforcement and Compliance<br>U.S. Department of Commerce<br>Washington, D.C.</td><td>/s/ Joshua E. Kurland<br>JOSHUA E, KURLAND<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480, Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 616-0477<br>Fax: (202) 353-0461<br>Email: Joshua.E.Kurland@usdoj.gov</td></tr>
<tr><td>July 29, 2019</td><td>*Attorneys for Defendant United States*</td></tr>
</table>

47

## **<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains approximately 13.920, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


<u>/s/ Joshua E. Kurland</u>