UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SeAH STEEL CORPORATION, AND NEXTEEL CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, AND MAVERICK TUBE CORPORATION, <br><br> Defendant-Intervenors. | Consolidated Court No. 18-00169 |

REPLY BRIEF OF
SeAH STEEL CORPORATION

PUBLIC DOCUMENT

LAW OFFICE OF JEFFREY M. WINTON PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

September 3, 2019

Table of Contents

Page

ARGUMENT ....................................................................................................... 2

A.   Commerce's Refusal to Use SeAH's Sales to Canada
     as the Basis for Normal Value Was Unlawful......................................................... 2

     1.   The Canadian Findings on Which Commerce Relied Do Not
          Provide a Basis for Disregarding SeAH's Canadian Sales
          under the Statute, Regulations, or Commerce's Past Practice ...................... 2

     2.   Commerce's Decision to Disregard SeAH's Sales
          o Canada Is Inconsistent with Its Treatment
          of an Identical Situation in the OCTG Reviews........................................... 6

          a.   Commerce's Determinations in the OCTG Reviews
               Used SeAH's "Dumped" Sales to Canada as the Basis
               for Normal Value for SeAH and Other Respondents........................... 6

          b.   Commerce Was Aware in the OCTG Reviews that
               There Was a Final Canadian Determination of
               Dumping, and Not Just a "Pending" Proceeding ............................... 10

     3.   The Past Decisions Cited by Defendant
          and Defendant-Intervenor Are Irrelevant...................................................... 11

B.   This Court Should Continue to Find that Commerce's Adjustment
     to Constructed Value for an Alleged Particular Market Situation
     Is Contrary to Law and Unsupported by Substantial Evidence......................... 14

     1.   The Court's Decision in NEXTEEL1 Is Not
          Meaningfully Distinguishable from This Case ........................................... 14

          a.   The Fact that Commerce Changed Its Position
               between the Preliminary and Final Determinations
               in OCTG1 Is Not a Meaningful Distinction....................................... 15

          b.   The Record in This Case Is Substantively the
               Same as the Record Before Commerce in OCTG1 ............................ 16

          c.   Commerce's Decision Not to Defend its Particular
               Market Situation Decision in NEXTEEL1 Does Not
               Prevent the Court from Relying on That Case .................................... 18

Page

2.  Commerce's Finding Was Insufficient,
    on Its Face, to Satisfy the Statutory
    Requirement for Adjusting Constructed Value ........................................... 19

3.  Commerce's Use of a "Particular Market Situation"
    Adjustment Based on the Adverse-Facts-Available Subsidy
    Rate Applied to POSCO in the Hot-Rolled Coil CVD
    Investigation Is Contrary to Law and Must Be Revised ........................... 21

    a.  Commerce Failed to Make the Required Statutory
        Determination of an Upstream Subsidy Before
        Adjusting Respondents' Cost of Production ...................................... 21

    b.  Commerce Failed to Support Its
        Chosen Particular Market Situation
        Adjustment with Substantial Evidence................................................ 23

C.  SeAH Has Not Waived Arguments Concerning
    Commerce's Use of the Differential Pricing Analysis ....................................... 25

CONCLUSION ................................................................................................................... 26

Table of Authorities

Page

COURT DECISIONS

*Alloy Piping Products v. United States*,
  201 F.Supp.2d 1267 (Ct. Int'l Trade 2002) .................................................................12

*Calgon Carbon v. United States*,
  slip op. 11-21 (Ct. Int'l. Trade Feb. 7, 2011) .............................................................11

*Camreta v. Greene*,
  563 U.S. 692 (2011) .....................................................................................................25

*China Nat. Mach. Imp. & Exp. Corp. v. United States*,
  27 Ct. Int'l Trade 255 (Ct. Int'l Trade 2003) .............................................................22

*Easley v. Cromartie*,
  532 U.S. 234 (2001) .....................................................................................................18

*E.I. DuPont De Nemours & Co. v. United States*,
  23 Ct. Int'l Trade 343, 1999 WL 378258 (Ct. Int'l Trade 1999) .................................17

*NEXTEEL Co., Ltd. v. United States*,
  355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019)........................................................ *passim*

*NEXTEEL Co., Ltd. v. United States*,
  No. 18-00083, slip op. 19-73 (Ct. Int'l Trade June 17, 2019)............................... *passim*

*POSCO v. United States*,
  378 F. Supp. 3d 1348 (Ct. Int'l Trade 2019) ...............................................................25

*Qingdao Taifa v. United States*,
  637 F. Supp. 2d 1231 (Ct. Int'l. Trade 2009)...............................................................11

*Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018) ...................................................................................................20

*United States v. Menasche*,
  348 U.S. 528 (1955)......................................................................................................20

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
  716 F.3d 1370 (Fed. Cir. 2013)....................................................................................24

*Zhaoqing Tifo New Fibre v. United States*,
  60 F. Supp. 3d 1328 (Ct. Int'l. Trade 2015)................................................................11

Page

<u>ADMINISTRATIVE DETERMINATIONS</u>

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Korea*,
   82 Fed. Reg. 16,341 (April 4, 2017) ...............................................................................23

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
   84 Fed. Reg. 28,461 (June 19, 2019) ...............................................................................24

*Certain New Pneumatic Off-the-Road Tires*,
   77 Fed. Reg. 52,683 (Aug. 30, 2012)..........................................................................22, 23

*Certain Oil Country Tubular Good from the Republic of Korea*,
   82 Fed. Reg. 18,105 (April 17, 2017) ..................................................................... *passim*

*Certain Oil Country Tubular Good from the Republic of Korea*,
   83 Fed. Reg. 17,149 (April 18, 2018) ..................................................................... *passim*

*Certain Polyester Staple Fiber from Korea*,
   68 Fed. Reg. 59,366 (Oct. 15, 2003) ..........................................................................12, 13, 14

*Certain Preserved Mushrooms from India*,
   67 Fed. Reg. 46,172 (July 12, 2002) ..........................................................................4, 9


<u>STATUTES AND REGULATIONS</u>

19 C.F.R. § 351.404 ...............................................................................................................4, 13

