

UNITED STATES COURT OF INTERNATIONAL TRADE
ONE FEDERAL PLAZA
NEW YORK, NY 10278-0001

CHAMBERS OF
Claire R. Kelly
Judge

November 8, 2019

**<u>PUBLIC VERSION</u>**

Donald Bertrand Cameron, Esq.
Brady Warfield Mills, Esq.
Eugene Degnan, Esq.
Julie Clark Mendoza, Esq.
Mary Shannon Hodgins, Esq.
Ragan William Updegraff, Esq.
Rudi Will Planert, Esq.
Sabahat Chaudhary, Esq.
Morris, Manning & Martin, LLP
1401 Eye Street, NW
Suite 600
Washington, DC 20005-2204
Email: dcameron@mmmlaw.com
       bmills@mmmlaw.com
       edegnan@mmmlaw.com
       jmendoza@mmmlaw.com
       mhodgins@mmmlaw.com
       rupdegraff@mmmlaw.com
       wplanert@mmmlaw.com
       tradeservice@mmmlaw.com

Jaehong David Park, Esq.
Daniel Robert Wilson, Esq.
Henry David Almond, Esq.
Kang Woo Lee, Esq.
Arnold & Porter LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Email:    david.park@aporter.com
       daniel.wilson@apks.com
       henry.almond@aporter.com
       kangwoo.lee@apks.com

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 2 of 11

Consol. Court No. 18-00169                                                Page **2** of **11**
**PUBLIC VERSION**

Jeffrey Michael Winton, Esq.
Amrietha Nellan, Esq.
Law Office of Jeffrey M. Winton PLLC
1900 L Street, NW
Suite 611
Washington, DC 20036
Email:  jwinton@jmwinton.com
        anellan@jmwinton.com

Joshua Ethan Kurland, Esq.
Loren Misha Preheim, Esq.
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Email:  joshua.e.kurland@usdoj.gov
        Misha.Preheim@usdoj.gov

Reza Karamloo, Esq.
Of Counsel
U.S. Department of Commerce
Office of Chief Counsel for Trade Enforcement and Compliance
1401 Constitution Avenue, NW
Room 3622
Washington, DC 20230-0001
Email:  reza.karamloo@trade.gov

Roger Brian Schagrin, Esq.
Christopher Todd Cloutier, Esq.
Elizabeth Jackson Drake, Esq.
Luke Anthony Meisner, Esq.
Paul Wright Jameson, Esq.
Schagrin Associates
900 Seventh Street, NW
Suite 500
Washington, DC 20001
Email: rschagrin@schagrinassociates.com
       ccloutier@schagrinassociates.com
       edrake@schagrinassociates.com
       lmeisner@schagrinassociates.com
       pjameson@schagrinassociates.com

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 3 of 11

Consol. Court No. 18-00169                                                   Page **3** of **11**
**PUBLIC VERSION**

Gregory James Spak, Esq.
Frank John Schweitzer, Esq.
Kristina Zissis, Esq.
Matthew Wolf Solomon, Esq.
White & Case, LLP
701 Thirteenth Street, NW
Suite 1100
Washington, DC 20005-3807
Email:        gspak@whitecase.com
              frank.schweitzer@whitecase.com
              kzissis@whitecase.com
              matt.solomon@whitecase.com

         Re:  *Husteel Co., Ltd. v. United States*
              Consol. Court No. 18-00169

Dear Counsel:

    As you know, oral argument in this case will be held on Tuesday, November 26, 2019, at 11 a.m. in Courtroom 3 of the James L. Watson Courthouse of the United States Court of International Trade, One Federal Plaza, New York, NY 10278.  The court has examined the parties' submissions and would like counsel to be prepared to address the following issues.

