Slip Op. 20-2

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **HUSTEEL CO., LTD. ET AL.,** | |
| **Plaintiff and Consolidated Plaintiffs,** | |
| **v.** | Before: Claire R. Kelly, Judge |
| **UNITED STATES,** | Consol. Court No. 18-00169 |
| **Defendant,** | PUBLIC VERSION |
| **and** | |
| **CALIFORNIA STEEL INDUSTRIES ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

### OPINION AND ORDER

[Remanding the U.S. Department of Commerce's final determination in the first administrative review of the antidumping duty order covering welded line pipe from the Republic of Korea.]

Dated: January 3, 2020

R. Will Planert and Donald B. Cameron, Morris, Manning & Martin LLP, of Washington, DC, argued for plaintiff Husteel Co., Ltd. With them on the briefs were Julie C. Mendoza, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, Sabahat Chaudhary, and Ragan W. Updegraff.

Henry D. Almond and Kang W. Lee, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for consolidated plaintiffs Hyundai Steel Company and NEXTEEL Co., Ltd. With them on the briefs were J. David Park and Daniel R. Wilson.

Jeffrey M. Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, argued for consolidated plaintiff SeAH Steel Corporation. With him on the brief was Amrietha Nellan.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the briefs were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Reza Karamloo, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Schagrin Associates, of Washington, DC, argued for defendant-intervenors California Steel Industries, TMK IPSCO, and Welspun Tubular LLC USA. With her on the brief was Roger B. Schagrin, Christopher T. Cloutier, and Luke A. Meisner.

Frank J. Schweitzer, White & Case LLP, of Washington, DC, argued for defendant-intervenor Maverick Tube Corporation. With him on the brief was Gregory J. Spak, Kristina Zissis, and Matthew W. Solomon.

Kelly, Judge:  This consolidated action is before the court on motions for judgment on the agency record filed respectively by SeAH Steel Corporation ("SeAH"), Hyundai Steel Company ("Hyundai"), NEXTEEL Co., Ltd. ("NEXTEEL"), and Husteel Co., Ltd. ("Husteel").  See Pl. [SeAH]'s Mot. J. Agency R., Feb. 1, 2019, ECF No. 37; Consol. Pl. [Hyundai]'s 56.2 Mot. J. Agency R., Feb. 1, 2019, ECF No. 39; Consol. Pl. [NEXTEEL]'s 56.2 Mot. J. Agency R., Feb. 1, 2019, ECF No. 41; Pl. [Husteel]'s Mot. J. Agency R., Feb. 1, 2019, ECF No. 42.  These parties challenge various aspects of the final results of the U.S. Department of Commerce's ("Department" or "Commerce") first administrative review of the antidumping duty ("ADD") order covering welded line pipe from the Republic of Korea ("Korea").  See [SeAH]'s Br. Supp. 56.2 Mot. J. Agency R. Confidential Version, Feb. 1, 2019, ECF No. 37-1 ("SeAH's Br."); Consol. Pl. [Hyundai]'s Memo. Supp. 56.2 Mot. J. Agency R. Confidential Version, February 1, 2019, ECF No. 39-1 ("Hyundai's Br."); Consol. Pl. [NEXTEEL]'s Memo. Supp. 56.2 Mot. J. Agency R., Feb. 1, 2019, ECF No. 41-1 ("NEXTEEL's Br."); Pl. [Husteel]'s Br. Supp. Mot. J. Agency R., Feb. 1, 2019, ECF

No. 42-1 ("Husteel's Br."); see also Welded Line Pipe from the Republic of Korea, 83 Fed.

Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of [ADD] admin. review; 2015–

2016 ) ("Final Results") as amended by Welded Line Pipe from the Republic of Korea, 83

Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018) (amended final results of [ADD]

admin. review; 2015–2016) ("Amended Final Results") and accompanying Issues and

Decisions Memo. for the Final Results of the 2015–2016 Admin. Review of the [ADD]

Order on Welded Line Pipe from Korea, A-580-876, (July 11, 2018), ECF No. 25-5 ("Final

Decision Memo.").

SeAH challenges as contrary to law and unsupported by substantial evidence

Commerce's decision to reject third country sales and use constructed value to calculate

its margins.  SeAH's Br. at 11–19.  Plaintiffs challenge as contrary to law and unsupported

by substantial evidence Commerce's particular market situation ("PMS") finding and

subsequent adjustments.  See SeAH's Br. at 19–27; Hyundai's Br. at 17–29; Husteel's

Br. at 11–19; see generally NEXTEEL's Br.  Husteel challenges Commerce's statutory

authority to adjust reported costs of production to account for a PMS in Korea. See

Husteel's Br. at 18–19.  Husteel also challenges Commerce's calculation of the non-

examined companies' rate. See Husteel's Br. at 19–23.

For the reasons that follow, this court remands Commerce's adjustment of the

reported costs of production for welded line pipe for purposes of the sales below costs

test when calculating normal value; Commerce's determination that distortions in the

Korean market give rise to a particular market situation; Commerce's decision to resort

to constructed value when calculating SeAH's margins; and accordingly, Commerce's

calculation of the all-others rate for non-examined respondents.

## BACKGROUND

On February 13, 2017, in response to timely requests by interested parties,

Commerce initiated an administrative review of various ADD and countervailing duty

("CVD") orders and findings, including an ADD order covering welded line pipe ("WLP")

from Korea.[1]  See Initiation of Antidumping and Countervailing Duty Admin. Reviews, 80

Fed. Reg. 10,457 (Dep't Commerce Feb. 13, 2017); see also Welded Line Pipe from the

Republic of Korea, 82 Fed. Reg. 75,056 (Dep't Commerce Dec. 1, 2015) ([ADD] orders).

On March 7, 2017, Commerce selected Hyundai and SeAH as mandatory respondents.

See Selection of Resp't for Individual Review at 2–4, PD 22, bar code 3549464-01 (Mar.

7, 2017).

