Slip Op. 20-103

# UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |
|---|---|
| HUSTEEL CO., LTD. ET AL.,<br><br>      Plaintiff and Consolidated Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>and<br><br>CALIFORNIA STEEL INDUSTRIES ET AL.,<br><br>      Defendant-Intervenors and Consolidated Defendant-Intervenors. | Before: Claire R. Kelly, Judge<br><br>Consol. Court No. 18-00169 |

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's remand results in the first administrative review of the antidumping duty order covering welded line pipe from the Republic of Korea.]

Dated: July 23, 2020

Donald B. Cameron, Morris, Manning & Martin LLP, of Washington, DC, for plaintiff Husteel Co., Ltd. With him on the brief were Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, and Eugene Degnan.

J. David Park, Arnold & Porter Kaye Scholer LLP, of Washington, DC, for consolidated plaintiffs Hyundai Steel Company and NEXTEEL Co., Ltd. With him on the brief were Henry D. Almond, Daniel R. Wilson, and Kang W. Lee.

Jeffrey M. Winton, Law Office of Winton & Chapman PLLC, of Washington, DC, for consolidated plaintiff SeAH Steel Corporation. With him on the brief was Amrietha Nellan.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Reza Karamloo, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Schagrin Associates, of Washington, DC, for defendant-intervenors California Steel Industries and Welspun Tubular LLC USA. With her on the brief was Roger B. Schagrin.

Gregory J. Spak, White & Case LLP, of Washington, DC, argued for defendant-intervenors Maverick Tube Corporation and IPSCO Tubulars Inc. With him on the brief were Frank J. Schweitzer, Kristina Zissis, and Luca Bertazzo.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") remand redetermination filed pursuant to the court's order in Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1376, 1395 (2020) ("Husteel I"). See Final Results of Redetermination Pursuant to Ct. Remand [in Husteel I], Apr. 1, 2020, ECF No. 124 ("Remand Results").

In Husteel I, the court remanded Commerce's final determination in the first administrative review of the antidumping duty ("ADD") order covering welded line pipe ("WLP") from the Republic of Korea ("Korea"). See Welded Line Pipe from the Republic of Korea, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of [ADD] admin. review; 2015–2016 ) ("Final Results") as amended by Welded Line Pipe from the Republic of Korea, 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018) (amended final results of [ADD] admin. review; 2015–2016) ("Amended Final

Results") and accompanying Issues and Decisions Memo. for the Final Results of the 2015–2016 Admin. Review of the [ADD] Order on Welded Line Pipe from Korea, A-580-876, (July 11, 2018), ECF No. 25-5 ("Final Decision Memo").

On remand, Commerce reverses its determination that a particular market situation ("PMS") exists in Korea warranting an adjustment to respondents' reported costs of hot rolled coil ("HRC"). See Remand Results at 5, 7–8. Further, Commerce reverses its determination that SeAH Steel Corporation's ("SeAH") sales into the Canadian market were unrepresentative and uses those third-country sales to determine SeAH's normal value. See Remand Results at 4, 6–7. Finally, Commerce declines to apply a constructed export price offset ("CEP offset") to SeAH's sales into the Canadian market. See Remand Results at 9. For the following reasons, the court sustains Commerce's decision to reverse its PMS determination and to calculate SeAH's normal value using third country sales. However, the court remands Commerce's determination not to apply a CEP offset to SeAH's Canadian sales for further explanation or reconsideration.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinion ordering remand to Commerce, and now recounts those facts relevant to the court's review of the Remand Results. See Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1380–82. On August 10, 2018, Commerce published its Amended Final Results. Amended Final Results, 83 Fed. Reg. at 39,682. Commerce

Consol. Court No. 18-00169                                                                              Page 4

determined that a PMS distorted the cost of production ("COP") of WLP and accounted for that distortion by upwardly adjusting SeAH and Hyundai Steel Company's ("Hyundai") reported costs of HRC—an input used to produce WLP—for purposes of determining the normal value of respondents' sales of WLP. See Final Decision Memo at 12–18. Commerce relied on the cumulative effect of Chinese steel overcapacity, Korean HRC subsidies, strategic alliances between Korean HRC producers, and government involvement in the Korean electricity market to justify its determination. See id. at 12–13.

