Slip Op. 21-1

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HUSTEEL CO., LTD. ET AL.,**<br><br>    **Plaintiff and Consolidated Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>and<br><br>**CALIFORNIA STEEL INDUSTRIES ET AL.,**<br><br>    **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | **Before: Claire R. Kelly, Judge**<br><br>**Consol. Court No. 18-00169** |

## OPINION AND ORDER

[Sustaining the U.S. Department of Commerce's final results in the second remand redetermination in the 2015–2016 administrative review of the antidumping duty order on welded line pipe from the Republic of Korea.]

Dated: January 4, 2021

Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Edward John Thomas , III, Jordan L. Fleischer, Sabahat Chaudhary, and Eugene Degnan, Morris, Manning & Martin LLP, of Washington, DC, for plaintiff Husteel Co., Ltd.

J. David Park, Henry D. Almond, Daniel R. Wilson, and Kang W. Lee, Arnold & Porter Kaye Scholer LLP, of Washington, DC, for consolidated plaintiffs Hyundai Steel Company and NEXTEEL Co., Ltd.

Jeffrey M. Winton and Amrietha Nellan, Law Office of Winton & Chapman PLLC, of Washington, DC, for consolidated plaintiff SeAH Steel Corporation.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  Also on the brief were Jeffrey Bossert Clark, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Reza Karamloo, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Roger B. Schagrin, Christopher Todd Cloutier, and John Winthrop Bohn, Schagrin Associates, of Washington, DC, for defendant-intervenors California Steel Industries and Welspun Tubular LLC USA.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, Luca Bertazzo, and Matthew Wolf Solomon, White & Case LLP, of Washington, DC, for defendant-intervenors Maverick Tube Corporation and IPSCO Tubulars Inc.

Kelly, Judge:   Before the court is the U.S. Department of Commerce's ("Commerce") second remand determination in the 2015–2016 administrative review of the antidumping duty ("ADD") order on welded line pipe ("WLP") from the Republic of Korea ("Korea"), filed pursuant to the court's remand order in Husteel  Co. v. United States, 44 CIT __, __, 463 F. Supp. 3d 1334, 1344 (2020) ("Husteel II").  See Final Results of Redetermination Pursuant to Second Ct. Remand [in Husteel II], Sept. 16, 2020, ECF No. 141 ("Second Remand Results"); see also [WLP] from [Korea], 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of [ADD] admin. review; 2015–2016) ("Final Results") as amended by [WLP] from [Korea], 83 Fed. Reg. 39,682 (Dep't Commerce Aug. 10, 2018) (amended final results of [ADD] admin. review; 2015–2016) ("Amended Final Results") and accompanying Issues and Decisions Memo. for the Final Results of the 2015–2016 Admin. Review of the [ADD]

Order on Welded Line Pipe from Korea, A-580-876, (July 11, 2018), ECF No. 25-5 ("Final Decision Memo").  For the following reasons, the court sustains Commerce's second remand redetermination.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinions ordering remand to Commerce, and now recounts those facts relevant to the court's review of the Second Remand Results.  See Husteel II, 44 CIT at __, 463 F. Supp. 3d at 1337–39; see also Husteel  Co. v. United States, 44 CIT __, __, __, 426 F. Supp. 3d 1376, 1380–82 (2020) ("Husteel I").  On August 10, 2018, Commerce published its amended final determination in its 2015–2016 administrative review of the ADD order covering WLP from Korea.  See generally Amended Final Results.  Commerce calculated weighted average dumping margins of 18.77 percent for Hyundai Steel Company/Hyundai HYSCO ("Hyundai"), and 14.39 percent for SeAH Steel Corporation ("SeAH").  See id., 83 Fed. Reg. at 39,682.  Pursuant to U.S. Court of International Trade Rule 56.2, SeAH, Hyundai, NEXTEEL Co., Ltd. ("NEXTEEL"), and Husteel Co., Ltd. ("Husteel") brought this consolidated action on several motions for judgment on the agency record, challenging various aspects of Commerce's final determination.  See Pl. [SeAH]'s Mot. J. Agency R., Feb. 1, 2019, ECF No. 37; Consol. Pl. [Hyundai]'s 56.2 Mot. J. Agency R., Feb. 1, 2019, ECF No. 39; Consol. Pl. [NEXTEEL]'s 56.2 Mot. J. Agency R., Feb. 1, 2019, ECF No. 41; Pl. [Husteel]'s Mot. J. Agency R., Feb. 1, 2019, ECF No. 42.