Tariff Act of 1930, as amended, § 771, 19 U.S.C. § 1677 ........................................... *passim*

Tariff Act of 1930, as amended, § 771A, 19 U.S.C. § 1677-1 ...........................................21

Tariff Act of 1930, as amended, § 773, 19 U.S.C. § 1677b ......................................... *passim*

Tariff Act of 1930, as amended, § 777A, 19 U.S.C. § 1677f-1 ...........................................22

Uruguay Round Agreements Act § 102, 19 U.S.C. § 3512 ...................................................6

U.S. CONST. art. III, § 2.........................................................................................................25


<u>OTHER AUTHORITIES</u>

*Restatement Third of the Foreign Relations Law of the United States*,
   §483 (1986) ...................................................................................................................6

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| HUSTEEL CO., LTD., HYUNDAI STEEL COMPANY, SEAH STEEL CORPORATION, AND NEXTEEL CO., LTD., <br><br>           Plaintiffs, <br><br>       v. <br><br> UNITED STATES, <br><br>           Defendant, <br><br>       and <br><br> CALIFORNIA STEEL INDUSTRIES, TMK IPSCO, WELSPUN TUBULAR LLC USA, AND MAVERICK TUBE CORPORATION, <br><br>           Defendant-Intervenors. | Consolidated Court No. 18-00169 |

REPLY BRIEF OF
SEAH STEEL CORPORATION

This reply brief is submitted on behalf of SeAH Steel Corporation ("SeAH") in reply to the Response Briefs submitted by Defendant and Defendant-Intervenors on July 29 in the appeal of the final determination by the Department of Commerce ("Commerce") in the first administrative review of the antidumping duty order on Welded Line Pipe ("Line Pipe") from Korea.

<u>ARGUMENT</u>

A.    *Commerce's Refusal to Use SeAH's Sales to Canada*
      *as the Basis for Normal Value Was Unlawful*

   1.    *The Canadian Findings on Which Commerce Relied Do Not*
         *Provide a Basis for Disregarding SeAH's Canadian Sales*
         *under the Statute, Regulations, or Commerce's Past Practice*

In the *Canadian* investigation of SeAH's sales, the Canadian Border Security Agency

("CBSA") made the following findings:

   (1)    The quantity of SeAH's sales of Line Pipe in Korea was insufficient to

          provide a viable basis for comparison to SeAH's sales to Canada and, as a

          result, "normal value" should be based on a constructed value.[1]  (The CBSA

          did not consider whether SeAH had a viable third-country market that might

          be used as the basis for normal value.)

   (2)    In calculating constructed value, the profit amount ("CV Profit") should be

          based on SeAH's profit on sales of Line Pipe in Korea, even though the

          CBSA had found that the sales in the Korean market did not provide a

          viable basis for comparison.[2]

   (3)    In reporting its sales of Line Pipe in Korea, SeAH had failed to report

          domestic sales of Line Pipe that had been produced by other manufacturers.

          Instead, SeAH only reported sales of Line Pipe that SeAH itself had

          produced.[3]

---

[1] *See* CBSA Final Determination at 15 (para. 89).  (A copy of the CBSA determination was provided in Exhibit 1 to Maverick's June 27, 2018, Response to Factual Information (Public Record Document ("PR") 308)).

[2] *Id.* at 15 (para. 91).

[3] *Id.* at 15 (para. 87).

(4)   The failure to report sales of Line Pipe in Korea produced by other

manufacturers justified the use of adverse inferences in calculating CV

Profit.[4]  As a result, the CBSA used the highest profit on any of SeAH's

home-market sales as the CV Profit figure when calculating constructed

value.[5]

(5)   The weighted-average prices for SeAH's sales of Line Pipe to Canada were

lower, on average, than the cost-plus-profit constructed values calculated

using the inflated CV Profit figure that had been selected using adverse

inferences.[6]

As a result of these findings, the CBSA determined that SeAH's sales to Canada were

"dumped" within the meaning of Canadian law.  And, in its final determination in the first

Line Pipe review, Commerce held that the mere fact that the CBSA had found that SeAH's

sales to Canada were "dumped" within the meaning of Canadian law meant that those sales

were not "representative" within the meaning of U.S. law and, therefore, could not be used

as the basis for calculating normal value for comparison to SeAH's U.S. sales.[7]

---

[4] *Id.* at 15 (para. 90).

[5] *Id.*

[6] *Id.* at 16 (para. 94).

[7] *See* Issues and Decision Memorandum for the Final Results of the 2015-2016 Administrative Review of the Antidumping Duty Order on Welded Line Pipe from Korea at 46 (July 11, 2018) (hereinafter "Final I&D Memo") (PR-322).

However, as demonstrated in our initial brief, the specific findings that the CBSA made to justify its dumping determination were irrelevant under U.S. law:

(1)   Commerce's regulations establish a preference for using third-country sales, rather than constructed value, to calculate normal value.[8]  During the period that the CBSA considered, SeAH had third-country sales that were well in excess of its sales to Canada.[9]

(2)   Under Commerce's longstanding practice, sales in a home market that do not meet the 5-percent viability threshold will not be used in the calculation of CV Profit.[10]

(3)   Under the U.S. statute, the "foreign like product" includes only home-market sales of merchandise produced by the same manufacturer that produced the merchandise exported to the United States.  Home-market sales of merchandise produced by other manufacturers are not part of the

---

[8] *See* 19 C.F.R. § 351.404(f) ("The Secretary normally will calculate normal value based on sales to a third country rather than on constructed value if adequate information is available and verifiable….").

[9] In the Canadian investigation of SeAH's exports to Canada, SeAH's sales to the United States would be considered third-country sales.  The evidence demonstrates that the quantity of SeAH's sales to the United States were far more than 5 percent of SeAH's sales to Canada during the relevant periods.  *See, e.g.*, SeAH's April 5, 2017, Submission at Appendix A-1 (PR-42, Confidential Record Document ("CR") 7).