**Particular Market Situation ("PMS") Statutory Authority for Below Costs Sales Adjustment**

**For Husteel Co., Ltd. ("Husteel")**

1. You argue that there is no exhaustion problem here because your statutory interpretation arguments fall within the "pure legal question" exception.  Pl. [Husteel's] Reply Br. Supp. Mot. J. Agency R. at 8, Sept. 3, 2019, ECF No. 77 ("Husteel's Reply Br.").  Defendant-Intervenors challenge the applicability of that exception where the agency is interpreting a newly enacted provision—submitting that, in such circumstances, Commerce must be given an opportunity to address contrary readings of the statute. Resp. Br. Def.-Intervenors California Steel Industries, TMK IPSCO, Welspun Tubular LLC USA at 10–11, July 29, 2019, ECF No. 63 ("Def.-Intervenors' Resp. Br.") (citing Fuwei Films (Shandong) Co. v. United States, 35 CIT 1229, 791 F. Supp. 2d 1381, 1384 (2011)).  How do you respond to this argument?

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 4 of 11

Consol. Court No. 18-00169                                                                          Page **4** of **11**
**PUBLIC VERSION**

**For Defendant and Defendant-Intervenors**

1. You assert that Husteel has failed to exhaust administrative remedies and also waived its statutory argument because it failed to raise the issue before Commerce in its complaint. Def.'s Resp. Pls.' Mot. J. Agency R. at 21–22, July 29, 2019, ECF No. 64 ("Def.'s Resp. Br.").

    a. However, Husteel states, in its complaint, that "Commerce's [PMS] determination and resulting adjustment are unsupported by substantial record evidence and contrary to law[.]" Compl. ¶15, at 5, Aug. 2, 2018, ECF No. 6. Husteel also states that it challenges "all other aspects of Commerce's [PMS] determination and resulting calculation adjustments." Id. Considering this language, how has Husteel failed to raise this issue in its complaint?

    b. Even if Defendant-Intervenors' argument—that Commerce should have the opportunity to address contentions regarding the proper reading of the statute during the underlying proceeding—were correct, Def.-Intervenors' Resp. Br. at 10–11, doesn't the fact that another respondent raised this question suffice for purposes of any exhaustion argument? See Husteel's Reply Br. at 7–8 (citing to SeAH's Rebuttal Brief to Sec. Commerce at 12, PD 291, bar code 3690116-01 (Apr. 2, 2018) (Part B.1.a)).

    c. Where in its issues and decision memorandum ("IDM") did Commerce reply to SeAH's argument?

2. In its IDM Commerce states that "[s]ection 504 of the TPEA added the concept of 'particular market situation' in the definition of the term 'ordinary course of trade,' for purposes of CV under section 773(e) of the Tariff Act of 1930, as amended (the Act), and through these provisions for purposes of the COP under section 773(b)(3) of the Act." See Welded Line Pipe from the Republic of Korea, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty administrative review; 2015–2016) ("Final Results") and accompanying [IDM] for the [Final Results] at 11, A-580-876, (July 11, 2018), ECF No. 25-5 ("Final Decision Memo") (footnotes omitted). What does the phrase "and through these provisions for purposes of the COP under section 773(b)(3) of the Act" mean?

3. Commerce adjusted the cost of production, for purposes of section 773(b) of the Tariff Act of 1930, 19 U.S.C. § 1677b(b) (2012),[1] based on its finding of a PMS. See Final Decision Memo at 12–18. This provision deals with whether certain

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of the United States Code, 2012 edition.

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 5 of 11

Consol. Court No. 18-00169                                                                    Page **5** of **11**
**PUBLIC VERSION**

sales may be disregarded when determining normal value. It does not appear to provide for the consideration of a PMS. Rather, 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III) (C)(iii), §§ 1677b(a)(4) address how to approach the existence of a PMS in the normal value context, specifically directing Commerce to use third country sales certain situations or constructed value.

   a. Commerce seems to have modified its cost of production calculation for purposes of its below cost sales test. What authorizes Commerce to make an adjustment to the cost of production for the below cost sales test based on a PMS?