Commerce published its preliminary results on January 9, 2018.  See Welded Line

Pipe from Korea, 83 Fed. Reg. 1,023 (Dep't Commerce Jan. 9, 2018) (prelim. results of

[ADD] admin. review; 2015–2016) ("Prelim. Results") and accompanying Decisions

Memo. for the [Prelim. Results], A-580-876, PD 259, bar code 3657712-01 (Jan. 2, 2018)

("Prelim. Decision Memo.").  Commerce calculated SeAH's margin by using Canada as

the comparator market because the aggregate volume of SeAH's home market sales

were insufficient to permit a proper comparison with United States sales.  See Prelim

Decision Memo. at 15–16 (citing to section 773(a)(1)(C)(ii) of the Tariff Act of 1930, as

---

[1] Each year during the anniversary month of the publication of an ADD duty order, interested
parties may request that Commerce conduct an administrative review of that order.  See 19 C.F.R.
§ 351.213; see also 19 U.S.C. § 1677 (defining interested parties).

amended, 19 U.S.C. § 1677b(a)(1)(C)(ii) (2012))[2].  On September 22, 2017, Defendant-Intervenor Maverick Tube Corporation ("Maverick") sent to Commerce a letter alleging that a PMS in Korea distorted the cost of production ("COP") of WLP.  See generally Letter from [Maverick] Pertaining to PMS Allegation and Factual Info., CD 230–297, bar codes 3622608-01–68 (Sept. 22, 2017).  Namely, Maverick alleged that the PMS in Korea distorted the cost of hot-rolled coil ("HRC"), an input in the production of WLP.  See generally id.  To account for the PMS, Commerce made an upward adjustment to Hyundai's and SeAH's reported costs for the HRC input when calculating normal value.  See generally Prelim. Decision Memo.  Commerce preliminarily calculated weighted-average dumping margins of 19.42 percent for Hyundai, 2.30 percent for SeAH, and 10.86 percent for non-selected respondents.  Prelim. Results 83 Fed. Reg. at 1,024.

On June 25, 2018, Commerce placed on the record the Canadian International Trade Tribunal's ("CITT")[3] final determination that SeAH's sales of steel line pipe into Canada were dumped and permitted interested parties to comment.  See Memo. from Commerce Pertaining to Canadian [ADD] Final Determination on [WLP], PD 303, bar code 3722970-01 (June 25, 2018) ("CITT Final Determination"); see also id. Attachment at 2.  On August 10, 2018, Commerce published its Amended Final Results, and

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[3] The CITT reviews determinations made by the Canada Border Services Agency ("CBSA"). When referencing the dumping determination at issue, the parties refer interchangeably to both the CITT and the CBSA.  Commerce placed on the record the CITT's findings.  Because both references pertain to the same dumping determination at issue, this court will refer to the CITT's determination.

recalculated the weighted-average dumping margins.  See generally, Amended Final

Results and Final Decision Memo.[4]  Commerce continued to apply the upward adjustment

to Hyundai and SeAH's reported HRC costs.  Final Decision Memo. at 12–17.  Relying

on the CITT's dumping determination, Commerce calculated SeAH's margin using the

constructed value methodology.  Final Decision Memo. at 45–47.  After correcting for

ministerial errors, see Final Decision Memo. at 3, Commerce assigned rates of 18.77

percent for Hyundai, 14.39 percent for SeAH, and 16.58 percent for non-selected

respondents.  See Amended Final Results, 83 Fed. Reg. at 39,682.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C.

§ 1581(c) (2012), which grant the court authority to review actions contesting the final

determination in an investigation of an [ADD] order.  The court will uphold Commerce's

determination unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  The Statute Precludes Commerce's PMS Adjustment

### A.  Exhaustion and Waiver

As a threshold matter, Defendant argues Husteel failed to exhaust its argument

that Commerce lacked authority to make a PMS adjustment to COP for purposes of

determining below cost sales before the agency.  Defendants also argue that Husteel

---

[4] Commerce amended its Final Results to correct for ministerial error not relevant to this dispute.
Amended Final Results, 83 Fed. Reg. at 39,682.

waived its claim with respect to this argument before this court.  Because the question

before the court concerns a pure question of law, the court will not require exhaustion

before the agency.  Moreover, Husteel sufficiently pled and briefed its claim that

Commerce acted contrary to law before this court.

Parties are required to exhaust administrative remedies before the agency by

raising all issues in their initial case briefs before Commerce.  Dorbest Ltd. v. United

States, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citing to 19 C.F.R. § 351.309(c)(2), (d)(2);

Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)).

However, the court has discretion not to require exhaustion of administrative remedies

where a pure legal question arises.  19 U.S.C. § 2637(d); see also Agro Dutch Indus. Ltd.

v. United States, 508 F.3d 1024, 1029–30 (Fed. Cir. 2007).[5]  The court is not required to

resort to agency expertise or factual determinations to dispose of this purely legal

question.  As explained below, the language of the statute precludes Commerce's action

and therefore exhaustion is not appropriate.

Further, Husteel has not waived its claim that Commerce acted contrary to law.  At

paragraph 15 of its complaint, Husteel states that "Commerce's [PMS] determination and

resulting adjustment are unsupported by substantial record evidence and contrary to law

---

[5] The "pure legal question" exception generally does not apply where determination of the pertinent issue requires any additional development of a factual record either before or after the court's review.  See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003–04 (Fed. Cir. 2003); see also Consol. Bearings Co. v. United States, 25 CIT 546, 166 F. Supp. 2d 580 (2001), rev'd on other grounds, 348 F.3d 997 (Fed. Cir. 2003) (synthesizing from numerous decisions four non-exhaustive requirements for application of the "pure legal question" doctrine: (a) a new argument that is (b) purely legal and (c) does not require agency involvement or fact finding and (d) does not create undue delay) (internal citations omitted).

in a number of respects." See Husteel's Compl. ¶ 15, Aug. 2, 2018, ECF No. 6.  Moreover,

Husteel fully explicates the argument in support of its claim in its moving brief.  Thus,

Husteel's claim and legal arguments are not waived.