When determining the normal value of Hyundai's U.S. sales of WLP, Commerce relied on home market prices, but applied the PMS adjustment to Hyundai's reported costs for purposes of determining whether sales were made below cost. See Final Decision Memo at 4, 14–15 & nn. 67–68; Remand Results at 1–2. When determining the normal value of SeAH's U.S. sales of WLP, Commerce did not use home market prices because it determined that SeAH had an insufficient volume of sales into the Korean market to permit a proper comparison with U.S. sales of the subject merchandise. See Welded Line Pipe from Korea, 83 Fed. Reg. 1,023 (Dep't Commerce Jan. 9, 2018) (prelim. results of [ADD] admin. review; 2015–2016) ("Prelim. Results") and accompanying Decisions Memo. for the [Prelim. Results] at 15, A-580-876, PD 259, bar code 3657712-01 (Jan. 2, 2018). Further, Commerce did not use SeAH's sales of WLP into the Canadian market because it determined that SeAH's sales into Canada were not representative—a determination predicated on

Consol. Court No. 18-00169 Page 5

the Canadian International Trade Tribunal's ("CITT")[1] finding that SeAH's sales were dumped. See Final Decision Memo at 45–47. Thus, Commerce used constructed value to calculate the normal value of SeAH's sales, as adjusted to account for the alleged PMS in Korea. See id.

In Husteel I, the court held that Commerce's upward adjustment to Hyundai's reported costs for purchases of the HRC input—for purposes of subjecting Hyundai's home market sales of WLP to the below-cost sales test when calculating normal value—is unlawful. See Husteel I, 44 CIT at __, __, 426 F. Supp. 3d at 1383–89, 1394. Further, the court held that Commerce's PMS determination was unsupported by substantial evidence because Commerce relied on the "cumulative effect" of four factors without substantiating its analysis regarding individual factors. See id., 44 CIT at __, 426 F. Supp. 3d at 1389–92. The court also held that Commerce failed to address why it was reasonable to rely solely on the CITT's findings that SeAH's sales were dumped to determine that SeAH's WLP sales into Canada were unrepresentative, despite being confronted with evidence of material differences between Canadian and U.S. antidumping laws. See id. Accordingly, the court did not reach Husteel's challenge to Commerce's calculation of the all-others rate, and

---

[1] The CITT reviews determinations made by the Canada Border Services Agency ("CBSA"). When referencing the dumping determination at issue, the parties referred interchangeably to both the CITT and the CBSA. Commerce placed on the record the CITT's findings. Because both references pertain to the same dumping determination at issue, this court will refer to the CITT's findings.

remanded Commerce's determination for further explanation or consideration consistent with the court's opinion. See id., 44 CIT at __, 426 F. Supp. 3d at 1395.

On remand, Commerce, under respectful protest,[2] reversed its determination that a PMS exists in Korea that distorts the COP of WLP, and calculated Hyundai and SeAH's dumping margin without upwardly adjusting the reported costs of HRC. See Remand Results at 1–2. Commerce relied on SeAH's third country sales to determine normal value, see id., and corrected a ministerial error when calculating SeAH's margin. See id. at 9–10. As a result, Commerce calculates weighted-average dumping margins of 4.70 percent for SeAH and 9.24 percent for Hyundai. See id. at 10. The all-others rate, which is no longer contested, is now 6.97 percent. Id. However, Commerce seeks a remand to address its failure to properly consider whether to apply a CEP offset to SeAH's sales of WLP into Canada. See Def.'s Resp. to Cmts. on [Remand Results] at 7–8, May 15, 2020, ECF No. 134 ("Def.'s Br.").

Defendant-intervenors California Steel Industries ("CSI") and Welspun Tubular LLC USA ("Welspun") dispute the court's holdings in Husteel I and concur with Commerce's decision to submit its Remand Results under protest. See Def.-Intervenors California Steel Industries & Welspun Tubular LLC USA's Cmts. on [Remand Results] at 1–5, May 1, 2020, ECF No. 130 ("CSI & Welspun's Br."). Defendant-Intervenors Maverick Tube Corporation ("Maverick") and IPSCO

---

[2] By adopting a position "under protest," Commerce preserves its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F. 3d 1371, 1376 (Fed. Cir. 2003).