In Husteel I, the court remanded Commerce's final determination for further explanation or reconsideration. See 44 CIT at __, 426 F. Supp. 3d at 1395. The court held that Commerce's upward adjustment to the reported costs of hot rolled coil ("HRC")—an input used to produce WLP—to account for a particular market situation ("PMS") in Korea when subjecting Hyundai's home market sales of WLP to the below-cost sales test was unsupported by substantial evidence and contrary to law. See id., 44 CIT at __, 426 F. Supp. 3d at 1383–92, 1394–95. The court also remanded Commerce's finding that SeAH's third country sales into Canada were unrepresentative, and its resultant decision to use constructed value to determine the normal value of SeAH's sales, for further explanation or reconsideration. See id., 44 CIT at __, 426 F. Supp. 3d at 1392–95.

In Husteel II, the court sustained Commerce's decision, under respectful protest,[1] to reverse its PMS finding and to calculate SeAH and Hyundai's dumping margin without applying an upward adjustment to the reported costs of HRC. See Husteel II, 44 CIT at __, 463 F. Supp. 3d at 1339–41; see also Final Results of Redetermination Pursuant to Ct. Remand [in Husteel I] at 1–2, Apr. 1, 2020, ECF No. 124. The court also sustained Commerce's decision to calculate SeAH's normal value using its third country sales into Canada. See Husteel II, 44 CIT at __, 463 F. Supp. 3d at 1341–42. However, as requested by Commerce, the court remanded

---

[1] By adopting a position "under protest," Commerce preserves its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F. 3d 1371, 1376 (Fed. Cir. 2003).

Consol. Court No. 18-00169                                                                     Page 5

Commerce's refusal to grant to SeAH a constructed export price offset when calculating SeAH's normal value. See id., 44 CIT at __, 463 F. Supp. 3d at 1343–44.

For its second remand, upon reconsideration of the record evidence and the court's remand order, Commerce determined that a constructed export price offset for SeAH is warranted. Second Remand Results at 2–6. SeAH did not object to Commerce's redetermination, and no other party commented on the draft results. Id. at 5. Commerce indicated its intent to issue a Timken notice with the amended final results should the court sustain its second remand redetermination.[2] Id. at 6. On November 2, 2020, Defendant filed comments on the Second Remand Results with the court, notifying that no party filed comments challenging Commerce's redetermination, and requesting that the court sustain Commerce's Second Remand Results and enter judgment for the United States. See Def.'s Cmts. Regarding Commerce's [Second Remand Results], Nov. 2, 2020, ECF No. 143.

---

[2]  The Timken Notice stems from Timken Co. v. United States, 893 F.2d 337 (Fed. Cir. 1990) ("Timken Co."), as clarified by Diamond Sawblades Mfrs. Coalition v. United States, 626 F.3d 1374 (Fed. Cir. 2010), where the Court of Appeals for the Federal Circuit clarified the requirements of 19 U.S.C. § 1516a(c)(1). Commerce must notify the public when a court's final judgment in a case is "not in harmony" with an original agency determination, and Commerce will suspend liquidations to ensure that post-notice entries are liquidated at a rate consistent with a conclusive court decision. Timken Co., 893 F.2d at 341.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516a(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[3] and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an [ADD] order.  The court will uphold Commerce's remand redetermination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'"  Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Commerce, to the extent practicable, calculates normal value based on prices for sales in the comparison market that are made at the same level of trade ("LOT") as the export price (or constructed export price).  19 U.S.C. § 1677b(a)(1)(B)(i).  "Sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)."  19 C.F.R. § 351.412(c)(2) (2017).[4]  When identifying the LOT