[10] *See, e.g.*, *Certain Preserved Mushrooms from India: Final Results of Antidumping Duty Administrative Review*, 67 Fed. Reg. 46,172 (July 12, 2002), and accompanying Issues and Decision Memorandum at cmt. 1 ("{B}ecause {respondent} Weikfield had no viable home or third country market during the POR, we derived profit and selling expenses … for the purpose of calculating constructed value in accordance with section 773(e)(2)(B)(iii) of the Act.").

"foreign like product,"[11] and do not have to be reported in response to Commerce's questionnaires.

(4)   The U.S. statute provides that, when CV Profit is based on the exporter's own home-market sales, only sales of the "foreign like product" may be considered.[12]  As a result, home-market sales of merchandise produced by other manufacturers cannot be used in the calculation of CV Profit.

(5)   The U.S. statute provides that home-market sales may be disregarded if made at prices below the cost of production (provided certain additional conditions are satisfied).[13]  The statute does not authorize Commerce to disregard third-country sales that are made at prices below the cost-*plus-profit* constructed value.

In these circumstances, if Commerce itself had made the specific findings that the CBSA relied upon, those findings would not have provided a basis for disregarding SeAH's sales to Canada under U.S. law.  Indeed, we are not aware of a single case in the entire history of Commerce's administration of the U.S. antidumping laws in which Commerce itself has examined whether third-country sales were made at prices below a cost-plus-profit constructed value (even when constructed value was calculated strictly in accordance with U.S. law) as part of its determination whether the third-country sales could be used to calculate normal value.

---

[11] *See* 19 U.S.C. § 1677(16).  *See also* SeAH's Initial Brief at 12 n.31.

[12] *See* 19 U.S.C. § 1677b(e)(2)(A).  *See also* SeAH's Initial Brief at 13 n.33.

[13] *See* 19 U.S.C. §§ 1677(15)(a) and 1677b(b)(1).

Commerce asserted that it could nevertheless rely on the fact that the CBSA called SeAH's sales "dumped," even though the CBSA's methodologies differed from those required by U.S. law, because the CBSA's determination was made in accordance with WTO rules.[14]  However, the WTO rules do not supersede the provisions of U.S. law.[15] And, U.S. law itself forbids "recognition" of the CBSA's determination in U.S. legal proceedings.[16]  In short, Commerce's rejection of SeAH's third-country sales based solely on the CBSA's determination was contrary to law, and cannot be sustained.

Significantly, the Response Briefs submitted by Defendant and Defendant-Intervenors utterly fail to address the fundamental inconsistency of the CBSA's determination with U.S. law.  They do not provide any legal justification for Commerce's unlawful "recognition" of the CBSA determination.  In these circumstances, Commerce's determination cannot be sustained.

> 2. *Commerce's Decision to Disregard SeAH's Sales*
>    *to Canada Is Inconsistent with Its Treatment*
>    *of an Identical Situation in the OCTG Reviews*

> a. *Commerce's Determinations in the OCTG Reviews*
>    *Used SeAH's "Dumped" Sales to Canada as the Basis*
>    *for Normal Value for SeAH and Other Respondents*

As explained in our initial brief, Commerce faced the very same issue — whether, when calculating normal value for SeAH's U.S. sales, it should include sales to Canada

---

[14] *See* Final I&D Memo at 46 (PR-322).

[15] *See* 19 U.S.C. § 3512 (a)(1) ("No provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect.").

[16] *See* SeAH's Initial Rule 56.2 Brief at 11-12 (citing Restatement Third of the Foreign Relations Law of the United States §483 (1986) (administrative determinations by foreign government agencies that relate to taxes, fines or other penalties are not entitled to "recognition" in U.S. legal proceedings)).

that the CBSA had found to be dumped — in the first review of the antidumping order on

Oil Country Tubular Goods ("*OCTG1*").  The CBSA's final determination in its

investigation of OCTG was part of the record of *OCTG1*.[17]  Furthermore, one of the

domestic parties in that review explicitly argued that, in light of the CBSA determination,

Commerce should find that SeAH's sales to Canada were not "representative" and thus

should not be used as the basis for normal value.[18]  Despite that argument, Commerce used

SeAH's sales to Canada as the basis for normal value for SeAH's U.S. sales.[19]

---

[17] *See* Maverick Tube Corporation's April 21, 2016, Market Viability Allegation in *OCTG1*, Exhibit 4.

[18] In its April 21, 2016, submission in *OCTG1,* Maverick argued:

> Further, the Canadian sales are not an appropriate basis of comparison under the statute because they are dumped.  In the Canadian OCTG investigation discussed above, the Canadian government found that SeAH's sales to Canada between January 2013 and March 2014 were dumped at an AD rate of 8.8%.  According to the statute, the Department will not use third country sales to calculate the normal value if the price in the third country is "unrepresentative" or the agency "does not determine that the particular market situation in such other country prevents a proper comparison with the export price or constructed export price."  As such, the Canadian sales are not "representative" of fairly traded third-country sales, and the dumping in Canada that has been confirmed by the Canadian authorities establishes a particular market situation in Canada such that it is not possible for a fair comparison to be made.

*Id.* at 14 (footnotes omitted).

[19] *See Certain Oil Country Tubular Goods from Korea: Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 71074 (Oct. 14, 2016), and accompanying Decision Memorandum at 16.  *See also Certain Oil Country Tubular Goods from Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18105 (April 17, 2017), and accompanying Issues and Decision Memorandum (hereinafter "OCTG1 I&D Memo") at 49-50 (describing use of third-country sales to Canada to calculate normal value for SeAH).

Both Defendant and Defendant-Intervenors appear to suggest that Commerce's decision in *OCTG1* is irrelevant, because none of the parties challenged Commerce's use of the sales to Canada as the basis for normal value for SeAH in the briefs submitted after the preliminary determination.  But the decision of all parties to accept Commerce's preliminary determination does not erase Commerce's determination.  Instead, a preliminary determination that is unchanged in the final results is a final determination.