   b. Defendant in its brief before the court argues that the TPEA also amended 19 U.S.C. § 1677(15) to define "ordinary course of trade" and sales that are outside the ordinary course of trade. See Def.'s Resp. Br. at 22–23. It argues that because 19 U.S.C. § 1677b(b) refers to sales in the ordinary course of trade, that the amendments of 19 U.S.C. § 1677b(e) are therefore included within 19 U.S.C. § 1677b(b). See id. However, 19 U.S.C. § 1677(15)(C) provides that transactions will be considered outside the ordinary course of trade where there is a PMS which prevents a proper comparison with export price or constructed export price. 19 U.S.C. § 1677(15)(C). At best, one could argue that 19 U.S.C. § 1677(15)(C) allows Commerce to eliminate sales under 19 U.S.C. § 1677b(a)(1)(B)(i) because those sales occur in a PMS which renders them outside the ordinary course of trade. Why would it allow Commerce to adjust the costs of inputs in a cost of production analysis for purposes of the below costs sales test?

   c. Defendant argues "it would be illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a particular market situation for constructed value, but still to rely on those same distorted costs for purposes of cost of production and sales-below-cost test." Def.'s Resp. Br. at 23. Why would it be illogical? Presumably if there is a PMS that affects the price of an input in a market it affects the price of the input for both home market and export sales. Commerce would still be able to make a proper comparison between normal value and export price or constructed export price.

**Finding of a PMS**

**For Respondents**

1. You assert that Commerce may not import an adverse facts available ("AFA") rate applied to POSCO in a separate proceeding, and apply it to a cooperative respondent in this proceeding. See Final Decision Memo at 15; Consol. Pl.

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 6 of 11

Consol. Court No. 18-00169                                                          Page **6** of **11**
**PUBLIC VERSION**

    Hyundai Steel Company's Reply Br. Supp. R. 56.2 Mot. J. Agency R. at 17, Sept. 3, 2019, ECF No. 78 ("Hyundai's Reply Br."). Is it unreasonable for Commerce to import a non-AFA rate from a separate proceeding for purposes of a PMS adjustment?

2. In arguing against Commerce's PMS determination, respondents note that Commerce relied on a CVD margin based on total AFA, which "[is] not evidence of actual subsidies at all[.]" Pl. [Husteel's] Mot. J. Agency R., Feb. 1, 2019, ECF No. 42; Pl. [Husteel's] Br. Supp. Mot. J. Agency R. at 14, Feb. 1, 2019, ECF No. 42 ("Husteel's Br."); Final Decision Memo at 8; see also Mot. Pl. SeAH Steel Corporation J. Agency R. Confidential Version at 27–29, Feb. 1, 2019, ECF No. 37 ("SeAH's Br."); Rule 56.2 Mot. J. Agency R. Consol. Pl. Hyundai Steel Company at 26–28, Feb. 1, 2019, ECF No. 39 ("Hyundai's Br."). Why doesn't an AFA determination of subsidization evidence the receipt of some subsidies? It may not be conclusive evidence or evidence of the exact degree of subsidization but isn't it some evidence?

3. SeAH argues that Commerce's PMS finding must be company specific and data driven. See SeAH's Br. at 21–26. SeAH highlights language that looks to the cost of materials in producing the merchandise. See id. Why isn't it reasonable for Commerce to interpret that language as meaning the cost for producing the merchandise in the market?