### B. Commerce's Below Cost Sales Adjustment

The statutory scheme precludes Commerce's PMS adjustment to COP for

purposes of a below cost sales analysis.  Congress specifically delineated Commerce's

options to account for a PMS whether using market sales or constructed value as normal

value.  Congress also provided for how to calculate the COP to identify sales below cost

in the market sales context and, in doing so, did not provide a means to adjust for a PMS.

Here, Commerce eschewed the options, provided by Congress, to account for a PMS;

Commerce instead chose to adjust the COP in a manner not permitted by statute. The

plain language of the statute prohibits Commerce's action and therefore its PMS

adjustment is contrary to law.[6]

In order to determine whether subject merchandise is sold at less than fair value

"a fair comparison shall be made between the export price or constructed export price

and normal value."  19 U.S.C. § 1677b(a).  The statute explains how a comparison is

made between normal value and export price.  First, the statute provides a methodology

---

[6] Defendant and Defendant-Intervenor argue that, to the extent that the statute is ambiguous, Commerce's interpretation is reasonable and thus entitled to Chevron deference. Def.'s Resp. Br. at 8–9, 12–23; Resp. Br. Def.-Intervenors California Steel Industries, TMK IPSCO, & Welspun Tubular LLC USA at 8–9, 11–15, July 29, 2019, ECF No. 63 ("Resp. Br. Def.-Intervenors"); see also Chevron U.S.A., Inc. v. Nat. Resources Def. Council, Inc., 467 U.S. 837, 844 (1984).  Here, Congress clearly set forth the means by which Commerce is to calculate COP for purposes of the below cost sales test.  Congress has spoken to the precise issue and therefore the matter is resolved according to the plain meaning of the statute.

for determining which sales should be considered, and disregarded, when calculating normal value, see § 1677b(a)(1), (b)(1); second, the statute sets forth what adjustments, if any, should be made to normal value, see § 1677b(a)(6), (7); and, third, the statute provides for what should be done if Commerce determines that, because of a PMS, a fair comparison between normal value and export price or constructed export price cannot be made.  See 19 U.S.C. §§ 1677(15); 1677b(a)(1)(B), (C), 1677b(a)(4).

First, when determining normal value, Commerce may disregard sales that are not made in the ordinary course of trade.  The statute defines normal value as the price at which the foreign like product is "first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade[.]"  19 U.S.C. § 1677b(a)(1)(B)(i). Therefore, sales outside the ordinary course of trade cannot be included in normal value. "Ordinary course of trade" is defined by statute and specifically excludes below cost sales, certain transactions between affiliated parties, and situations where a PMS would not allow for a proper comparison between normal value and export price or constructed export price.  19 U.S.C. § 1677(15)(A)–(C).[7]

---

[7] (15) Ordinary course of trade.

The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:

(A) Sales disregarded under section 1677b(b)(1) of this title.

(B) Transactions disregarded under section 1677b(f)(2) of this title.

(C) Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

When identifying normal value sales, Commerce may also disregard sales made

at less than the COP.  19 U.S.C. § 1677b(b)(1).  The COP is defined by statute to include

the costs of materials and fabrication, amounts for selling and general expenses, and the

cost of containers and other expenses incidental to putting the product into a condition

ready for shipment.[8]  Congress provided additional special rules for the calculation of

---

[8] More specifically the statute provides that the cost of production equals the sum of:

> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;

> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and

> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

> For purposes of subparagraph (A), if the normal value is based on the price of the foreign like product sold for consumption in a country other than the exporting country, the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition which are remitted or refunded upon exportation.

19 U.S.C. § 1677b(b)(3).  Defendant argues that the phrase "ordinary course of business" in section 1677b(b)(3)(A) is similar to "ordinary course of trade" so as to justify reading a PMS adjustment into this portion of the statute.  Def.'s Resp. Br. at 22.  This argument proves contrary to Defendant's position.  Congress amended the statute in 2015.  See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504, 129 Stat. 362 (2015) ("TPEA").  In doing so, Congress authorized Commerce to adjust its constructed value methodology where it finds that a PMS exists.  Id.  Congress also amended § 1677b(e)(1) to change the phrase "ordinary course of business" to "ordinary course of trade."  Id.  It amended the definition of "ordinary course of trade."  Id.  Congress did not modify section 1677b(f). That Congress chose to leave the phrase "ordinary course of business" in section 1677b(f) when it changed the very same phrase in section 1677b(e) to "ordinary course of trade" indicates that it did not intend to incorporate a PMS adjustment to the sales-below-cost analysis.  Defendant-Intervenor points out that the phrase "ordinary course of trade" is nonetheless found in the provision of the statute which tasks

(footnote continued)

**PUBLIC VERSION**

COP including adjustments to be made in certain circumstances.   <u>See</u> 19 U.S.C.

§ 1677b(f).[9]  Specifically, the statute provides:

> Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise. The administering authority shall consider all available evidence on the proper allocation of costs, including that which is made available by the exporter or producer on a timely basis, if such allocations have been historically used by the exporter or producer, in particular for establishing appropriate amortization and depreciation periods, and allowances for capital expenditures and other development costs.

---

Commerce to disregard below costs sales. Oral Arg. at 00:46:05–00:46:20, Nov. 26, 2019, ECF No. 101. <u>See also</u> Def.-Intervenors Resp. Br. at 14.  The statute provides that where sales have been disregarded, normal value shall be based on the "remaining sales of the foreign like product in the ordinary course of trade."  19 U.S.C. § 1677b(b)(1).  The mere presence of this phrase in this portion of the statute does not advance Defendant's position.

[9] These rules also apply to calculation of constructed value.  Notably, the constructed value portion of the statute includes a provision for accounting for a PMS, which is not included here. <u>Compare</u> 19 U.S.C. § 1677b(e) <u>with</u> <u>id.</u> § 1677b(f).

**PUBLIC VERSION**

19 U.S.C. § 1677b(f)(1)(A).  The statute provides for adjustments to be made for startup

operations when determining COP,[10] and makes provisions for transactions between

affiliated persons.[11]

---

[10] 19 U.S.C. § 1677b(f)(1)(C)(ii) and (iii) provide:

> (ii) Startup operations.