Tubulars Inc. ("IPSCO Tubulars")[3] request the court remand Commerce's determination with instructions to recalculate SeAH's dumping margin using constructed value. See Def.-Intervenors Maverick Tube Corporation & IPSCO Tubulars Inc.'s Cmts. on [Remand Results] at 2–13, May 1, 2020, ECF No. 133 ("Maverick & IPSCO Tubulars' Br."). Maverick and IPSCO Tubulars alternatively request that the court sustain Commerce's ministerial correction. Maverick & IPSCO Tubulars' Br. at 12–13. CSI and Welspun endorse Maverick and IPSCO Tubulars comments on Commerce's Remand Results. See CSI & Welspun's Br. at 1.

SeAH requests the court remand Commerce's determination with instructions to apply a CEP offset when calculating SeAH's normal value. See [SeAH's] Cmts. on [Remand Results] at 1–5, May 1, 2020, ECF No. 131 ("SeAH's Br."). SeAH also requests the court disregard Maverick and IPSCO Tubulars' comments on the Remand Results as untimely motions for the court to alter or amend its original judgment. See [SeAH's] Reply to Cmts. on [Remand Results] at 1–4, May 18, 2020, ECF No. 135 ("SeAH's Reply Br."). Hyundai and NEXTEEL Co., Ltd. ("NEXTEEL") similarly contest CSI and Welspun's failure to address Commerce's compliance with the court's instructions and argue that defendant-intervenors' objections to the Remand Results, and this court's holding, are otherwise unpersuasive. See Consol.

---

[3] On February 7, 2020, defendant-intervenor IPSCO Tubulars Inc., formerly referred to as "TMK IPSCO", filed on the docket a letter apprising the court of its acquisition by Tenaris, S.A, corporate restructuring, and resultant change in name. See Letter Regarding Acquisition & Party Name, Feb. 7, 2020, ECF No. 119.

Pls. [Hyundai] & NEXTEEL's Reply to Cmts. on [Remand Results] 2–7, May 18, 2020, ECF No. 137 ("Consol. Pls.' Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516a(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii),[4] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an investigation of an [ADD] order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition. All further citations to 19 U.S.C. § 1677b(e) are to the 2015 version, as amended pursuant to the Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015) ("TPEA").

## DISCUSSION

**I.     Particular Market Situation**

CSI and Welspun object to Commerce's decision to reverse its PMS finding. See CSI & Welspun's Br. at 1–5. Defendant, Hyundai, and NEXTEEL counter that Commerce's remand redetermination complies with the court's remand order, and that defendant-intervenors fail to produce any evidence demonstrating otherwise. See Def.'s Br. at 5–6; Consol. Pls.' Br. at 2–7. For the reasons that follow, Commerce's reversal of its PMS determination is sustained.

When reviewing an ADD order, Commerce determines antidumping duties owed on subject imports by calculating the amount by which the normal value of the merchandise exceeds its export price (or constructed export price). See 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C); see also id. at § 1677(35). Commerce normally relies on sales of the subject merchandise in the home market, or sales in a third country comparator market, to determine normal value. See id. at § 1677b(a)(1)(B)(ii)(III), (C)(iii). However, if Commerce determines that a PMS exists, the agency may determine normal value using the constructed value methodology. See id.

To establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price. See id. at § 1677b(a)(1)(B)(ii)(III), (C)(iii) (stating that home market or third market prices that Commerce determines are affected by a PMS which prevents a proper

comparison with export price or constructed price cannot be used to calculate normal value). Commerce's determinations must be supported by substantial evidence. The evidence must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence. See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994).

On remand, Commerce reverses its determination that a PMS exists in Korea that distorts the COP of WLP. See Remand Results at 5, 7–8. Commerce does so under respectful protest. Id. at 7–8. Although Commerce and the domestic parties disagree with the court's holding in Husteel I,[5] they do not provide any additional

---

[5] CSI and Welspun maintain that Commerce is authorized to make a PMS adjustment to the reported costs of WLP for purposes of administering the below-cost sales test. See CSI & Welspun's Br. at 2 & n.2. Furthermore, CSI and Welspun argue that Commerce's PMS finding was "amply supported by substantial evidence." See id. at 2–5. Regarding Commerce's PMS finding, CSI and Welspun take particular issue with the court's suggestion that Commerce explain why Chinese steel overcapacity prevents a proper comparison between home market prices and export prices, quoting the following from Husteel I:

> Chinese overcapacity may affect the COP by lowering the price of HRC, however, it is unclear how that finding alone would support the determination that the home market price and export price (or constructed export price) cannot be compared because Commerce does not address whether costs would be lowered on both sides of the less than fair value equation

Id. at 4 (quoting Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1391–92). CSI and Welspun argue that the statute is "only concerned with whether normal values are in the ordinary course of trade" and that "the concept of ordinary course of trade and PMS do not apply to the calculation of export price." Id. 4 (citing 19 U.S.C.

(footnote continued)

evidence or analysis demonstrating why the cumulative effect of Chinese steel overcapacity, Korean HRC subsidies, strategic alliances between HRC producers, and government control over electricity price distort the market such that Commerce is unable to render a proper comparison between normal value and export price (or constructed export price) for WLP. See id. at 8; see also CSI & Welspun's Br. at 1–5. Commerce's determination to reverse its PMS finding is reasonable and complies with the court's order in Husteel I.

## II. SeAH's Third Country Sales

Maverick and IPSCO Tubulars challenge Commerce's determination to calculate normal value for SeAH's sales of WLP based on its sales into the Canadian market. See Maverick & IPSCO Tubulars' Br. at 3–12.[6] Defendant counters that

---

§§ 1677(15), 1677a, 1677b). In Husteel I, the court explained that Commerce failed to substantiate its analysis regarding the individual factors it cites as support for its determination that a PMS in Korea distorts the costs of producing WLP. See Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1389–92 & nn. 18–19. The court observed that, even if the agency's findings of various market distortions were supported, Commerce failed to explain how the distortions prevent a proper comparison between normal value and export prices (or constructed export prices). See id. For instance, the court noted that it was not clear how Chinese steel overcapacity "specifically" or "particularly" affected the Korean market. See e.g., Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1391 (noting Defendant's concession that Chinese steel overcapacity is not a phenomenon specific to the Korean market). Thus, Husteel I does not suggest that the concepts of "PMS" and "ordinary course of trade" extend to calculation of the export price (or constructed export price), but rather illustrates the evidentiary and analytical shortcomings of Commerce's PMS determination.

[6] SeAH requests that the court treat Maverick and IPSCO Tubulars' comments as a Rule 59(e) motion for the court to alter or amend its judgment in Husteel I and to

(footnote continued)

Maverick and IPSCO Tubulars fail to demonstrate that Commerce's determination is inconsistent with the court's remand order. See Def.'s Br. at 6–7; see also Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1392–94. For the following reasons, Commerce's determination to calculate normal value for SeAH's sales based on its sales into the Canadian market is sustained.

Where Commerce finds that home market sales are an inappropriate basis for determining normal value, it may resort to third country sales. See 19 U.S.C. § 1677b(a)(1). Commerce may only rely on third country sales where the "prices [for those sales] are representative," where the aggregate quantity of sales are at a sufficient level, and where Commerce does not determine that a PMS prevents a proper comparison between the export price (or constructed export price) and the third country price. See 19 U.S.C. § 1677b(a)(1)(B)(ii). The statute does not define what it means for prices to be representative, but Commerce's regulations and regulatory history reveal that where the aggregate quantity of third country sales are at a sufficient level, those sales are presumptively representative unless proven

---

reject these submissions as untimely filed. See SeAH's Reply Br. at 2–4; see also USCIT R. 59(e). Without ruling on the timeliness and procedural propriety of Maverick and IPSCO Tubulars' comments on Commerce's Remand Results, the court declines to consider the parties' challenges to the court's holding in Husteel I. Under USCIT R. 54(b), the court retains the general power to reconsider non-final orders. See, e.g., Union Steel v. United States, 35 CIT 1647, 1659, 804 F. Supp. 2d 1356, 1367 (2011). The court revisits non-final determinations as justice requires, meaning when necessary under the relevant circumstances. See Irwin Indus. Tool Co. v. United States, 41 CIT __, __, 269 F. Supp. 3d 1294, 1300–01 (2017). Maverick and IPSCO Tubulars, however, fail to provide any reason or controlling precedent that would warrant reconsideration of the court's holding in Husteel I.