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[4] Further citations to Title 19 of the Code of Federal Regulations are to the 2017 edition.

for comparison market sales (here, third country sales) and export price sales, see 19 U.S.C. § 1677a(a), Commerce looks at what selling activities relate to the starting price before any statutory adjustments to the starting price are made.  See 19 C.F.R. § 351.412(c)(i), (iii).  However, when identifying the LOT for constructed export price sales, see 19 U.S.C. § 1677a(b), Commerce looks "only [at] the selling activities reflected in the price after the deduction of expenses and profit under [19 U.S.C. § 1677a(d)(2)]."  See [WLP] from [Korea], 83 Fed. Reg. 1,023 (Dep't Commerce Jan. 9, 2018) (prelim. results of [ADD] admin. review; 2015–2016) ("Prelim. Results") and accompanying Decisions Memo. for the [Prelim. Results] at 17, A-580-876, PD 259, bar code 3657712-01 (Jan. 2, 2018) ("Prelim. Decision Memo") (citing Micron Tech., Inc. v. United States, 243 F.3d 1301, 1314–16 (Fed. Cir. 2001) ("Micron")); see also 19 C.F.R. § 351.412(c)(ii).

Under 19 U.S.C. § 1677b(a)(7)(A), if it is unable to match foreign market sales with export price (or constructed export price) sales at the same LOT, Commerce will make a LOT adjustment.  See Prelim. Decision Memo at 17.  Where Commerce uses constructed export price sales, if the normal value of those sales is established at a LOT which constitutes a more advanced stage of distribution than the constructed export price, and if it lacks the necessary data to determine a LOT adjustment, Commerce will grant a constructed export price offset.  See 19 U.S.C. § 1677b(a)(7)(B); Prelim. Decision Memo at 17.  When granting a constructed export price offset, Commerce shall reduce the normal value "by the amount of indirect selling expenses

incurred in the country in which normal value is determined on sales of the foreign

like product but not more than the amount of such expenses for which a deduction is

made under [19 U.S.C. § 1677a(d)(1)(D)]."  19 U.S.C. § 1677b(a)(7)(B).

Commerce explains that it failed to include in its discussion of the LOT for the

third country sales (here, Canada) the selling functions performed by SeAH's U.S.

affiliates, Pusan Pipe America ("PPA") and State Pipe and Supply, Inc. ("State Pipe"),

in addition to those performed by SeAH.  Second Remand Results at 3; see also

Prelim. Decision Memo at 19–20.  Commerce thus revises its analysis as follows.

Second Remand Results at 3–5.

Commerce determines the LOT for Canadian sales and U.S. sales in order to

assess whether a LOT adjustment or constructed export price offset is warranted.  In

the Canadian market, Commerce determines the LOT by identifying the channels of

distribution for SeAH's sales, and then ascertaining what selling functions and

activities relate to the starting price, i.e., the price charged by SeAH and its affiliates

to the unaffiliated customer.  See Second Remand Results at 3–4.  Commerce observes

that SeAH made sales through two channels of distribution: (1) "back-to-back sales

through PPA to unaffiliated Canadian customers"; and (2) "sales to unaffiliated

Canadian customers from State Pipe's Canadian warehouse of merchandise

purchased from PPA."  Id. at 3.  With the exception of warehouse operations,

Commerce finds that SeAH performed the same selling functions and activities in

both channels,  see id. at 3–4, and sorts SeAH's selling functions and activities in both

channels into four categories: sales and marketing; freight and delivery; inventory maintenance and warehousing; and warranty and technical support. Id. With respect to each category, Commerce finds that SeAH performed functions at the same level of intensity, and thus determines all of SeAH's Canadian market sales constitute one LOT. Id. at 4.