Furthermore, it is clear that Commerce's final determination in *OCTG1* did consider the significance of the CBSA's dumping determination.  While none of the parties explicitly challenged Commerce's preliminary determination to use the sales to Canada as the basis for normal value for SeAH, another respondent, NEXTEEL, challenged the use of the profit on those sales as the basis for CV Profit.  In its final determination, Commerce reviewed the arguments by the parties on that issue, and held that SeAH's "dumped" sales to Canada could be used to calculate CV Profit.[20]  That determination has been upheld by this Court.[21]  Furthermore, Commerce's subsequent decision to use the profit on SeAH's "dumped" sales to Canada as the basis for CV Profit in the second OCTG review ("*OCTG2*")[22] has also been upheld by this Court.[23]

Defendant-Intervenor Maverick also appears to contend that the holdings by Commerce and this Court concerning the use of "dumped" sales in calculating CV Profit

---

[20] *See* OCTG1 I&D Memo at 11-14.

[21] *See NEXTEEL Co., Ltd. v. United States*, 355 F. Supp. 3d 1336, 1353 (Ct. Int'l Trade 2019) (hereinafter "*NEXTEEL1*").

[22] *Certain Oil Country Tubular Good from Korea*, 83 Fed. Reg. 17149 (April 18, 2018), and accompanying Issues and Decision Memorandum (hereinafter "OCTG2 I&D Memo").

[23] *See NEXTEEL Co., Ltd. v. United States*, No. 18-00083, slip op. at 17-18 (Ct. Int'l Trade June 17, 2019) (hereinafter "*NEXTEEL2*").

are irrelevant to the issues raised in this appeal, because the calculation of CV Profit is distinct from the determination whether Canada was a "viable" market.[24]  But that assertion ignores the fact that Commerce itself has held that it will not calculate CV Profit based on sales in a non-viable market.[25]  In such circumstances, the decision to use SeAH's Canadian sales as the basis for CV Profit necessarily required a determination that the Canadian market was viable.

More generally, the attempt by Defendant and Defendant-Intervenors to distinguish the holdings in *OCTG1* and *OCTG2* from the decision in the Line Pipe case is fundamentally inconsistent with Commerce's reasoning in this case.  According to Commerce, the CBSA's finding that SeAH's sales to Canada were "dumped" meant that the prices for those sales were "distorted" and that any comparison based on those prices would be "inaccurate."[26]  But, if that were the case, a CV Profit based on those sales to Canada would also be "distorted," and any comparison using a normal value calculated using that CV Profit would be "inaccurate."  Neither Defendant nor Defendant-Intervenors have explained why the use of distorted figures that lead to inaccurate comparisons should be permitted when normal value is based on constructed value calculated using the profit on third-country sales, but not when normal value is based directly on third-country sales.

---

[24] *See* Defendant's Response Brief at 44-46; Defendant-Intervenor Maverick's Response Brief at 12.

[25] *See, e.g.*, *Certain Preserved Mushrooms from India*, 67 Fed. Reg. 46,172, and accompanying Issues and Decision Memorandum at cmt. 1.

[26] *See* Final I&D Memo at 46 (PR-322).

> b. *Commerce Was Aware in the OCTG Reviews that*
> *There Was a Final Canadian Determination of*
> *Dumping, and Not Just a "Pending" Proceeding*

Defendant's Response Brief initially asserted that Commerce's inconsistent treatment of "dumped" sales to Canada was justified, because there allegedly was no final Canadian determination of dumping at the time of the decision in *OCTG1,* but there was a final Canadian determination at the time of the decision in the Line Pipe review.[27]  However, the assertion that there was no final Canadian determination of dumping at the time of the decision in *OCTG1* is false, as Defendant has subsequently admitted.[28]

Defendant-Intervenor Maverick has suggested that SeAH's arguments somehow failed to properly bring the inconsistency with *OCTG1* to Commerce's attention, because SeAH presented an estoppel argument that Commerce properly rejected.[29]  But that suggestion misstates the nature of SeAH's claims before Commerce.  In the proceedings before Commerce, Maverick's claimed that "dumped" third-country sales had to be rejected automatically by Commerce.  In response, SeAH pointed out that Maverick's assertion was directly inconsistent with Commerce's past practice, as exemplified by the decision in *OCTG1*.[30]  The fact that SeAH <u>also</u> argued that Maverick should be estopped

---

[27] Defendant's Response Brief at 45.

[28] *See* Defendant's August 27, 2019, Notice of Correction.

[29] *See* Maverick's Response Brief at 12.

[30] As SeAH explained in its rebuttal brief to Commerce,

> Wiley Rein suggests, falsely, that a finding of dumping in Canada must automatically disqualify SeAH's sales in that market from use in the determination of normal value.  But the Department has, in the past, relied on third-country sales that were subject to a dumping finding in the third country as the basis for normal value.  Indeed, just last year, the Department based normal value for SeAH in the first

*(footnote continued on following page)*

from even raising the issue does not mean that SeAH failed to point out the legal error in

Maverick's claim.[31]

Finally, we note that, even if SeAH had failed to address the decision in *OCTG1*

before Commerce, any suggestion that SeAH failed to exhaust administrative remedies

would still be frivolous:  Because Commerce's preliminary determination based normal

value on SeAH's third-country sales to Canada, and because SeAH agreed with that

determination, it is well-settled that SeAH was not required to address the issue in its briefs

before the agency.[32]

### 3.   The Past Decisions Cited by Defendant and Defendant-Intervenor Are Irrelevant

In its Response, Defendant contends that Commerce's decision to disregard the

"dumped" sales to Canada was justified by this Court's decision in the *Alloy Piping* case.

---

(*footnote continued from previous page*)
> review of Oil Country Tubular Goods from Korea on SeAH's sales to
> Canada that were subject to a Canadian dumping finding."

SeAH's April 2, 2018, Rebuttal Brief at 4-5 (PR-291).

[31] SeAH's estoppel argument was based on the inconsistency between the arguments that *Maverick* had made in *OCTG1* and in the Line Pipe review.  *Id.*  As such, the estoppel argument was logically distinct from SeAH's assertion that Maverick's claim was inconsistent with *Commerce's* decision in *OCTG1*.