4. Hyundai argues that Commerce has established a "high threshold" for rendering a PMS determination, and that Commerce "must rely on strong, substantial evidence" of "extreme and pervasive market conditions and/or government interference[.]" See Hyundai Br. at 20–21, 23 (citing to Certain Durum Wheat and Hard Red Spring Wheat from Canada, 68 Fed. Reg. 52,741 (Dep't Commerce Sept. 5, 2003) (notice of final determinations of sales at less than fair value) ("Certain Wheat from Canada") and accompanying [IDM] for the Final Determinations of the Antidumping Duty Investigations of [Certain Wheat from Canada] at cmt. 1, A-122-845, A-122-847, (Sept. 5, 2003) available at http://ia.ita.doc.gov/frn/summary/canada/03-22661-1.pdf ("Certain Wheat from Canada IDM"); Certain Pasta from Italy, 74 Fed. Reg. 39,285, 39,288 (Dep't Commerce Aug. 6, 2009) (notice of preliminary results of twelfth antidumping duty administrative review) ("Certain Pasta from Italy II"); Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea, 62 Fed. Reg. 18,404, 18,412 (Dep't Commerce Apr. 15, 1997) (final results of antidumping duty administrative reviews) ("Cold Rolled Steel from Korea")). Each proceeding that Hyundai cites involve an instance where Commerce found a lone allegation of extraneous influence to be insufficient to constitute a PMS. See Certain Wheat from Canada IDM at 5–8 (discussing an allegation of government influence); Certain Pasta from Italy II, 74 Fed. Reg. at 39,287–39,288 (discussing an allegation that producers agreed on a ceiling or floor price); Cold Rolled Steel from

Korea, 62 Fed. Reg. at 18,411–18,412 (discussing an allegation of government influence). Here, Commerce found a PMS determination because of a confluence of distortions stemming from government influence and Chinese steel overcapacity. See Def.-Intervenors' Resp. Br. at 3; Def.'s Resp. Br. at 17–18; Final Decision Memo at 4. Considering the factual differences between those proceedings and this one, how do the cited proceedings support your argument that a PMS determination in this instance does not accord with Commerce's past practice?

5. Hyundai argues that Commerce has "historically" and "properly focused its analysis 'on the behavior of the specific respondent(s) under [investigation or review.]" See Hyundai Br. at 21–22 (quoting Certain Pasta from Italy, 72 Fed. Reg. 7,011 (Dep't Commerce Feb. 14, 2007) (notice of final results of the ninth administrative review of the antidumping duty order on certain pasta from Italy) ("Certain Pasta from Italy"), accompanying [IDM] for [Certain Pasta from Italy] cmt. 1 at 9, A-475-818, (Feb. 14, 2007), available at http://ia.ita.doc.gov/frn/summary/ITALY/E7-2563-1.pdf ("Certain Pasta from Italy IDM"); see also id. (citing Steel Concrete Reinforcing Bar from Taiwan, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) (final determination of sales at less than fair value) ("Rebar from Taiwan") and accompanying IDM for [Rebar from Taiwan], A-583-859, (July 20, 2017) available at http://ia.ita.doc.gov/frn/summary/taiwan/2017-15840-1.pdf ("Rebar from Taiwan IDM"). In the proceedings Hyundai cites, however, Commerce either deviates from the respondent-specific approach or expressly acknowledges there are circumstances where a general market-analysis (i.e., "totality of the circumstances") approach would be appropriate.[2] Commerce appears to tailor its approach depending on the nature of the PMS allegation. See Certain Pasta from Italy IDM at 8 (determining the existence of a PMS during a first sale in a newly established market); Rebar from Taiwan IDM at cmt. 1 (determining whether lower priced inputs evidenced a PMS). In the IDM to Certain Pasta from Italy, Commerce specifically gives the example of an allegation that "the entire market in question is export oriented," as an "instance to consider general market conditions[.]" See Certain Pasta from Italy IDM at 9. How do these proceedings support your

---

[2] See e.g., Biodiesel from Indonesia, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final determination of sales at less than fair value) and accompanying [IDM] for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Indonesia at 23, A-560-830, (Feb. 20, 2018) available at http://ia.ita.doc.gov/frn/summary/indonesia/2018-04138-1.pdf (adopting a general market-analysis approach and stating that Commerce "do[es] not believe [a comparison of specific sales and transactions to the general market] is always appropriate within the context of a PMS analysis); Certain Pasta from Italy IDM at 8–9 (stating that "it may be appropriate in some instances to consider general market conditions in determining whether a PMS exists[.]"); Rebar from Taiwan IDM cmt. 1 at 10 (acknowledging the totality of the circumstances approach taken in OCTG from Korea because of the confluence of distortions present in that proceeding) (internal citation omitted); see also Def.'s Resp. Br. at 19.