> Adjustments shall be made for startup operations only where--

> (I) a producer is using new production facilities or producing a new product that requires substantial additional investment, and

> (II) production levels are limited by technical factors associated with the initial phase of commercial production.

> For purposes of subclause (II), the initial phase of commercial production ends at the end of the startup period. In determining whether commercial production levels have been achieved, the administering authority shall consider factors unrelated to startup operations that might affect the volume of production processed, such as demand, seasonality, or business cycles.

> (iii) Adjustment for startup operations. The adjustment for startup operations shall be made by substituting the unit production costs incurred with respect to the merchandise at the end of the startup period for the unit production costs incurred during the startup period. If the startup period extends beyond the period of the investigation or review under this title, the administering authority shall use the most recent cost of production data that it reasonably can obtain, analyze, and verify without delaying the timely completion of the investigation or review. For purposes of this subparagraph, the startup period ends at the point at which the level of commercial production that is characteristic of the merchandise, producer, or industry concerned is achieved.

[11] Transactions between affiliated persons are provided for under the transactions disregarded rule and the major input rule. Specifically, 19 U.S.C. § 1677b(f)(2) provides:

> Transactions disregarded. A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(3) provides:

(footnote continued)

**PUBLIC VERSION**

Second, when using market prices to determine normal value, Commerce may need to make certain adjustments.  Congress provided for those adjustments, specifically to account for the cost of containers and other expenses incident to making the goods ready for shipment, direct taxes, differences in the quantities sold or physical differences

---

Major input rule. If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

**PUBLIC VERSION**

and differences in the circumstances of sale.[12] Additional adjustments are allowed for

differences in levels of trade.[13]

---

[12] 19 U.S.C. § 1677b(a)(6) provides for adjustments:

The price described in paragraph (1)(B) shall be--

(A) increased by the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States;

(B) reduced by--

(i) when included in the price described in paragraph (1)(B), the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the foreign like product in condition packed ready for shipment to the place of delivery to the purchaser,

(ii) the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser, and

(iii) the amount of any taxes imposed directly upon the foreign like product or components thereof which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product, and

(C) increased or decreased by the amount of any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise provided under this section) that is established to the satisfaction of the administering authority to be wholly or partly due to--

(i) the fact that the quantities in which the subject merchandise is sold or agreed to be sold to the United States are greater than or less than the quantities in which the foreign like product is sold, agreed to be sold, or offered for sale,

(ii) the fact that merchandise described in subparagraph (B) or (C) of section 1677(16) of this title is used in determining normal value, or

(iii) other differences in the circumstances of sale.

[13] 19 U.S.C. § 1677b(a)(7) provides for additional adjustments.

(A) Level of trade. The price described in paragraph (1)(B) shall also be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in paragraph

(footnote continued)

**PUBLIC VERSION**

Third, when using home market sales for normal value, Commerce may discover there is a PMS that prevents the proper comparison of normal value and export price or constructed export price.  Congress specifically provided for such situations. If Commerce determines that a PMS "prevents a proper comparison with the export price or constructed export price" then normal value will be determined by third country sales or constructive value. 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), 1677b(a)(1)(C)(iii), 1677b(a)(4).

If there are insufficient home market or third country sales, or if a PMS prevents the fair comparison of normal value and export price or constructed export price, Commerce may use constructed value to determine the price for comparison to export price.  See 19 U.S.C. § 1677b(a)(1)(B)(ii), § 1677b(a)(1)(C)(iii), 1677b(b)(1), 1677b(a)(4). Commerce shall determine constructed value by adding "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade[.]"  See 19 U.S.C. § 1677b(e)(1). If, however when determining constructed value, Commerce determines that a PMS exists such that the cost of

---

(1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade--

(i) involves the performance of different selling activities; and

(ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.

In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

materials and fabrication or other processing of any kind does not accurately reflect the COP in the ordinary course of trade, Commerce may use "any other calculation methodology."  19 U.S.C. § 1677b(e).

Therefore, the plain language of the statute provides: a definition of normal value as based on home market sales, third country sales, or constructed value, 19 U.S.C. § 1677b(a)(1), (4); sales to be disregarded, § 1677b(a)(1)(B)(i), (b)(1); available adjustments, § 1677b(a)(6), (7); and, alternatives where a PMS prevents a proper comparison between normal value and export price or constructed export price, § 1677b(a)(1)(B), (C); 1677b(a)(4).  The statute separately provides that when Commerce is using constructed value and encounters a PMS that it may resort to "any other calculation methodology."  19 U.S.C. § 1677b(e).

Here, Commerce chose a path not permitted by the statutory scheme.  Commerce misappropriated the language of 19 U.S.C. § 1677b(e), which provides that when using constructed value, Commerce may use any reasonable calculation methodology if it finds a PMS affected the COP.  In the Final Decision Memo., Commerce explains its authority to act:

> Section 504 of the TPEA added the concept of "particular market situation" in the definition of the term "ordinary course of trade," for purposes of CV under section 773(e) of the Tariff Act of 1930, as amended (the Act), and through these provisions for purposes of the COP under section 773(b)(3) of the Act. Section 773(e) of the Act states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology.

Final Decision Memo. at 12 (footnote omitted).  Although Commerce's phrasing "and through these provisions for purposes of the COP under section 773(b)(3) of the Act" is vague, it appears to be saying that the "any other calculation" language of the constructed value portion of the statute applies to the COP and below cost sales portion of the statute.

However, there is nothing in the statutory scheme which can be read to grant Commerce the authority to modify the below cost sales test to account for a PMS.  Indeed, the statute precludes a PMS adjustment to COP for the below cost sales analysis because it specifically lists the method of calculation and the adjustments to be made, and there is no ambiguity in this portion of the statute.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–44 (1992) (a cardinal canon of statutory interpretation is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); see also Duncan v. Walker, 533 U.S. 167, 173 (2001) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation and internal quotations omitted).  Section 1677b(b)(3) lays out how to calculate the COP and does not provide for PMS adjustments. Compare 19 U.S.C. § 1677b(b)(3) with id. § 1677b(e).