otherwise. See 19 C.F.R. § 351.404(b)–(c) (2017)[7] (providing that Commerce shall consider a third country market viable if the aggregate quantity of sales are at a sufficient level, but setting forth an exception where it is established, to the satisfaction of the agency, that, inter alia, the prices are not representative); Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,357 (Dep't Commerce May 19, 1997);[8] see also Alloy Piping Prods v. United States, 26 CIT 330, 339–340, 201 F. Supp. 2d 1267, 1276–77 & n.7 (2002) (citations omitted); see also, e.g., Husteel Co. v. United States, 32 CIT 610, 616–620, 558 F. Supp. 2d 1357, 1363–66 (2008) (instructing Commerce to find respondents' sales representative if the agency cannot present persuasive evidence demonstrating otherwise). The agency's determination that sales into a third country comparator market are not

---

[7] Further citations to Title 19 of the Code of Federal Regulations are to the 2017 edition.

[8] The regulatory history to 19 C.F.R. § 351.404 provides, in pertinent part, that:

> In the Department's view, the criteria of a "particular market situation" and the "representativeness" of prices fall into the category of issues that the Department need not, and should not, routinely consider . . . the [Statement of Administrative Action] at 821 recognizes that the Department must inform exporters at an early stage of a proceeding as to which sales they must report. This objective would be frustrated if the Department routinely analyzed the existence of a "particular market situation" or the "representativeness" of third country sales . . . the party alleging . . . that sales are not "representative" has the burden of demonstrating that there is a reasonable basis for believing that a "particular market situation" exists or that sales are not "representative."

Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,357; see also Statement of Administrative Action, H.R. DOC. NO. 103-826, vol. 1, at 821 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162 ("SAA").

representative must be supported by substantial evidence. See e.g., Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ("CS Wind Vietnam Co.") (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)).

Commerce now finds, under protest, that SeAH's sales into Canada are representative. See Remand Results at 4, 7. Apart from the CITT's findings that SeAH's sales into Canada are dumped, neither Commerce, nor the interested parties, point to any record evidence or explanation as to why Commerce's previous determination that SeAH's third country sales are not representative was reasonable in light of inconsistencies between U.S. and Canadian antidumping law. See id. Commerce complains that it lacks sufficient evidence to "perform the compulsory analysis" necessary to determine "whether SeAH's comparison market sales to Canada would be found to have been dumped under U.S. law." Remand Results at 4. Commerce does not explain why it would not suffice for the agency to explain why the inconsistencies between U.S. and Canadian antidumping law should not disturb its

previous finding that SeAH's sales were not representative.[9]  As such, Commerce's determination that SeAH's sales are representative is reasonable.[10]

### III. CEP Offset

SeAH argues that Commerce contravenes agency regulation by declining to apply a CEP offset when calculating its normal value because the level of SeAH's U.S. sales is less advanced than the actual level of SeAH's third country sales into Canada. See SeAH's Br. at 1–5; see also 19 C.F.R. § 352.412.  Maverick and IPSCO Tubulars

---

[9] Maverick and IPSCO Tubulars submit that Commerce did account for inconsistencies between U.S. and Canadian antidumping law in its Final Results. See Maverick & IPSCO Tubulars' Br. at 9.  As their only support, Maverick and IPSCO Tubulars quote the same statement from Commerce that the court rejected in Husteel I: "[t]he fact that Commerce's methodology may differ from that of the CBSA does not negate Canada's finding of dumping."  Maverick & IPSCO Tubulars' Br. at 9 (quoting Final Decision Memo at 46); but see Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1393 ("This response does not engage the apparent flaw in the evidence upon which Commerce is relying to find that SeAH's sales into the Canadian market were not representative.").  Again, Commerce's conclusory response did not address detracting evidence because it did not explain why the differences between antidumping laws did not disturb its determination that SeAH's sales were unrepresentative.  See CS Wind Vietnam Co., 832 F.3d at 1373.  Commerce's reversal of its finding that SeAH's sales into Canada are not representative is reasonable.