In the U.S. market, Commerce finds that SeAH made sales through three channels of distribution: (1) "back-to-back sales through its U.S. affiliate PPA to unaffiliated U.S. customers"; (2) "sales to unaffiliated U.S. customers from State Pipe's U.S. warehouse of merchandise purchased from PPA"; and (3) "sales of further manufactured merchandise from PPA's inventory." Id. Commerce examines SeAH's selling activities in each channel; however, in accordance with 19 C.F.R. § 351.412(c)(ii), Commerce excludes from its consideration those selling activities listed in 19 U.S.C. § 1677a(d),[5] i.e., those performed by PPA and State Pipe in the

---

[5] 19 U.S.C. § 1677a(d). Additional adjustments to constructed export price. For purposes of this section, the price used to establish constructed export price shall also be reduced by—

    (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

        (A) commissions for selling the subject merchandise in the United States;

        (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

        (C) any selling expenses that the seller pays on behalf of the purchaser; and

(footnote continued)

Consol. Court No. 18-00169                                         Page 10

United States.  Compare Second Remand Results at 4–5 with Prelim. Decision Memo at 19–20; see also Micron, 243 F.3d at 1314–16.  Commerce finds SeAH performed "sales and marketing, freight and delivery services, and inventory maintenance and warehousing for each of its three reported U.S. channels" at the same level of intensity, and, as a result, determines that all of SeAH's constructed export sales constitute one LOT.  Second Remand Results at 4–5.

After excluding the selling activities of State Pipe and PPA in the U.S. market, when comparing the LOT of SeAH's constructed export price sales to the LOT of its Canadian sales, Commerce finds there are "significant differences between the selling functions performed for U.S. and Canadian customers."  See id. at 5.  Namely, Commerce finds that SeAH performed many selling functions in the Canadian market that it did not perform in the U.S. market.  Id.  As a result, Commerce determines that the LOT of SeAH's Canadian sales is at a more advanced stage of distribution than the LOT of SeAH's constructed export price sales.  Id.  Noting that "no LOT adjustment is possible," Commerce grants a constructed export price offset

---

(D) any selling expenses not deducted under subparagraph (A), (B), or (C);
(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and
(3) the profit allocated to the expenses described in paragraphs (1) and (2).

Consol. Court No. 18-00169                                      Page 11

pursuant to 19 U.S.C. § 1677b(a)(7)(B) and 19 C.F.R. § 351.412(f).[6] Id. Commerce

calculates an estimated weighted-average dumping margin of 4.23 percent for SeAH

and 9.24 percent for Hyundai, and calculates a review-specific rate applicable to non-

selected respondents of 6.74 percent. Id. at 6.

Commerce's redetermination in its Second Remand Results is supported by

substantial evidence and in accordance with law. Commerce reasonably accounts for

the selling activities of State Pipe and PPA in calculating SeAH's dumping margin,

and none of the parties contest Commerce's determination. As such, Commerce's

decision to grant SeAH a constructed export price offset is sustained.

### CONCLUSION

For the foregoing reasons, Commerce's second remand redetermination is

supported by substantial evidence and in accordance with law and is therefore

sustained. Judgment will enter accordingly.

        /s/ Claire R. Kelly
        Claire R. Kelly, Judge

Dated:  January 4, 2021
     New York, New York

---

[6] 19 C.F.R. § 351.412(f)(2). Amount of the offset. The amount of the constructed export price offset will be the amount of indirect selling expenses included in normal value, up to the amount of indirect selling expenses deducted in determining constructed export price. In making the constructed export price offset, "indirect selling expenses" means selling expenses, other than direct selling expenses or assumed selling expenses (see § 351.410), that the seller would incur regardless of whether particular sales were made, but that reasonably may be attributed, in whole or in part, to such sales.