[32] *See, e.g.*, *Zhaoqing Tifo New Fibre  v. United States*, 60 F. Supp. 3d 1328, 1346-47 n.23 (Ct. Int'l. Trade 2015) ("{T}he doctrine of exhaustion does not apply in situations where the agency changes its position after a party's case brief has been filed."); *Id.* at 1347 ("{A} party may seek judicial review of an issue that it did not raise in a case brief if the Department of Commerce did not address the issue until its final decision.").  *See also Calgon Carbon v. United States*, slip op. 11-21 at 7 n.4 (Ct. Int'l. Trade Feb. 17, 2011); *Qingdao Taifa v. United States*, 637 F. Supp. 2d 1231, 1237 (Ct. Int'l. Trade 2009).

Indeed, they argue that our failure to address *Alloy Piping* in our initial brief in this appeal is itself a sufficient basis to uphold Commerce's determination.[33]

That argument would earn a failing grade in any law school, because it fails to recognize the difference between a Court's *holding* and other *dicta*. The actual *holding* in *Alloy Piping* was that normal value *could be* based on third-country sales notwithstanding Petitioners' allegation that the third-country sales were dumped.[34] That *holding* does not support Commerce's determination to disregard SeAH's sales to Canada.

In reaching its decision in *Alloy Piping,* the Court did observe that it "agrees that the goal of accuracy cannot be achieved if Commerce relies upon dumped third country prices to calculate {normal value}."[35] But the Court offered no analysis of the statutory language or structure to support that assertion. And, even if the Court's statement was meant to provide future guidance to Commerce, there is nothing in the *Alloy Piping* decision that indicates that Commerce may simply adopt another country's dumping determination as its own, when the evidence demonstrates, as it does in this case, that the other country followed methodologies that are inconsistent with U.S. law. In short, *Alloy Piping* does not purport to address the issues we have raised in this appeal.

For its part, Defendant-Intervenor Maverick tries to justify Commerce's decision by claiming that Commerce had, in an earlier case involving *Polyester Staple Fiber from Korea,* disregarded third-country sales that were subject to a third-country dumping

---

[33] *See* Defendant's Response Brief at 44 (citing *Alloy Piping Products v. United States*, 201 F.Supp.2d 1267 (Ct. Int'l Trade 2002)).

[34] *See Alloy Piping*, 201 F.Supp.2d at 1277 (Ct. Int'l Trade 2002).

[35] *Id.*

finding.[36]  But Maverick's argument ignores several important factual differences between the *Polyester Staple Fiber* case and the first Line Pipe review.  To begin with, when Commerce was informed in *Polyester Staple Fiber* of the EU dumping finding*,* Commerce did not simply disregard those sales.  Instead, Commerce requested data for sales to another potentially viable third-country market, and then utilized the criteria set forth in Section 351.404(e) of its regulations to compare the third-country markets.[37]  In the Line Pipe case, SeAH had another viable third-country market for Line Pipe in Singapore.[38]  But Commerce never requested data for SeAH's sales to Singapore, and it never made a comparison of SeAH's sales to Singapore and Canada under the criteria set forth in Section 351.404(e) of its regulations.

---

[36] *See* Maverick's Response Brief at 11-13.

[37] *See Certain Polyester Staple Fiber from Korea*, 68 Fed. Reg. 59,366 (Oct. 15, 2003), and accompanying Issues and Decision Memorandum at cmt. 9 ("Given the E.U.'s finding of dumping of Korean PSF, we believe that our request that East Young provide data on an alternative third-country comparison market was justified and in accordance with our regulations.").

   In this regard, Section 351.404(e) of Commerce's regulations provides that:

> {W}here prices in more than one third country satisfy the criteria of section 773(a)(1)(B)(ii) of the Act and this section, the Secretary generally will select the third country based on the following criteria:
>
> (1)  The foreign like product exported to a particular third country is more similar to the subject merchandise exported to the United States than is the foreign like product exported to other third countries;
>
> (2)  The volume of sales to a particular third country is larger than the volume of sales to other third countries;
>
> (3)  Such other factors as the Secretary considers appropriate.

19 C.F.R. § 351.404(e).

[38] See SeAH's Initial Brief at 5 n.7 (citing SeAH's April 5, 2017, Submission at Appendix A-1 (PR-42, CR-7)).

As a separate matter, there does not appear to have been any argument in the

*Polyester Staple Fiber* case concerning the legality of Commerce's recognition of a foreign

country's determination or about the consistency of the EU's dumping-calculation

methodologies with U.S. law.  The issue presented in this appeal is whether the statute

permits Commerce to adopt a foreign government's findings without undertaking its own

examination of the underlying facts, especially when the evidence confirms that the foreign

government's findings were not consistent with U.S. law.  Nothing in *Polyester Staple*

*Fiber* addresses those issues.

    **B.**    *This Court Should Continue to Find that Commerce's Adjustment*
           *to Constructed Value for an Alleged Particular Market Situation*
           *Is Contrary to Law and Unsupported by Substantial Evidence*

          **1.**    *The Court's Decision in* <u>NEXTEEL1</u> *Is Not*
                  *Meaningfully Distinguishable from This Case*

As explained in our initial brief, Commerce's finding of a particular market situation

in this case was based on the same facts and reasoning that the Court evaluated in

*NEXTEEL1*.[39]  In that case, the Court held that Commerce's conclusion that a particular

market situation exists due to the cumulative effect of the same four factors alleged in this

case was unsupported by substantial evidence.[40]

---

[39] *See id.* at 19-21.

[40] *See NEXTEEL1* at 11, 15.  The four factors that were alleged to create a particular
market situation were:  (1) alleged subsidies to Korean hot-rolled coil producers,
(2) alleged dumping of Chinese hot-rolled coil into the Korean market, (3) alleged strategic
alliances between Korean coil producers and pipe producers, and (4) alleged subsidization
of Korean electricity.