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 8 of 11

Consol. Court No. 18-00169                                               Page **8** of **11**
**PUBLIC VERSION**

contention that Commerce's past practice demands a respondent-specific PMS analysis in this proceeding?

**For Defendant and Defendant-Intervenors**

1. Commerce takes the position that a PMS determination under section 1677b demands a general analysis of distortions within the overall market, yet acknowledges that, "in certain contexts, an ordinary course of trade analysis may involve a comparison of specific sales and transactions to the general market[.]" Final Decision Memo at 16.  Commerce goes on to state that such a company-specific analysis is not appropriate here because there is "sufficient evidence" that the market as a whole is distorted. Id. If direct evidence, demonstrating that respondents' costs are not affected by market distortions, does not suffice to require a company-specific analysis, when is it ever appropriate to consider such information?  For purposes of the PMS determination, is it always "illogical to conclude that one company operating in a particular market is insulated from the market distortions with respect to costs?"  Final Decision Memo at 16.

2. The statute asks whether a PMS prevents a proper comparison, 19 U.S.C. §§ 1677b(a)(1)(B)(ii)(III), (C)(iii),  or, in the constructed value context, whether a PMS leads to the conclusion that the cost of production are not accurate.  19 U.S.C. § 1677b(e).

    a. Commerce identifies factors which it assumes would affect the price of inputs but where does Commerce consider whether these factors prevent a proper comparison?  Where does Commerce demonstrate that the PMS is such that the cost of production is not accurate?

    b. Commerce relies on the "cumulative effect" of four factors to arrive at a PMS determination.  However, as Respondents point out, and Commerce acknowledges, that information on the record is insufficient to permit Commerce to quantify the effect of three out of the four factors for purposes of making adjustments. See Final Decision Memo at 5, 18, 23, 24.[3]  Given that Commerce could not quantify three of the four factors leading to its PMS determination, did Commerce effectively base its PMS adjustment entirely on the AFA subsidy rate that POSCO received in OCTG from Korea?

---

[3] Commerce acknowledges that it was "unable to quantify the effect of distortions in the electricity market," Final Decision Memo at 18, that "the information on the record for this review does not permit [it] to quantify the effect of imports of Chinese HRC on Korean HRC inputs," id. at 23, and that "the record lacks information concerning strategic alliances that could be used to adjust the respondents' costs." Id. at 24.

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 9 of 11

Consol. Court No. 18-00169                                                                                    Page **9** of **11**
**PUBLIC VERSION**

      c. Does the "totality of the circumstances" test that you employ here allow you to circumvent a substantive analysis of the sufficiency of the record when rendering a PMS determination? How can the court review the sufficiency of Commerce's reasoning under this standard?

3. SeAH points to evidence that the prices paid to POSCO [[ ]] than prices paid to its Japanese suppliers? SeAH's Br. at 25–26. Doesn't this evidence detract from Commerce's determination that subsidies distorted the market?

4. Commerce points to record evidence that Chinese exports have "pushed global prices [of Chinese HRC] to their lowest in at least a decade." Final Decision Memo at 17 (internal citation omitted). How can global prices evidence a particular market situation?

**Dumping Margin for Non-Selected Respondents**

**For Defendant**

1. You argue that Commerce is not applying an AFA rate but rather is making an adjustment to the cost of an input in its calculations. See Def.'s Resp. Br. at 40–41. What is the difference between applying an AFA rate (for example a rate of 60%) and multiplying (adjusting) the cost of an input by 60%? Is the difference that the resulting rate is not 60% higher but rather some proportion of 60% higher? Whether you call it "applying AFA" or "making an adjustment", isn't the point that the rate here is some order of magnitude higher than it would be if Commerce had used a subsidy rate that had not been arrived at via AFA? Why is it reasonable to adjust the rate at all when the quantifier for making the adjustment is one that was reached using AFA?