Commerce apparently assumes, and Defendant argues, that when Congress amended the statute to define "ordinary course of trade" in 2015, it enabled Commerce to make PMS adjustments to the COP for purposes of the below cost sales test.  See Final Decision Memo. at 12–18; Def.'s Resp. Pls.' Mots. J. Agency R. at 21–23, July 29, 2019, ECF No. 64 ("Def.'s Resp. Br."). Section 504 of the Trade Preferences Extension

Act of 2015 amended section 1677(15) to provide that "situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price" are considered to be outside the ordinary course of trade.  Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504, 129 Stat. 362 (2015) ("TPEA"); see also 19 U.S.C. § 1677(15); Final Decision Memo. at 12; Def.'s Resp. Br. at 22–23.   However, this amendment does not help Commerce's position.   If a PMS prevents a proper comparison with export price or constructed export price, sales would indeed be considered outside the ordinary course of trade; as such, they shall be disregarded. See 19 U.S.C. § 1677b(a)(1); see also id. § 1677(15).  Alternatively, the existence of the PMS would justify Commerce using third country sales or constructed value.  § 1677b(a)(1)(B)(ii), (a)(4).  However, Commerce is not authorized to tinker with the below cost sales calculation because of a PMS.  No part of the statute allows Commerce to use "any other methodology" when market sales are used for normal value.  The "any other methodology" language is reserved solely for when normal value is determined by constructed value.[14]

Defendant argues that it would be "illogical to conclude that Congress intended for Commerce not to rely on costs distorted by a [PMS] for constructed value, but still to rely on those same distorted costs for purposes of cost of production and the sales-below-

---

[14] Indeed, Commerce found that "the collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market, a PMS exists in Korea which distorts the cost of production for WLP."  Final Decision Memo. at 13.  The statute enquires whether the PMS "prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677(15).

cost test."  Def.'s Resp. Br. at 23.  Defendant explains that Commerce reasoned that the

language of the constructed value portion of the statute that allows Commerce to use

"any other calculation methodology" must therefore apply to the COP portion of the statute

and allow Commerce to adjust the COP for the purposes of its below cost sales analysis

in the normal value portion of the statute.  Def.'s Resp. Br. at 22–23 (citing Final Decision

Memo. at 12).  Defendant's argument is not persuasive.

    The plain meaning of the statutory scheme is not illogical.  Congress provided for

the existence of a PMS when market sales are used for normal value by allowing

Commerce to disregard specific sales (because they were made outside the ordinary

course of trade) or to move off of home market sales to use third country sales or

constructed value.  19 U.S.C. § 1677b(a)(1)(B)–(C), (a)(4).  Congress provided for the

existence of the PMS in a constructed value context by allowing Commerce to choose

another reasonable means to calculate costs.  Indeed, Congress's choice makes a great

deal of sense.  A PMS that affects costs of production would presumably affect prices for

domestic sales and export sales so there would be no reason to adjust only the home

market prices.  If the PMS was of a kind that only affected domestic sales, then it would

be one which prevented "a proper comparison with the export price or constructed export

price" and Commerce would move to either third country sales or constructed value.  19

U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii); see also id. § 1677b(a)(4).

    If a PMS only affected some sales, then those sales would be outside the ordinary

course of trade and would be disregarded by Commerce in identifying normal value.  At

oral argument Defendant argues that, effectively, Commerce did simply disregard sales

affected by a PMS in this case.  Oral Arg. at 00:14:45, Nov. 26, 2019, ECF No. 101.  In

its Final Decision Memo, Commerce does not claim it is disregarding sales that are

outside the ordinary course of trade because they are affected by a PMS. More

importantly, that is not what Commerce did.  Commerce did not exclude sales affected by

a PMS, it adjusted reported costs affected by a PMS. Final Decision Memo. at 13–15.

Commerce alleged a PMS that pertained to a specific input, HRC.  Commerce made an

adjustment to its COP calculation for purposes of its below cost sales analysis.

Thereafter, some portion of sales were excluded as being below COP.

Ultimately, Commerce's argument hinges upon a view that when Congress

amended the statute in 2015 to add the PMS language to the constructed value section

of the statute that it also amended the below cost sales test to allow Commerce to

calculate the COP to account for a PMS.  Undeniably Congress did not amend either

section 1677b(b)(1) (below costs sales) or section 1677b(f) (calculation of a cost of

production) to allow for a PMS adjustment.[15]  Commerce attempts to bootstrap such an

amendment in its Final Decision Memo. by stating "Section 504 of the TPEA added the

concept of 'particular market situation' in the definition of the term 'ordinary course of

trade,' for purposes of CV under section 773(e) of the Tariff Act of 1930, as amended (the

Act), and through these provisions for purposes of the COP under section 773(b)(3) of

the Act."  Final Decision Memo. at 12.  Commerce and the Defendant thus claim that

although the PMS language was not added to the cost of sales or calculation of COP

---

[15] Section 505 of the TPEA did amend the below cost sales in ways not relevant here.  <u>See</u> Trade
Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).

sections of the statute, the PMS concept should be read into those provisions because of the phrase "ordinary course of trade" language was amended to exclude situations where a PMS prevents a proper comparison with the export price or constructed export price. However, between the below cost sales section, and the COP section, the only reference to "ordinary course of trade" simply says that where sales have been disregarded, normal value shall be based on the "remaining sales of the foreign like product in the ordinary course of trade."  See 19 U.S.C. § 1677b(b)(1).  The words of the statute cannot support the adjustment made here by Commerce.