[10] Commerce, Maverick, and IPSCO Tubulars disagree with the court's holding in Husteel I, arguing that it requires Commerce to disregard a formal finding of dumping.  See Remand Results at 4, 7; see also Maverick & IPSCO Tubulars' Br. at 6–7.  This argument misconstrues the holding in Husteel I.  In Husteel I, Commerce determined that SeAH's sales of WLP into Canada were unrepresentative because of the CITT's formal finding that those sales were dumped.  See Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1392–94.  The court held that it was unreasonable for Commerce to rely solely on the CITT's findings when confronted with record evidence that those findings are materially inconsistent with U.S. antidumping law.  See id.  The court remanded the issue to Commerce to reconcile its analysis with record evidence of material inconsistences between U.S. and Canadian antidumping law alleged by SeAH.  See Remand Results at 4; but see Husteel I, 44 CIT at __, 426 F. Supp. 3d at 1392–94, 95.

argue that Commerce's determination not to grant a CEP offset is supported by substantial evidence. See Maverick & IPSCO Tubulars' Reply to Cmts. on [Remand Results] at 4–8, May 18, 2020, ECF No. 136 ("Maverick & IPSCO Tubulars' Reply Br."). Defendant conveys Commerce's concession that the agency failed to properly consider whether a CEP offset is warranted and requests a remand on this issue. See Def.'s Br. at 7–9. For the following reasons, Commerce's determination is remanded for further explanation or reconsideration.

On remand, Commerce declines to grant a CEP offset to SeAH after finding that SeAH's sales into Canada were made at the same level of trade as its sales into the United States, see Remand Results at 9, but SeAH submits that Commerce fails to properly consider the selling activities of SeAH's U.S. affiliate Pusan Pipe Americas, Inc. ("PPA"). See SeAH's Br. at 1–5. Defendant states that "Commerce agrees with SeAH that the agency should have considered PPA's selling functions in determining the third country level of trade." Def.'s Br. at 7–9.

The court has discretion to grant a request from Commerce for remand where the agency expresses doubts about the correctness of its decision. See SKF USA, Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (citations omitted). The court will usually grant such requests where Commerce's concern is substantial and legitimate, see id., but may refuse remand where the request appears to be frivolous or in bad faith. See, e.g., Corus Staal BV v. United States, 29 CIT 777, 781–83, 387 F.Supp.2d 1291, 1296–97 (2005) ("The Government must give due regard to finality

and cannot simply ask for a do-over any time it wishes."); Corus Staal BV v. U.S. Dep't of Commerce, 27 CIT 388, 391–95, 259 F. Supp. 2d 1253, 1257–60 (2003) (noting that unsupported and vague requests are insufficient to meet the bar for a remand).

Commerce's request for a remand to consider whether to apply a CEP offset to SeAH's Canadian sales raises substantial and legitimate concerns, and remand on this issue is appropriate, because the agency acknowledges it failed to revisit its preliminary determination that SeAH's sales into Canada were made at the same level as its U.S. sales. Def.'s Br. at 7–8 (citations omitted). Commerce makes a specific request to address a clearly identified lapse in its analysis on remand, and does not appear to do so frivolously or in bad faith. See id. Accordingly, Commerce's request for remand to address the question of whether to apply the CEP offset to SeAH's Canadian sales is granted, and SeAH's request for the court to instruct Commerce to grant the CEP offset is denied.[11]

## CONCLUSION

For the forgoing reasons, it is

---

[11] Maverick and IPSCO Tubulars request the court sustain Commerce's correction to its ministerial error of converting sales and expense data to U.S. dollars that were already reported as U.S. dollars when calculating SeAH's dumping margin. See Maverick & IPSCO Tubulars' Br. at 12–13; see also Remand Results at 9–10. Because the court is remanding Commerce's determination not to apply a CEP offset when calculating SeAH's dumping margin for further explanation or reconsideration, which may result in different calculations and a different rate, the court does not reach the issue.

**ORDERED** that Commerce's reversal of its particular market situation determination is sustained; and it is further

**ORDERED** that Commerce's determination to calculate SeAH's normal value using third country sales into Canada is sustained; and it is further

**ORDERED** that Commerce's determination not to apply a CEP offset to SeAH's Canadian sales is remanded for further consideration and/or explanation consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 15 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.

      /s/ Claire R. Kelly  
      Claire R. Kelly, Judge

Dated:     July 23, 2020  
             New York, New York