      *a.   The Fact that Commerce Changed Its Position*
            *between the Preliminary and Final Determinations*
            *in OCTG1 Is Not a Meaningful Distinction*

Defendant argues that *NEXTEEL1* is distinguishable from the present case, because, in *NEXTEEL1,* the Court addressed a situation where Commerce changed its determination between the preliminary and final results, while in this case Commerce made an affirmative particular market situation finding in both the preliminary and final determination.[41]  However, contrary to Defendant's assertions, in *NEXTEEL1,* the Court did not simply evaluate whether it was permissible for Commerce to change its finding on the existence of a particular market situation between the preliminary and the final results. Instead, the Court was presented with the first instance in which Commerce found a particular market situation in Korea under Section 504 of the Trade Preference Extension Act, and evaluated whether Commerce's decision was supported by substantial evidence. That is precisely the same determination the Court must make in this case.

In *NEXTEEL1,* the Court reviewed the full record and held that "Commerce failed … to substantiate its finding of one particular market situation with evidence on the record."[42] Significantly, Commerce's preliminary and final determinations in the Line Pipe review that is the subject of this appeal explicitly based the findings of a particular market situation on Commerce's earlier determination in *OCTG1,* which was the subject of the *NEXTEEL1* appeal.[43]  Since the Court's decision in *NEXTEEL1* rejected Commerce's

---

[41] *See* Defendant's Response Brief at 29-30.

[42] See *NEXTEEL1* at 15.

[43] *See* Decision Memorandum for the Preliminary Results of the 2015-2016 Administrative Review of the Antidumping Review of the Antidumping Duty Order on Welded Line Pipe from Korea at 13 (Jan. 3, 2018) (hereinafter "Preliminary Decision Memo") (PR-259).  *See also* Final I&D Memo at 14 (PR-322).

conclusion in *OCTG1,* there is no reason for the Court to reach a different conclusion here, where Commerce's decision was explicitly based on findings in *OCTG1* that were rejected by the Court in *NEXTEEL1.*[44]

In any event, the Court's subsequent decision in the appeal of *OCTG2* demonstrates that Defendant's attempt to distinguish *NEXTEEL1* is invalid.  In *OCTG2,* Commerce's preliminary and final determinations both found that there was a particular market situation, explicitly relying on the final determination in *OCTG1.*[45]  On appeal*,* this Court again held that Commerce's particular market situation finding was not reasonable.[46]  In short, this Court's decision in *NEXTEEL2* confirms that Commerce's finding of a particular market situation is unlawful, whether made for the first time in the final determination (as in *OCTG1)* or whether made in both the preliminary and final determinations.

> b.   *The Record in This Case Is Substantively the Same as the Record Before Commerce in* OCTG1

Defendant and Defendant-Intervenors California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA (hereinafter "Welspun"), also argue that additional factual information was submitted in this case that was not part of the record in *OCTG1.*[47] However, the determinative facts and legal arguments presented by the parties in this review are the same as those presented in *OCTG1.*  Indeed, Commerce's final

---

[44] *See* Final I&D Memo at 13 (PR-322) (referencing *OCTG1*).

[45] *See* OCTG2 I&D Memo at 17.

[46] *NEXTEEL2* at 11-15.

[47] *See* Defendant's Response Brief at 25-26; Defendant-Intervenor Welspun's Response Brief at 19.

determination explicitly noted that "the PMS allegation itself and the record evidence concerning the allegation — remained largely unchanged from those which led to the finding of a PMS in Korea in the other reviews."[48]

In fact, a closer look at the "additional" information submitted by Petitioner reveals that none of that information related to how the four alleged factors affected the cost of production such that it was outside the ordinary course of trade, as required by the statute. Commerce even recognized that the particular market situation allegation made by Maverick Tube Corporation in this case was the same that Maverick provided in *OCTG2*.[49] The Court has already evaluated the record provided in *OCTG2,* noted Commerce's admission of that record's factual similarity to *OCTG1,*[50] and held that "Commerce's determination of the existence of a particular market situation … is unsupported by substantial evidence."[51]

Since neither Defendant nor Welspun have demonstrated that the Court's previous decisions were clearly erroneous, the Court should simply affirm its prior decisions and reverse Commerce's finding of a particular market situation in this case.[52]

---

[48] *See* Final I&D Memo at 13 (PR-322) (referencing *OCTG1*).

[49] *See* Final I&D Memo at 10 (PR-322).

[50] *See NEXTEEL2* at 14 ("Commerce itself stated, '{W}e agree with Maverick that facts in the instant review are largely identical to the facts in the first administrative review, and the same evidence is on the record of the instant review.'" (citation omitted)).

[51] *See id.* at 15.

[52] Although "technically the factual basis may be different {in trade cases} because different entries during different time periods are involved, if the *determinative facts* and *legal arguments* do not vary, judicial economy is served by application of stare decisis principles." *E.I. DuPont De Nemours & Co. v. United States*, 23 Ct. Int'l Trade 343, 1999 WL 378258, at *5 (Ct. Int'l Trade 1999) (emphasis added).

*(footnote continued on following page)*

> c. *Commerce's Decision Not to Defend its Particular*
>    *Market Situation Decision in* NEXTEEL1 *Does Not*
>    *Prevent the Court from Relying on That Case*

Although Commerce chose not to argue the merits of its particular market

determination in *OCTG1,* the Court in *NEXTEEL1* still evaluated Commerce's decision

based on the substantiality of evidence.  In addition, the petitioners in that case fully

briefed and presented an exhaustive defense of their particular market situation allegation.

The Court reviewed the entire record of the underlying administrative review,[53] and

concluded that the record did not substantially support a finding of a particular market

situation.  Therefore, the Court's decision in *NEXTEEL1* addressed the merits of

Commerce's particular market situation determination.  There is no basis for Defendant's

suggestion[54] otherwise.

Furthermore, in *NEXTEEL2,* the government did argue the merits of Commerce's

particular market situation finding.  Nonetheless, the Court found those arguments

unpersuasive, and concluded, once again, that Commerce's determination was not

supported by substantial evidence, affirming its decision in *NEXTEEL1.*[55]  In such

circumstances, the Court should follow the decisions in *NEXTEEL1* and *NEXTEEL2*, and

thus again reject Commerce's finding of a particular market situation in this case.