2. Congress specifically provided that de minimis rates or rates based on total AFA would be excluding when averaging rates for non-selected respondents. See 19 U.S.C. § 1673d(c)(5)(A). Even if it were reasonable for Commerce to consider the subsidy rate in finding the existence of a PMS, if Commerce uses that AFA rate as the sole means of quantifying a PMS adjustment, hasn't it effectively imported an AFA rate into this proceeding and applied it to a cooperative respondent? Wouldn't such a result disincentivize cooperation in the larger scheme of things?

**For Husteel**

1. If Commerce made an adjustment based upon an actual subsidy, would that be a problem?

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 10 of 11

Consol. Court No. 18-00169                                                                    Page **10** of **11**
**PUBLIC VERSION**

2. As you point out in your brief, AFA is meant to induce cooperation. SeAH's Br. at 20–23. Theoretically, a party will be induced to cooperate at the point which the AFA rate exceeds the rate that it would receive with cooperation. Therefore, in some sense the AFA rate is a proxy for the real rate, albeit an imperfect one. Can Commerce never make a PMS adjustment if all it has is imperfect data?

**Refusal to Use Canada Sales as the Basis for Normal Value**

**For SeAH**

1. You state that, as a matter of law, Commerce is "not permitted to rely on the [Canadian Border Services Agency's ("CBSA")] [dumping] conclusions." SeAH's Br. at 11–12 (footnote omitted). You cite to the Restatement Third (and not the Fourth) of the Foreign Relations Law of the United States § 483 as an example supporting your statement. Id. n. 30 at 12. However, Restatement Third only states that "[c]ourts in the United States are not required to recognize or enforce judgments for the collection of taxes, fines, or penalties rendered by the court or other states." Restatement (Third) of the Foreign Relations Law of the United States § 483 (Am. Law Inst. 1987). This is permissive language, not restrictive. Why does this source support your position?

**For Defendant**

1. Your reliance on Alloy Piping seems misplaced. See Def.'s Resp. Br. at 44 (citing to Final Decision Memo nn.242–243 at 46; Alloy Piping Prods. v. United States, 26 CIT 330, 201 F. Supp. 2d 1267, 1277 (2002)). Didn't Alloy Piping simply hold that a mere allegation of dumping was an insufficient basis to disregard third party sales for the purposes of normal value?

2. Even if Commerce may rely, to an extent, on a third country government's findings, why is it reasonable for Commerce to exclusively rely on those findings when there is evidence that, as SeAH alleges, Commerce would have come to different conclusions using its own methodology? See SeAH's Br. at 9–19; SeAH's Reply Br. at 2–9.

3. When Maverick sought "an upward adjustment to the cost of Chinese HRC purchases based on the simple average of subsidy rates from the European's Union recent [determinations][,]" Final Decision Memo at 18–19, Commerce stated that it is "reluctant to make an adjustment based on a subsidy determination by another administering authority[.]" Final Decision Memo at 23. However, when SeAH contended that Commerce should not rely on a foreign government's antidumping determinations when conducting a market viability analysis, Final Decision Memo at 43–45, Commerce concluded that "[t]he fact that Commerce's methodology may differ from that of the CBSA does not negate Canada's finding

Case 1:18-cv-00169-CRK   Document 98   Filed 11/15/19   Page 11 of 11

Consol. Court No. 18-00169                                                                 Page **11** of **11**
**PUBLIC VERSION**

of dumping." Final Decision Memo at 46. Why isn't it arbitrary or inconsistent for Commerce to rely almost exclusively on the Canadian government's findings regarding dumping in its normal value analysis, while refusing to defer to the the European Union's findings regarding dumping and subsidization in its PMS analysis? <u>See</u> Final Decision Memo at 23.

Please feel free to address any other issues that you consider important.

                                             Sincerely,

                                          <u>/s/ Claire R. Kelly</u>
                                         Claire R. Kelly, Judge

Cc:    Steve Taronji
          For docketing