### C.  Commerce's PMS Determination

Plaintiffs also challenge Commerce's PMS determination as unsupported by substantial evidence and contrary to law.  Commerce relied in part on its analysis in past reviews.  Final Decision Memo. at 12–13 ("[W]e determine that the circumstances present during this review–that is, the PMS allegation itself and the record evidence concerning the allegation–remained largely unchanged from those which led to the finding of a PMS in Korea in the other reviews.")  Commerce found that the "collective impact of Korean HRC subsidies, Korean imports of HRC from China, strategic alliances, and government involvement in the Korean electricity market" constituted a PMS in Korea "which distorts the cost of production for WLP."  Id.  Commerce's PMS finding is unsupported by substantial evidence.[16]

_____

[16] SeAH does not challenge Commerce's statutory authority to make the PMS adjustment to cost of production for purposes of the sales below cost test under normal value—as Commerce

(footnote continued)

To establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price.  See 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(iii) (stating that home market or third market prices that Commerce determines are affected by a PMS which prevents a proper comparison with export price or constructed price cannot be used to calculate normal value).  Those determinations must be supported by substantial evidence.  The evidence must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence.  See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

---

calculated SeAH's margins using constructed value.  However, SeAH challenges Commerce's PMS finding as unsupported by substantial evidence, see SeAH's Br. at 19–26, and its subsequent adjustment as contrary to law.  See SeAH's Br. at 26–27.  SeAH argues that, by relying on an AFA subsidy rate in a previous proceeding to calculate the adjustment to SeAH's COP, Commerce effectively applied AFA against a cooperative respondent.  See id.  Commerce's PMS finding is unsupported by substantial evidence, and thus, this court does not reach the issue of the lawfulness of Commerce's resulting adjustment.

Hyundai and SeAH both argue that Section 19 U.S.C. § 1677-1 which allows Commerce to remedy upstream subsidies precludes the use of the PMS provision in this case as a matter of law.  Hyundai's Br. at 31–33; SeAH's Br. at 26. Defendant argues that the PMS provisions and the upstream subsidy provisions are two distinct provisions that serve different purposes. Def.'s Resp. Br. at 20–21.  The question before Commerce in this proceeding was whether a confluence of factors gave rise to a PMS that affected the less than fair value equation when calculating margins pursuant to an [ADD] order review–not whether or not there existed remediable subsidies within the Korean market.  Therefore, the court need not reach the argument posed by Hyundai and SeAH as to whether the statutory provisions remedying upstream subsidies preclude the use of the PMS provisions to remedy alleged market distortions that affect the cost of an input, where those alleged distortions include allegations of subsidies.

Here, Commerce found that four factors, based on their cumulative effect, warranted a PMS finding and subsequent adjustment.  Final Decision Memo. at 13. Nonetheless, Commerce acknowledged that the information on the record was insufficient to permit it to quantify three out of four of those factors.  <u>See</u> Final Decision Memo. at 14–15, 18, 23, and 24.  Commerce possessed only enough information to quantify the impact of Korean HRC subsidies, and in doing so, relied on AFA[17] CVD rates assigned to HRC producers from a previous administrative proceeding.  Final Decision Memo. at 14–15 (citing to <u>Hot-Rolled Steel Flat Products from Korea</u>, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirm. determination) <u>as amended by</u> 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) ("<u>Hot-Rolled Steel from Korea</u>") and accompanying Issues and Decisions Memo. for [<u>Hot-Rolled Steel from Korea</u>], C-580-884, (Aug. 4, 2016) <u>available at</u> https://enforcement.trade.gov/frn/summary/korea-south/2016-19377-1.pdf (last visited Dec. 30, 2019)).[18]

Commerce failed to substantiate three out of the four factors upon which it relied. Defendant argues that Chinese overcapacity affects the Korean market in particular because Chinese imports constitute a significant and growing portion of the HRC market

---

[17]   Parties and Commerce sometimes use the shorthand "AFA" or "adverse facts available" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. AFA, however, encompasses a two-part inquiry established by a statute.  <u>See</u> 19 U.S.C. § 1677e(a)–(b). It first requires Commerce to identify information missing from the record, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available."  <u>Id.</u>

[18] The only record evidence of strategic alliances on the record appears to be a declaration from the [[                                                                          ]],  that these alliances exist.  <u>See</u> [Maverick's] Particular Market Situation Allegation at Ex. 31, CD 296, bar code 3622608-67 (Sept. 25, 2017) ("[[                    ]] Declaration").

in Korea, resulting in a downward pressure on steel prices and incentives for government

interventions which would cause further distortions, <u>see</u> Def.'s Resp. Br. at 26–27 (citing,

<u>inter alia</u>, Final Decision Memo. at 13, 17; Prelim. Decision Memo. at 15). However,

Defendant concedes that Chinese overcapacity is "not a phenomenon specific to the

Korean market."   <u>See</u> Def.'s Resp. Br. at 27.   Although 19 U.S.C. § 1677b may not

demand that a PMS be such that it only affects the subject market, there is no evidence

on the record that Chinese overcapacity affects the Korean market in some way that is

specific to the Korean market at all.   Commerce's support for the other factors is likewise

lacking.[19]   Regarding evidence of strategic alliances and government involvement in the

Korean electricity market, both Defendant and Commerce seem to acknowledge that

these factors support the PMS finding only to the extent that they lend credence to a

determination based on the totality of the circumstances in the market.   <u>See</u> Def.'s Resp.

Br. at 27–28; <u>see also</u> Final Decision Memo. at 13, 17–18.   Defendant and Commerce

rely on the cumulative effect of these distortions taken together.   <u>Id.</u>; <u>see also</u> Final

Decision Memo. at 13.   Although Commerce may rely on the cumulative effect of multiple

distortions to arrive at a PMS determination, it cannot use that phrase to circumvent a

meaningful review of the sufficiency of the record.

---

[19] Defendant cites to a declaration in support of Commerce's finding that there are strategic alliances in the Koreans government, <u>see generally</u> [[                    ]] Declaration, and previous administrative proceeding in support of Commerce's finding that electricity operates as a tool of the government's industrial policy in Korea.  Def.'s Resp. Br. at 27–28 (citing, <u>inter alia</u> <u>Oil Country Tubular Goods from The Republic of Korea</u>, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of [ADD] admin. rev.; 2014–2015) ("<u>OCTG from Korea</u>") and accompanying Issues and Decisions Memo. for [<u>OCTG from Korea</u>] at 13–14, A-580-870, (Apr. 10, 2017) <u>available at</u> https://enforcement.trade.gov/frn/summary/korea-south/2017-07684-1.pdf (last visited Dec. 30, 2019).