---

(*footnote continued from previous page*)

When reviewing for clear error, a "court must ask whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'"  *See Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[53] Transcript of Oral Argument at 77, *NEXTEEL1*.

[54] Defendant's Response Brief at 29-30.

[55] *See NEXTEEL1* at 11.

2.   *Commerce's Finding Was Insufficient,*
*on Its Face, to Satisfy the Statutory*
*Requirement for Adjusting Constructed Value*

As explained in our initial brief, the statute permits an adjustment to constructed value only when, as a result of a "particular market situation," the cost of materials and other inputs "does not accurately reflect the cost of production in the ordinary course of trade."[56] In the absence of such a finding, Commerce is not permitted to depart from the normal cost calculation methodologies.

In its determination, Commerce purported to find in this case that there was a "particular market situation" that "distorted" the *prices* for the steel coil inputs used by Korean Line Pipe manufacturers.[57] However, as explained in our initial brief, Commerce failed to find that the alleged "distortions" resulted in prices for steel coils that did "not accurately reflect the cost of production in the ordinary course of trade."[58] In such circumstances, Commerce's determination fails to satisfy the statutory requirements for making an adjustment to constructed value.

Tellingly, neither Defendant nor Defendant-Intervenors have pointed to record evidence that identifies "the cost of production in the ordinary course of trade" for the inputs in question. They have not attempted to argue that prices for steel coils in Korea failed to reflect the "cost of production" of those inputs. Nor have they addressed how the "the cost of production in the ordinary course of trade" is distorted by the four alleged factors when there is evidence that several of the factors do not apply to SeAH and other

---

[56] *See* SeAH's Initial Brief at 21 (quoting 19 U.S.C. § 1677b(e)).

[57] Final I&D Memo at 18 (PR-322).

[58] SeAH's Initial Brief at 21-23.

respondents in the case.  Instead, they contend only that such a finding is unnecessary because "the plain meaning of the statutory term 'particular market situation,' specifically the use of the term 'market' rather than the term 'company,' suggests that the inquiry generally concerns a particular *market* and is not company-specific."[59]

That argument completely misses the point.

For purposes of this appeal, it is not necessary for the Court to decide whether the statutory provision permitting adjustments to constructed value requires the "cost of production" analysis to be based on a market-wide or company-specific analysis.  It is enough simply to recognize that, under the statute, a finding of generalized "distortions" due to a "particular market situation" is not sufficient.  The statute contains an additional requirement, which cannot be ignored.[60]  Before making an adjustment to constructed value, the statute requires Commerce to undertake an additional step — analyzing whether whatever "particular market situation" it has found resulted in an input cost that "does not accurately reflect the cost of production in the ordinary course of trade."  Because Commerce failed to make any findings on that issue (either on a market-wide or company-specific basis), its decision to adjust constructed value in this case cannot be upheld.

---

[59] *See* Defendant's Response Brief at 36; Welspun's Response Brief at 36.

[60] *See, e.g.*, *United States v. Menasche*, 348 U.S. 528, 538-39 (1955); *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018) (A court's reading of a statute must be "consistent 'with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

3.  *Commerce's Use of a "Particular Market Situation"
    Adjustment Based on the Adverse-Facts-Available Subsidy
    Rate Applied to POSCO in the Hot-Rolled Coil CVD
    Investigation Is Contrary to Law and Must Be Revised*

a.  *Commerce Failed to Make the Required Statutory
    Determination of an Upstream Subsidy Before
    Adjusting Respondents' Cost of Production*

Even if there had been some basis for Commerce to find that a particular market

situation did exist, its chosen adjustment for a particular market situation would still be

unsupported by substantial evidence.  As explained in our initial brief, Commerce's

particular market situation adjustment to respondents' cost of production in this case was

based entirely on the subsidy rate from the countervailing duty investigation of *Hot-Rolled

Coil from Korea.*[61]

However, Commerce failed to evaluate whether and to what extent the subsidies

purportedly received by Korean hot-rolled coil input suppliers were passed on to Line Pipe

producers in this case.  As explained in our initial brief, the statute is clear on its face that

Commerce cannot presume that subsidies to a producer of an upstream product actually

provide benefits to a downstream product.[62]  Instead, the upstream subsidy provision of

Section 771A of the Tariff Act requires Commerce to determine based on evidence, and

not just assume, that there is a "competitive benefit" realized by the downstream product.[63]

In the absence of such a finding, Commerce cannot conclude that Korean pipe producers

derived any benefit from subsidized Korean hot-rolled coil.

---

[61] *See* SeAH's Initial Brief at 26.

[62] *Id.* at 26 n.58.

[63] *See* 19 U.S.C. § 1677-1.

Welspun claims that Commerce and the Court have held that input subsidies can generally be assumed to affect the cost of downstream products.[64]   However, the two cases they cite for that proposition do not support their claim.

The first case they cite involved the determination of surrogate values for inputs in a case involving a non-market economy country.[65]   In that case, Commerce decided to use surrogate values rather than the amount the respondent actually paid for inputs from a market-economy supplier that had received subsidies.   On appeal, the Court held that Commerce could properly disregard the market-economy prices if it had "reason to believe or suspect" that the inputs were subsidized.[66]   Significantly, the Court did not find that the full subsidy amount was passed-through to the downstream producer, and it did not hold that Commerce could adjust the normal value of the downstream product based on the subsidy rate received by the input supplier.

Welspun also cites a Commerce determination in a Section 129 proceeding to support its position.[67]   In that proceeding, Commerce applied Section 777A(f) of the Tariff Act, which provides when Commerce may reduce antidumping duties due to the effect of a countervailable subsidy on the dumping margin.[68]   Contrary to Welspun's claim, Commerce did not make an adjustment for the *full* amount of the input subsidies that were

---

[64] *See* Welspun's Response Brief at 24-25.

[65] *See id.* (citing *China Nat. Mach. Imp. & Exp. Corp. v. United States*, 27 Ct. Int'l Trade 255, 265 (Ct. Int'l Trade 2003)).