Furthermore, even if this court agreed that Commerce's findings of various distortions were supported, Commerce fails to explain how these distortions prevent a proper comparison. See 19 U.S.C. § 1677b(a)(1)(B)(ii)(III); see also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 822 (1994) reprinted in 1994 U.S.C.C.A.N 4040, 4162 ("SAA").  Chinese overcapacity may affect the COP by lowering the price of HRC, however, it is unclear how that finding alone would support the determination that the home market price and export price (or constructed export price) cannot be compared because Commerce does not address whether costs would be lowered on both sides of the less than fair value equation. See id.  Therefore, Commerce's PMS finding is unsupported by substantial evidence.[20]

---

[20] Hyundai argues that Commerce's determination is contrary to law because it failed to make a respondent-specific determination.  See Hyundai's Br. at 18–22; Def.'s Resp Br. at 12–23. Hyundai argues that Commerce has "historically" and "properly focused its analysis 'on the behavior of the specific respondent(s) under [investigation or review.]"  See Hyundai Br. at 21–22 (quoting Certain Pasta from Italy, 72 Fed. Reg. 7,011 (Dep't Commerce Feb. 14, 2007) (notice of final results of the ninth admin. review of the [ADD] order on certain pasta from Italy) ("Certain Pasta from Italy"), accompanying Issues and Decisions Memo. for [Certain Pasta from Italy] cmt. 1 at 9, A-475-818, (Feb. 14, 2007), available at https://enforcement.trade.gov/frn/summary/ITALY/E7-2563-1.pdf (last visited Dec. 30, 2019) ("Certain Pasta from Italy IDM"); see also id. (citing Steel Concrete Reinforcing Bar from Taiwan, 82 Fed. Reg. 34,925 (Dep't Commerce July 27, 2017) (final determination of sales at less than fair value) ("Rebar from Taiwan") and accompanying Issues and Decisions Memo. for [Rebar from Taiwan], A-583-859, (July 20, 2017) available at https://enforcement.trade.gov/frn/summary/taiwan/2017-15840-1.pdf (last visited Dec. 30, 2019) ("Rebar from Taiwan IDM").  In the proceedings Hyundai cites, however, Commerce either deviates from the respondent-specific approach or expressly acknowledges there are circumstances where a general market-analysis (i.e., "totality of the circumstances") approach would be appropriate.  See e.g., Biodiesel from Indonesia, 83 Fed. Reg. 8,835 (Dep't Commerce Mar. 1, 2018) (final determination of sales at less than fair value) and accompanying Issues and Decisions Memo. for the Final Affirmative Determination in the Antidumping Duty Investigation of Biodiesel from Indonesia at 23, A-560-830, (Feb. 20, 2018) available at https://enforcement.trade.gov/frn/summary/indonesia/2018-04138-1.pdf (last visited Dec. 30, 2019) (adopting a general market-analysis approach and stating that Commerce "do[es] not

(footnote continued)

### D.  Third Country Sales

Commerce's finding that third country sales are unrepresentative is unsupported by substantial evidence.  After finding that there were insufficient home market sales for purposes of normal value, Commerce considered, but ultimately rejected, SeAH's sales into the Canadian market.  Commerce based its finding on the CITT's determination that SeAH's sales into the Canadian market were dumped.  Here, it is unreasonable to rely solely on the CITT's determination when confronted with evidence that those findings are not reliable.

Where Commerce finds that home market sales are an inappropriate basis for determining normal value, it may resort to third country sales.  <u>See</u> 19 U.S.C. § 1677b(a)(1).  Commerce may only rely on third country sales where the prices are representative, where the aggregate quantity of sales are at a sufficient level, and where Commerce does not determine that a PMS prevents a proper comparison between the export price, or constructed export price, and the third country price.  <u>See</u> 19 U.S.C. § 1677b(a)(1)(B)(ii).  If Commerce determines that the conditions for third country sales are not met, then it resorts to constructed value.  <u>See</u> 19 U.S.C. § 1677b(a)(4), 1677b(e).

---

believe [a comparison of specific sales and transactions to the general market] is always appropriate within the context of a PMS analysis); Certain Pasta from Italy IDM at 8–9 (stating that "it may be appropriate in some instances to consider general market conditions in determining whether a PMS exists[.]"); Rebar from Taiwan IDM cmt. 1 at 10 (acknowledging the totality of the circumstances approach taken in <u>OCTG from Korea</u> because of the confluence of distortions present in that proceeding) (internal citation omitted); <u>see also</u> Def.'s Resp. Br. at 19. Commerce's practice is to vary its approach based on the facts presented to it and this practice is reasonable. Commerce has discretion to determine its methodology in the first instance as long as it does not exercise its discretion in an arbitrary and unlawful manner.

Here, Commerce relied on CITT's final determination that SeAH's sales into Canada were dumped to find that those sales were not representative.  Final Decision Memo. at 45–47; see also 19 U.S.C. § 1677b(a)(1)(B)(ii)(I).  Commerce's determination is not supported by substantial evidence because Commerce failed to consider contradictory evidence that Canadian antidumping law was materially inconsistent with U.S. law.  Specifically, SeAH argued that the Canada Border Services Agency ("CBSA") applied the equivalent of facts available to SeAH for failing to report home market sales of merchandise produced by another manufacturer.  Final Decision Memo. at 45; see also [SeAH]'s Resp.  New Factual Information at 2, PD 318, bar code 3725459-01 (June 27, 2018) ("SeAH's NFI Resp."); id. at Attachment 1.  SeAH explained that, under U.S. law, the reporting of such sales in unnecessary, because the "home market sales of merchandise produced by one manufacturer may not be used to calculate [normal value] for exports of merchandise produced by another manufacturer."  Id.  Commerce thus noted SeAH's apparent contention that there is no evidence Canada would have found SeAH's sales to be dumped if it had applied Commerce's methodology.  See id.   In response, Commerce explained that "the fact that Commerce's methodology may differ from that of the CBSA does not negate Canada's finding of dumping."  Final Decision Memo. at 46.  This response does not engage the apparent flaw in the evidence upon which Commerce is relying to find that SeAH's sales into the Canadian market were not representative.  Further, Commerce did not give weight to its previous determination that