[66] *Id.*

[67] *See id.* (citing *Determinations under Section 129 of the Uruguay Round Agreements Act*, 77 Fed. Reg. 52,683 (Aug. 30, 2012), and accompanying Issues and Decision Memorandum for *Certain New Pneumatic Off-the-Road Tires from China* at 20).

[68] 19 U.S.C. § 1677f-1.

found.  Commerce specifically justified that position on the grounds that there was "no

affirmative cost or pricing evidence on any basis … that substantiates a claim of full

subsidy pass-through."[69]  In short, the case cited by Welspun actually supports the view

that a full pass-through of subsidies *cannot* be presumed.

Both the statute and agency practice require that any adjustment due to an upstream

subsidy be based on actual evidence of the extent that the subsidy affects the downstream

price.  Commerce failed to make any evidentiary finding regarding pass-through subsidies

in this case.  As a result, Commerce cannot make a particular market situation adjustment

to respondents' cost of production using the *Hot-Rolled Coil* countervailing duty rate.

> b.  *Commerce Failed to Support Its*
> *Chosen Particular Market Situation*
> *Adjustment with Substantial Evidence*

As explained in our initial brief, it is undisputed that Commerce had available more

recent evidence concerning Korean government subsidization to POSCO on which it

imposed a duty that was not based solely on the application of adverse facts available.  For

example, the findings in the *Cut-to-Length Plate from Korea* covered a period more

contemporaneous with the review period in this case, and the *Plate* investigation addressed

the very same subsidies analyzed in the earlier *Hot-Rolled Coil* investigation, none of

which were specific to a particular product.[70]  Welspun contends that Commerce's

findings in the *Plate* investigation are irrelevant, because steel plate is not used in making

---

[69] *See Certain New Pneumatic Off-the-Road Tires from China*, 77 Fed. Reg. 52,683 (Aug. 30, 2012), and accompanying Issues and Decision Memorandum at 20.

[70] *See* SeAH's Initial Brief at 27-29.  In its determination in the *Cut-to-Length Plate* case, Commerce assigned POSCO a total subsidy rate of 4.31 percent, based on the application of partial adverse facts available for certain subsidy programs.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Korea*, 82 Fed. Reg. 16,341 (April 4, 2017).

Line Pipe.[71]  But even if Welspun's assertion were correct,[72] it does not explain why an earlier adverse-facts-available rate for the very same subsidies to the very same company should be used, when more recent information identifying the lower actual benefit from those subsidies was available to Commerce at the time it made its determination.

In this regard, the Court may also take notice of the fact that Commerce has recently completed its first administrative review of the countervailing duty order on *Hot-Rolled Coil,* which shows that the lower rates calculated in the *Plate* investigation are themselves much too high.  In fact, the current subsidy rate for POSCO's hot-rolled coils (which was based on information submitted by POSCO for its 2016 fiscal year, and not on total adverse facts available) is only 0.54 percent.[73]  In such circumstances, there is simply no evidence on the record supporting the contention that a subsidy rate based on the adverse-facts-available POSCO rate of 58.68 percent rate was reasonably reflective of the economic reality during the review period.[74]

Finally, it should be noted that Commerce recently completed its remand determination in the appeal of the *Hot-Rolled Coil* investigation — which reduced the

---

[71] *See* Welspun's Response Brief at 33.

[72] In reality, steel plate (not hot-rolled coil) is used as the raw material for many of SeAH's Line Pipe products.  *See, e.g.,* SeAH's Case Brief at 9 (PR-286, CR-327).  However, Commerce did not make a "particular market situation" adjustment in this review to the cost of steel plates used by SeAH.

[73] See *Certain Hot-Rolled Steel Flat Products from Korea*, 84 Fed. Reg. 28,461 (June 19, 2019) as amended by *Certain Hot-Rolled Steel Flat Products from Korea: Amended Final Results of the First Administrative Review*, 84 Fed. Reg. 35,604 (July 24, 2019).

[74] *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (citations omitted) ("{W}hile various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case." As a result, "{f}orm should be disregarded for substance and the emphasis should be on economic reality.").

overall adverse-facts-available subsidy rate for POSCO from 58.68 percent to 42.47 percent.[75]   Consequently, even if Commerce were permitted to ignore the findings in the *Plate* investigation, there still would be no justification for Commerce's reliance on the adverse-facts-available determination in the original *Hot-Rolled Coil* investigation as the basis for its particular market situation adjustment in this case.

### C.   SeAH Has Not Waived Arguments Concerning Commerce's Use of the Differential Pricing Analysis

As noted in our initial brief, we believe that the "Differential Pricing Analysis" used by Commerce to determine whether "targeted dumping" existed in this case is contrary to law and unsupported by evidence.   However, because Commerce found that "targeted dumping" does not exist in this case, and because we agree with that conclusion, our concerns about the use of the Differential Pricing Analysis are moot.

Defendant-Intervenor Maverick contends that our failure to detail our objections to the Differential Pricing Analysis in our brief means that we have waived those arguments.[76]   That assertion is false.   Because we agree with Commerce's conclusion, we cannot now challenge the methodology by which Commerce reached that conclusion:  As the Court undoubtedly is aware, a ruling by the Court on Commerce's methodology, when no party has challenged the outcome of that methodology, would constitute an impermissible advisory opinion.[77]

---

[75] *See POSCO v. United States*, 378 F. Supp. 3d 1348, 1351-52 (Ct. Int'l Trade 2019).

[76] *See* Maverick's Response Brief at 13.

[77] *See* U.S. CONST. art. III, § 2.  *See also, e.g.*, *Camreta v. Greene*, 563 U.S. 692, 717 (2011).

<u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the arguments of Defendant and Defendant-Intervenors be rejected, and that SeAH's motion for judgment on the agency record be granted.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Amrietha Nellan
Jordan Fleischer
LAW OFFICE OF JEFFREY M. WINTON PLLC
1900 L Street, N.W., Suite 611
Washington, D.C.  20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

September 3, 2019

<u>Certificate of Compliance</u>

 Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 6,884 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

      /s/Jeffrey M. Winton

September 3, 2019