SeAH's sales into the Canadian market were representative.[21]  See SeAH's Br. at 9; see also Oil Country Tubular Goods from The Republic of Korea, 82 Fed. Reg. 18,105 (Dep't Commerce Apr. 17, 2017) (final results of [ADD] admin. rev.; 2014–2015) ("OCTG from Korea") and accompanying Issues and Decisions Memo. for [OCTG from Korea] at 13–14, A-580-870, (Apr. 10, 2017) available at https://enforcement.trade.gov/frn/summary/korea-south/2017-07684-1.pdf (last visited Dec. 30, 2019).  Commerce instead relied solely on the CITT's findings.  For these

---

[21] In its Final Decision Memo, Commerce explained that it based its decision on Alloy Piping Prods., Inc. v. United States to rely exclusively on a foreign government's antidumping determination when deciding between use of third country sales and constructed value.  Final Decision Memo at 46 n.242 (citing to Alloy Piping Prods., Inc. v. United States, 26 CIT 330, 341, 201 F. Supp. 2d 1267, 1277 (2002) ("Alloy Piping"); see also Def.'s Resp. Br. at 44 (stating that this court has indicated Commerce may rely on a foreign government's antidumping findings when deciding third country sales are inappropriate for use as normal value; identifying Alloy Piping as the basis for Commerce's decision).  However, Commerce's reliance on Alloy Piping is misguided.  Alloy Piping held that Commerce's decision to use third country sales as the basis for normal value was supported by substantial evidence, and otherwise in accordance with law, where Commerce's record-based consideration of the representativeness of sales made to a single customer in a third country market is met with unsupported contentions that a market comprised of such sales cannot be representative.  See Alloy Piping, 26 CIT at 340–42, 201 F. Supp. 2d at 1276–78.  The court disposed of respondent's argument that Commerce must avoid using prices "that it has 'reason to believe or suspect' may be dumped" because it determined that the "reason to believe or suspect" standard applied to non-market economy proceedings.  See Alloy Piping, 26 CIT at 240–41, 201 F. Supp. 2d. at 1277–78.  The court then reasoned, in the alternative, that respondent's application of the standard would not apply to a "suitable comparison market" analysis absent a formal finding of dumping.  Id.  The present dispute is whether Commerce's decision to rely on the antidumping findings produced by a methodology inconsistent with U.S. law is supported by substantial evidence.  Commerce cannot rely on Alloy Piping in order to circumvent its statutory obligations to render decisions based on substantial evidence and to reasonably explain its determinations below.

reasons, Commerce's decision to disregard third country sales and calculate SeAH's sales based on constructed value are not supported by substantial evidence.[22]

### E.  All-Others Rate

Husteel argues that the all-others rate is unlawful and unsupported by substantial evidence because it is the product of a margin calculated with reference to rates that were based on total and partial AFA.  Husteel's Br. at 19–23.  Defendant counters that this methodology is appropriate because Commerce may average rates that are based on AFA when calculating the all-others rate, and also because the AFA rates were only incorporated into the calculation of the all-others rate to the extent that Commerce adjusted the cost of certain inputs when determining the margins for the mandatory respondents.  See Def.'s Resp. Br. at 40–42.  Because Commerce's PMS adjustment and determination are being remanded the court will not reach Husteel's argument.

The expected method for calculating the estimated margin, also known as the "all-others" rate, is to weight average the margins assigned to the mandatory respondents—excluding all zero margins, de minimis margins, and margins determined entirely under 19 U.S.C. § 1677e.  19 U.S.C. § 1673d(c)(5); see also SAA 1994 U.S.C.C.A.N at 4201. However, if the only margins available to Commerce are those excluded under 19 U.S.C.

---

[22] Indeed, in NEXTEEL Co. v. United States, 43 CIT __, Slip Op. 19-1 at 21 (Jan. 2, 2019), this court sustained Commerce's determination that SeAH's sales to Canada were an appropriate basis for normal value as reasonable.  The only discernible difference between that proceeding and this one is that the CITT rendered its final determination in the interim.  See Def.'s Resp. Br. at 45 (citing to CITT Final Determination).  Commerce must explain why the CITT's determination reasonably justifies its decision to discard third country sales and instead rely on constructed value when determining SeAH's margin.

§ 1673d(c)(5), Commerce may either apply the expected method to those margins, or resort to any reasonable method to establish the separate rate.  Id.  When calculating the all-others rate using the expected method, section 1673d(c)(5) provides that where no other margins are available, zero, de minimis, and "any margins determined entirely under section 1677e" can be used to calculate the separate rate.  This court—in remanding to Commerce its PMS methodology and determination as unlawful and unsupported by substantial evidence, respectively—does not reach the issue of whether the all-others rate is lawful in this instance because Commerce's re-calculations on remand may result in a change to the all-others rate.[23]

## CONCLUSION

The plain meaning of the statute precludes Commerce's PMS adjustment to Hyundai's reported costs of production for purposes of the sales-below-cost test when calculating normal value.  Further, Commerce's determination that sales of WLP in the Korean market are affected by a PMS is not supported by substantial evidence.  Finally, Commerce's decision to resort to constructed value when calculating SeAH's margin is unsupported by substantial evidence.

For the foregoing reasons, it is

**ORDERED** that Commerce's determination is remanded for further consideration and/or explanation consistent with this opinion; and it is further

---

[23] SeAH also complains that Commerce's differential pricing analysis is not supported by substantial evidence and not in accordance with law.  SeAH's Br. at 4, 29–30.  As both parties agree, "at this moment . . . the issue is moot" because Commerce's differential pricing analysis did not affect the calculation of SeAH's dumping margins.  Id.; see also Def.'s Resp. Br. at 46. Therefore, this court does not reach the issue.

**PUBLIC VERSION**

     **ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

     **ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

     **ORDERED** that the parties shall have 15 days to file their replies to comments on the remand redetermination.


                             /s/ Claire R. Kelly
                           Claire R. Kelly, Judge

Dated:January 3, 2020
      New York, New York